**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-3258-CMA

SAVE THE COLORADO, a Colorado nonprofit corporation;
THE ENVIRONMENTAL GROUP, a Colorado nonprofit corporation;
WILDEARTH GUARDIANS, a nonprofit corporation;
LIVING RIVERS, a nonprofit corporation;
WATERKEEPER ALLIANCE, INC., a nonprofit corporation; and
SIERRA CLUB, a nonprofit corporation.

       Petitioners,

  v.

LIEUTENANT GENERAL SCOTT SPELLMON, in his official capacity as the Chief of the U.S. Army Corps of Engineers; DEB HAALAND, in her official capacity as Secretary of the Interior; and MARTHA WILLIAMS, in her official capacity as Director of the U.S. Fish and Wildlife Service.

       Respondents.

---

**PETITIONERS' OPENING MERITS BRIEF**

***Oral Argument Requested***

---

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................iii

GLOSSARY ...................................................................................................................viii

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................ 3

    I.    STATUTORY AND REGULATORY FRAMEWORK ........................................... 3

        A.   Clean Water Act................................................................................... 3

        B.   National Environmental Policy Act .................................................... 5

        C.   Endangered Species Act ................................................................... 7

        D.   Administrative Procedure Act........................................................... 10

    II.   FACTUAL BACKGROUND ............................................................................ 11

        A.   The Corps' 2003 Scoping Notice .................................................... 11

        B.   The Corps' "Independent" Review of Denver Water's Needs ......................... 13

        C.   The Corps' 2009 Draft EIS ............................................................. 15

        D.   Draft EIS Comments ....................................................................... 18

        E.   The Corps' 2014 Final EIS .............................................................. 21

        F.   Final EIS Comments ....................................................................... 23

        G.   The Corps' 2017 Record of Decision and Section 404 Permit ........................ 25

        H.   The Project's ESA Process ............................................................. 26

ARGUMENT ................................................................................................. 28

I.    PETITIONERS HAVE STANDING ................................................... 28

II.   THE CORPS' ROD, FINAL EIS, AND SECTION 404 PERMIT VIOLATE LAW . 29

   A.   The Project's Purpose and Need Statement Cannot Pass Muster Under
   Either NEPA or the CWA ........................................................................ 30

      1.   The Corps' Unduly Restrictive Purpose and Need Statement Violates NEPA
      and Its Regulations ............................................................................ 30

      2.   The Corps' Unduly Restrictive Purpose Violates the CWA .......................... 33

   B.   The Corps Failed to Satisfy Its Duty Under Both NEPA and the CWA to
   Independently Validate the Project's Purported Purpose and Need ...................... 38

      1.   The Corps Failed to Independently Validate Denver Water's Demand
      Projection ........................................................................................ 38

      2.   The Corps Failed to Independently Validate that the Location Restriction
      Would Meaningfully Address System Imbalance ................................................. 43

   C.   The Corps' Alternatives Analysis Violates the CWA and NEPA ...................... 45

      1.   The Corps Violated the CWA by Excluding Alternatives as Impracticable
      Without Proving Their Impracticability ................................................. 45

      2.   The Corps Violated NEPA by Analyzing Five Virtually Indistinguishable
      Action Alternatives ............................................................................ 49

   D.   The Corps' LEDPA Determination Violates the CWA and NEPA .................... 50

III.  FWS'S ACTIONS VIOLATE THE ESA AND THE APA .................................. 54

CONCLUSION ............................................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alameda Water & Sanitation Dist. v. Reilly*,
   930 F. Supp. 486 (D. Colo. 1996) ............................................................... 37

*Alaska Survival v. Surface Transp. Bd.*,
   705 F.3d 1073 (9th Cir. 2013) .................................................................... 33

*All. to Save the Mattaponi v. U.S. Army Corps of Eng'rs*,
   606 F. Supp. 2d 121 (D.D.C. 2009) ........................................................... 42

*Am. Wild Horse Pres. Campaign v. Vilsack*,
   873 F.3d 914 (D.C. Cir. 2017).................................................................... 56

*Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
   123 F. 3d. 1142 (9th Cir. 1997) ................................................................. 30

*Cent. Or. Landwatch v. Connaughton*,
   905 F. Supp. 2d 1192 (D. Or. 2012).......................................................... 42

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)................................................................................... 11

*Colo. Env'tl Coal. v. Dombeck*,
   185 F.3d 1162 (10th Cir.1999).......................................................... 30, 33, 50

*Colo. Wild v. U.S. Forest Serv.*,
   435 F.3d 1204 (10th Cir. 2006) ................................................................. 11

*Crow Indian Tribe v. United States*,
   343 F. Supp. 3d 999 (D. Mont. 2018)........................................................ 56

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
   72 F.4th 1166 (10th Cir. 2023) ............................................................. 52, 54

*Davis v. Mineta*,
   302 F.3d 1104 (10th Cir. 2002) ............................................................ 30, 32

*Dillmon v. Nat'l Transp. Safety Bd.*,
   588 F.3d 1085 (D.C. Cir. 2009).................................................................. 59

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016)................................................................................... 59

*Friends of the Earth, Inc. v. Laidlaw Env'tl Serv., Inc.*,
   528 U.S. 167 (2000) ................................................................................. 28

*Friends of Yosemite Valley v. Kempthorne*,
   520 F.3d 1024 (9th Cir. 2008) ................................................................. 50

*Greater Yellowstone Coal. v. Flowers*,
   359 F.3d 1257 (10th Cir. 2004) ............................................................... 45

*High Country Conservation Advocs. v. U.S. Forest Serv.*,
   52 F. Supp. 3d 1174 (D. Colo. 2014) ...................................................... 54

*Humane Soc'y v. Zinke*,
   865 F.3d 585 (D.C. Cir. 2017) ................................................................. 55

*Initiative & Reform Inst. v. Walker*,
   450 F.3d 1082 (10th Cir. 2006) ............................................................... 29

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ................................................................................. 60

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................ 11, 57

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
   177 F.3d 800 (9th Cir. 1999) ................................................................... 50

*N.Y. Pub. Interest Res. Grp. v. Williams*,
   511 N.Y.S.2d 864 (1987) ......................................................................... 40

*Nat'l Wildlife Fed'n v. Whistler*,
   27 F.3d 1341 (8th Cir. 1994) ................................................................... 35

*New England Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*,
   727 F.2d 1127 (D.C. Cir. 1984) ............................................................... 58

*Olenhouse v. Comm. Credit Corp.*,
   42 F.3d 1560 (10th Cir. 1994) ................................................................. 11

*Or.-Cal. Trails Ass'n v. Walsh*,
   467 F. Supp. 3d 1007 (D. Colo. 2020) .................................................... 60

*Rocky Mountain Wild v. Dallas*,
   No. 19-cv-01512, 2022 WL 11733139 (D. Colo. Oct. 20, 2022) .............. 60

*Save The Colorado v. Spellmon*,
   50 F.4th 954 (10th Cir. 2022) ................................................................. 29

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021)..................................................................... 42

*Sierra Club v. EPA*,
    671 F.3d 955 (9th Cir. 2012)..................................................................... 42

*Sierra Club v. Salazar*,
    177 F. Supp. 3d 512 (D.D.C. 2016) ......................................................... 58

*Sierra Club v. Sigler*,
    695 F.2d 957 (5th Cir. 1983)................................................................ 40, 48

*Sierra Club v. Van Antwerp*,
    709 F. Supp. 2d 1254 (S.D. Fla. 2009), *aff'd*, 362 F. App'x 100 (11th
    Cir. 2010) ............................................................................................. 35, 45

*Simmons v. U.S. Army Corps of Eng'rs*,
    120 F.3d 664 (7th Cir. 1997)........................................................ 32, 33, 35

*Sylvester v. U.S. Army Corps of Eng'rs*,
    882 F.2d 407 (9th Cir. 1989)..................................................................... 38

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978)............................................................................... 7, 8

*Utah Env'tl Cong. v. Richmond*,
    483 F.3d 1127 (10th Cir. 2007)................................................................ 11

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
    305 F.3d 1152 (10th Cir. 2002)........................................................... 29, 45

*W. Watersheds Project v. Abbey*,
    719 F.3d 1035 (9th Cir. 2013)................................................................... 50

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
    870 F.3d 1222 (10th Cir. 2017)................................................................ 54

**Statutes**

5 U.S.C. § 706.................................................................................................. 2, 10

16 U.S.C. § 1531................................................................................................... 7

16 U.S.C. § 1532.............................................................................................. 8, 55

16 U.S.C. § 1533.................................................................................. 8, 55, 56, 59

16 U.S.C. § 1536.................................................................................................. 10

16 U.S.C. § 1538 ................................................................................................ 10

33 U.S.C. § 1251 .................................................................................................. 3

33 U.S.C. § 1311 .................................................................................................. 3

33 U.S.C. § 1344 .............................................................................................. 2, 3

42 U.S.C. § 4321 .................................................................................................. 5

42 U.S.C. § 4332 .................................................................................................. 6

**Regulations**

33 C.F.R. Part 320 ............................................................................................... 3

33 C.F.R. § 320.4 ................................................................................................. 3

33 C.F.R. § 323.2 ................................................................................................. 3

33 C.F.R. § 323.6 ................................................................................................. 3

33 C.F.R. Part 325 App. B ............................................................................... 7, 38

40 C.F.R. Part 230 ............................................................................................... 3

40 C.F.R. § 230.1 ................................................................................................. 4

40 C.F.R. § 230.5 ................................................................................................. 5

40 C.F.R. § 230.10 .......................................... 3, 4, 33, 35, 36, 38, 43, 45, 47, 50, 51, 53

40 C.F.R. § 230.12 ............................................................................................ 3, 4

40 C.F.R. § 1500.1 ............................................................................................... 5

40 C.F.R. § 1500.2 ............................................................................................... 5

40 C.F.R. § 1500.3 ............................................................................................... 6

40 C.F.R. § 1502.1 ............................................................................................ 5, 6

40 C.F.R. § 1502.13 ......................................................................................... 6, 30

40 C.F.R. § 1502.14 ..................................................................................... 6, 30, 49

40 C.F.R. § 1502.16 ............................................................................................. 6

40 C.F.R. § 1506.5 ........................................................................................... 7, 38

40 C.F.R. § 1508.7 ................................................................................................ 7

40 C.F.R. § 1508.8 ................................................................................................ 7

40 C.F.R. § 1508.25 .............................................................................................. 7

50 C.F.R. § 402.14 .............................................................................................. 10

50 C.F.R. § 424.11 ................................................................................................ 8

50 C.F.R. § 424.11 ......................................................................................... 56, 57

50 C.F.R. § 424.16 ..................................................................................... 9, 55, 56

50 C.F.R. § 424.18 ..................................................................................... 9, 55, 56

## <u>GLOSSARY</u>

| | |
|---|---|
| AF | Acre-Feet (of water) |
| AF/yr | Acre-Feet Per Year |
| APA | Administrative Procedure Act |
| BBC | BBC Research & Consulting |
| BiOp | Biological Opinion |
| CEQ | Council on Environmental Quality |
| CWA | Clean Water Act |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| IRP | Integrated Resource Plan |
| LEDPA | Least Environmentally Damaging Practicable Alternative |
| NEPA | National Environmental Policy Act |
| ROD | Record of Decision |

## INTRODUCTION

Petitioners—six national and local conservation organizations—challenge decisions by the U.S. Army Corps of Engineers ("the Corps") and the U.S. Fish and Wildlife Service ("FWS"), authorizing the construction and operation of the Moffat Collection System Project ("the Project"). Few projects in Colorado's history have posed this level of environmental damage or engendered this degree of controversy. This is because the Project threatens the Colorado River, which becomes more important by the day as its supply dwindles due to climate change and overuse, severely diminishing the river's ability to support the 40 million people in seven States, dozens of Tribes, and Mexico that rely upon it as their lifeblood, let alone fish, bird, and other wildlife species.

The Project, if completed, would consist of several components, causing extensive environmental damage. Denver Water—the Project proponent—would divert water from the already highly depleted Colorado River on the Western Slope, further straining the river's ability to supply downstream users and exacerbating the effects of climate change and drought. Denver Water would transport this water under the Continental Divide to store it in an expanded Gross Reservoir on the Eastern Slope, which requires constructing the tallest dam in Colorado and enlarging the impoundment at Gross Reservoir to triple its storage capacity. The largest construction project in Boulder County history would have devastating effects on the county's ecology and residents: Denver Water will clear-cut more than 500,000 trees; blast and mine 1.6 million tons of rock; release "freezing flow" cold water into South Boulder Creek with adverse impacts on fish; permanently eliminate popular recreational destinations; and elevate reservoir mercury levels that could affect fish and human health.

Despite the severity of adverse impacts, the Corps issued Denver Water a Section 404 permit under the Clean Water Act ("CWA"), 33 U.S.C. § 1344. To do so, the Corps determined that Denver Water's preferred action—i.e., the Project ultimately authorized—meets the CWA's issuance criteria, including because the Project is the least environmentally damaging practicable alternative ("LEDPA"). However, to reach this outcome, the Corps and Denver Water stacked the deck such that enlarging Gross Reservoir was the only practicable option to obtain more water to meet purported future demand needs. In this way and many others, the Corps arbitrarily applied the CWA and its regulations, as well as the National Environmental Policy Act ("NEPA") and its implementing regulations, 42 U.S.C. §§ 4321-4347; 40 C.F.R. §§ 1500-1508.

Likewise, FWS arbitrarily discharged its duties under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544. After a fisheries expert questioned the validity of FWS's biological opinion ("BiOp") regarding the measures necessary to minimize harm to the green lineage cutthroat trout, FWS withdrew the BiOp and abruptly announced that it lacked legal authority to protect this species. However, FWS did not conduct any formal rulemaking or peer review process, nor did the agency satisfy the specific, mandatory conditions FWS said it must before altering the listing status of this species.

For these and other reasons, the Court should vacate these actions as Congress directed in the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706(2)(A), (D) (instructing that courts "shall . . . hold unlawful and set aside" agency action that is arbitrary, capricious, an abuse of discretion, or not in accordance with law, or that is "without observance of procedure required by law").

2

## BACKGROUND

I.    **STATUTORY AND REGULATORY FRAMEWORK**

    A.    **Clean Water Act**

The CWA is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). It prohibits the discharge of pollutants, including dredged or fill material, into the waters of the United States unless authorized by a permit. *See id.* §§ 1311(a), 1344. The term "discharge of fill material" is defined as "the addition of fill material into the waters of the United States" or the placement of fill necessary for the construction of any structure in waters of the United States. 33 C.F.R. § 323.2(f).

Section 404 authorizes the Corps to permit the discharge of dredged or fill material into waters of the United States. 33 U.S.C. § 1344. The Corps adopted regulations, called the "public interest" factors, to implement its permitting authority through a balancing process. *See* 33 C.F.R. Part 320. "The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments," and "[t]he decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process." *Id.* § 320.4(a)(1).

The Environmental Protection Agency ("EPA") has also promulgated regulations, known as the "404(b)(1) Guidelines," which apply to all Section 404 permits. 33 U.S.C. § 1344(b)(1); 40 C.F.R. Part 230. The Corps must deny a Section 404 permit if it is either contrary to the public interest or it does not comport with EPA's 404(b)(1) Guidelines. 33 C.F.R. §§ 320.4, 323.6; 40 C.F.R. §§ 230.10, 230.12.

"Fundamental to [EPA's 404(b)(1)] Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." 40 C.F.R. § 230.1(c). To this end, EPA's 404(b)(1) Guidelines contain several important presumptions and prohibitions.

First, for non-water-dependent projects (i.e., those that do not require siting in wetlands), practicable alternatives not affecting wetlands "are presumed to be available, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3). Second, where a discharge is proposed in wetlands, "all practicable alternatives to the proposed discharge which do not involve a discharge into [wetlands] are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise." *Id.* Finally, the Corps may not issue a permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a), *see also id.* § 230.12(a)(3)(i). This final prohibition is called the LEDPA requirement—i.e., the Corps may not permit an action unless it is proven to be the least environmentally damaging practicable alternative.

"Practicable alternatives" are those options that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). To satisfy EPA's 404(b)(1) Guidelines, the Corps must "[e]xamine practicable alternatives to the proposed discharge, that is, not discharging into waters of the U.S. or discharging into an alternative aquatic site

4

with potentially less damaging consequences." *Id.* § 230.5(c). Thus, in order to eliminate an alternative from further consideration as impracticable where it would avoid wetlands or cause less environmental damage than the proposed action, the applicant and the Corps must clearly demonstrate that each eliminated alternative is impracticable, rather than merely undesirable to the project proponent. "The mere fact that an alternative may cost somewhat more does not necessarily mean it is not practicable." 45 Fed. Reg. 85,336, 85,339 (Dec. 24, 1980).

### B.    National Environmental Policy Act

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its purposes are to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b), (c). It "encourage[s] productive and enjoyable harmony between man and his environment" and promotes government efforts "which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. NEPA directs federal agencies to "[u]se all practicable means . . . to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." 40 C.F.R. § 1500.2(f).

The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA, *see* 40 C.F.R. §§ 1500-1508, which are "binding on all federal agencies." *Id.* § 1500.3.[1]

To accomplish its underlying goals, NEPA requires federal agencies to prepare a "detailed statement"—i.e., an Environmental Impact Statement ("EIS")—for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS must describe (1) "the environmental impact of the proposed action," (2) "any adverse environmental effects which cannot be avoided," and (3) "alternatives to the proposed action." *Id.* § 4332(C)(i)-(iii).

An EIS "serve[s] as an action-forcing device" and must "provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives" to a proposed project. 40 C.F.R. § 1502.1. Each EIS must consider the "purpose and need" for the action, and "[r]igorously explore and objectively evaluate" the impacts of "all reasonable alternatives" to the proposed action. *Id.* §§ 1502.13, 1502.14. CEQ has deemed the alternatives analysis "the heart" of an EIS because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.* § 1502.14.

In evaluating alternatives to a proposed action, agencies must take a hard look at the effects of the proposed action as compared to feasible alternatives. *See* 40 C.F.R. §§ 1502.1, 1502.16. The EIS must assess the direct, indirect, and cumulative impacts of

---

[1] After the Corps issued its Project decision, these regulations were amended. *See* 85 Fed. Reg. 43,304 (July 16, 2020); 87 Fed. Reg. 23,453 (Apr. 20, 2022). The new regulations do not apply here.

the proposed action. *Id.* § 1508.25; *see also id.* § 1508.8 (defining direct and indirect effects); *id.* § 1508.7 (defining cumulative effects).

According to the Corps' NEPA regulations—which supplement CEQ's regulations—"[t]he Corps, will in all cases, exercise independent judgment in defining the purpose and need for the project from both the applicant's and the public's perspective." 33 C.F.R. Part 325 App. B § 9(b)(4). "[W]henever the NEPA document's scope of analysis renders it appropriate, the Corps also should consider and express that activity's underlying purpose and need from a public interest perspective." *Id.* In analyzing alternatives, "[t]he Corps is neither an opponent nor a proponent of the applicant's proposal." *Id.* § 9(b)(5). "Decision options available to the district engineer, which embrace all of the applicant's alternatives, are issue the permit, issue with modifications or conditions or deny the permit." *Id.* § 9(b)(5). The record must document "the Corps' independent evaluation of the information [submitted by the applicant for the EIS] and its accuracy, as required by 40 C.F.R. 1506.5(a)." *Id.* § 8(f)(2).

###    C.    Endangered Species Act

Recognizing that certain plants and animals "have been so depleted in numbers that they are in danger of or threatened with extinction," Congress enacted the ESA to provide "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531. The ESA reflects "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437

U.S. 153, 185 (1978). The ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.

Under the ESA, a species may be listed as endangered or threatened. An endangered species is one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

In determining whether a species warrants listing—or, conversely, warrants delisting—FWS must use the best available scientific evidence and make its decision based only on the specific factors enumerated in Section 4 of the ESA. *See* 16 U.S.C. § 1533(a)(1). Those factors are: (1) "the present or threatened destruction, modification, or curtailment of its habitat or range"; (2) "overutilization for commercial, recreational, scientific, or educational purposes"; (3) "disease or predation"; (4) the "inadequacy of existing regulatory mechanisms"; and (5) "other natural or manmade factors affecting its continued existence." *Id.*; *see also* 50 C.F.R. § 424.11 (requiring that FWS make all listing and delisting decisions based only on these five factors).

Although the public may submit listing petitions to FWS, 16 U.S.C. § 1533(b)(3), FWS also has inherent authority to "determine whether any species is an endangered species or a threatened species" on the basis of the five listing factors. *Id.* § 1533(a)(1). In either case, FWS must "with respect to any regulation proposed by [FWS] to implement a [listing or delisting] determination . . . publish a general notice and complete text of the proposed regulation in the Federal Register." *Id.* § 1533(b)(5)(A)(i);

*see also* 50 C.F.R. §§ 424.16, .18 (requiring that FWS publish in the Federal Register all listing and delisting proposals and final decisions).

Since 1994, FWS has followed an established peer review policy for all listing and delisting decisions, by "[s]olicit[ing] the expert opinions of three appropriate and independent specialists regarding pertinent scientific or commercial data and assumptions relating to the taxonomy, population models, and supportive biological and ecological information for species. . . ." 59 Fed. Reg. 34,270, 34,270 (July 1, 1994); *see also id.* (applying this policy "Servicewide for all species of fish and wildlife and plants").

In 2016, FWS updated this policy "to establish a consistent and rigorous practice of undertaking and managing peer review." Peer Review Process Memorandum (Aug. 22, 2016), http://bitly.ws/SJVj. In this update, FWS made clear its "policy" that FWS "will solicit the review of, and comment on, such ESA listing . . . actions from three or more objective and independent reviewers with expertise and/or experience relevant to the scientific questions and determinations addressed in our actions." *Id.* at 1. As part of this process, FWS "will solicit from these expert reviewers their opinions as to whether: (1) We have assembled and considered the best available scientific and commercial information relevant to our decision; (2) Our analysis of this information is correct and properly applied to our decision; and (3) Our scientific conclusions are reasonable in light of that information." *Id.* at 1-2. Under this policy, FWS "will summarize in the final decision document (rule, notice of withdrawal . . .) the opinions of all independent peer reviewers received on the species under consideration." *Id.* at 2.

Where a proposed action may impact listed species, Section 7(a)(2) of the ESA requires agencies to "insure that any action authorized, funded, or carried out by such

9

agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ." 16 U.S.C. § 1536(a)(2). In turn, before undertaking any action that may affect listed species, an action agency must consult with FWS in order to evaluate the impact of the proposed action on any listed species or habitat. *See id.* In evaluating the effects of the proposed action on listed species, FWS must use "the best scientific . . . data available." *Id.* § 1536(a)(2). The result of a formal consultation is FWS's issuance of a BiOp, which must examine the best available data on the status of the species and determine how the proposed action, in combination with baseline threats, will likely affect the species. *See* 50 C.F.R. § 402.14(g), (h).

If FWS concludes that the proposed action will not jeopardize the recovery of a listed species, but that it will nevertheless result in the incidental taking of the species, FWS must specify the "impact of such incidental taking on the species" and "those reasonable and prudent measures [FWS] considers necessary or appropriate to minimize such impact," and set forth "the terms and conditions . . . that must be complied with by the [action] agency or applicant (if any), or both, to implement [those] measures." 16 U.S.C. § 1536(b)(4)(i), (ii), (iv). Without a lawful BiOp, any activities that take members of listed species are unlawful. *Id.* §§ 1538(a)(1)(B), 1536(o)(2).

D.    **Administrative Procedure Act**

Under the APA, courts "shall . . . hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or not in accordance with law," or that was undertaken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An action is arbitrary and capricious

> if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or [if the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Utah Env'tl Cong. v. Richmond*, 483 F.3d 1127, 1134 (10th Cir. 2007) (quoting

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

A court must "ascertain whether the [agency] examined the relevant data and articulated a rational connection between the facts found and the decision made." *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1220 (10th Cir. 2006). "In reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Olenhouse v. Comm. Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994). This requires a "thorough, probing, in-depth review" of the record. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, (1971).

## II.    FACTUAL BACKGROUND

### A.    The Corps' 2003 Scoping Notice

In 2002, Denver Water revised its Integrated Resource Plan ("IRP"). AR177568-AR177782.[2] The IRP projected water demand fifty years into the future. *Id.* Based on then-existing information—which is now more than two decades outdated—Denver Water's consultant, BBC Research & Consulting ("BBC"), estimated that growth-fueled demand would overtake existing supply in 2016. AR177576-AR177577. The IRP acknowledged that "it is almost certain that things will change in the future, and Denver Water will have to adapt its future plans to those changes." AR177583.

---

[2] Petitioners cite to the record using the government's Bates numbering. Citations to "ARXXX" refer to the Corps' initial record, whereas citations to "PDXXXX" refer to the agency's supplemental record. "USFWS_XXXX" and "FWSXXXX" refer to FWS's initial and supplemental records, respectively.

In January 2003, Denver Water notified the Corps that it desired a Section 404
permit "to resolve a water supply reliability problem in Denver's Moffat Collection
System and a vulnerability problem in Denver's entire collection system." AR177294. It
explained the reliability problem as "[e]xisting water demands in Denver's Moffat
Collection System exceed available supplies during a drought." *Id.* It explained the
vulnerability problem as "Denver Water's ability to serve its customers is unacceptably
vulnerable to natural and man-made disasters because about 90 percent of the
available water storage relies exclusively on the unimpeded operation of one portion of
its total collection system—the South Platte Collection System." *Id.* Denver Water
analyzed what it viewed as feasible options to satisfy those needs; with one exception,
every option proposed the enlargement of Gross Reservoir. AR177289-AR177293.

In September 2003, the Corps issued a scoping notice commencing the
combined Section 404 and NEPA process. AR176962-AR176963. There, the Corps
indicated that Denver Water had identified four purported needs that must be satisfied
by a single Corps permit: the reliability need, the vulnerability need, a flexibility need,
and a new firm yield need. *Id.* It noted that "Denver Water has identified four preliminary
alternatives that would address these needs," including the expansion of Gross
Reservoir. AR176963. Around this time, Corps staff identified to Denver Water many
additional alternatives, but noted that it "[a]ll depends on how we define the project
purpose as to whether the following should be looked at." AR176932.

The Corps received scoping comments from many stakeholders. Notably, EPA—
which co-administers the CWA with the Corps, and which promulgated the 404(b)(1)
Guidelines that the Corps must satisfy before issuing any Section 404 permit—raised

12

serious concerns. AR176391-AR176397. EPA questioned the Corps' identification of four distinct needs and Denver Water's "desire to resolve all four problems with one Federal action." AR176393. EPA noted that "the preliminary alternatives analysis presented indicate that alternatives may be available which would not require a CWA 404 permit," and that "[r]eview of these 'needs' also indicates that different alternatives may be available that could resolve the needs in an independent manner." *Id.* EPA concluded that "[i]t would be more useful if a single, basic project purpose could be developed so that various alternatives would not have to be examined for each separate project purpose." AR176391. It also urged the Corps to evaluate "a specific alternative that meets the need or shortage through sustainable water management/conservation of current resource, rather than construction of added storage facilities." AR176394.

Petitioners and other stakeholders raised similar scoping concerns. *See, e.g.*, AR176557-AR176558; AR176563-AR176564. Comments addressed myriad issues, including the artificially narrow four-need purpose, problems with each articulated need, the accuracy of Denver Water's water demand projection, and unexamined, yet feasible alternatives. *See, e.g.*, AR176063-AR176080.

### B.    The Corps' "Independent" Review of Denver Water's Needs

In 2003, the Corps retained Ed Harvey to review Denver Water's 2002 IRP demand projection, which drove Denver Water's request for a CWA permit to address its stated need for 18,000 acre-feet ("AF") per year ("AF/yr") of new firm yield. This led to a January 2004 report, AR174245-AR174259, concluding that "the water demand projections produced from the 2002 IRP offer an acceptable basis for water supply planning purposes," and that the "demand forecasting model" and the "economic and

13

demographic forecasts that drive the water demand forecasting model are as reasonable as such forecasts can be, given their inherent level of uncertainty." AR174256-AR174257.

Although the purpose was to independently scrutinize the demand projection BBC prepared for Denver Water's 2002 IRP, the report was anything but objective. Mr. Harvey previously served as the Managing Director of BBC, including during the time period when BBC generated the 2002 IRP demand projection for Denver Water at the heart of this case. PD000011; PD000039-PD000058. Mr. Harvey was the team leader on IRP-related reports submitted to Denver Water. *E.g.*, PD000015-PD00038 (listing Ed Harvey as the lead consultant on a detailed "literature review" that constituted "one element of BBC's support of Denver Water's 2001 update of its [IRP]"). Indeed, Mr. Harvey and his BBC team explained that their "purpose was to identify both dependent and independent variables that should be included [in] Denver Water's long-range water demand forecast as part of their [IRP]." PD000018. Mr. Harvey left BBC to start Harvey Economics in 2003, after Denver Water finalized its IRP in February 2002. AR008777. There, he was immediately retained by the Corps to evaluate the accuracy of the very forecast he and his BBC colleagues had prepared months earlier for Denver Water.

During the 14-year permitting process, the Corps never disclosed Mr. Harvey's prior involvement with Denver Water's IRP process or its demand projection, let alone the lack of objectivity that might result from that history. Petitioners learned about this serious issue years later through Denver Water's response to public records requests. After filing this case, Petitioners also discovered that the Corps continued to retain Mr. Harvey for the Project, despite learning that Denver Water hired Harvey Economics

14

during the Project's EIS process to analyze economic matters related to "trans-mountain diversion issues" between Denver Water and entities on the West Slope. AR167592-AR167593. Whether or not that work relates specifically to the Project, the fact that Harvey Economics had an active relationship with the Project proponent—and a pecuniary interest in helping Denver Water achieve its goals—is highly troubling.[3]

Despite Mr. Harvey's pre-existing relationship with Denver Water at BBC where his team prepared Denver Water's demand projection, and the active contractor-client relationship between Mr. Harvey and Denver Water during the time frame in which Harvey Economics purported to independently review that *same* demand projection, the Corps neither changed contractors nor publicly disclosed this concern.[4]

### C. The Corps' 2009 Draft EIS

After scoping, the Corps began preparing the Draft EIS. Once Harvey Economics provided its January 2004 review of Denver Water's demand projection, Denver Water prepared a purpose and need statement. AR173948-AR174007. EPA again raised

---

[3] In 2016, before the Corps issued a final decision for the Project, Mr. Harvey wanted to bid for Denver Water's contract to prepare its new IRP. AR008060-AR008062. Although the Corps asked Mr. Harvey to decline work for Denver Water in this instance, *id.*, the same conflict existed throughout the permitting process and this later date was the first (and only) time the Corps took action to address the conflict that existed throughout the permitting process. Indeed, as far back as 2007, the Corps recognized "the overlap of" Ed Harvey's work for Denver Water "with the work and issues that will be addressed by the Moffat EIS" that could "influence [his] conclusions associated with Moffat analyses," AR167592; yet, the Corps took no corrective action and simply looked the other way.

[4] This was not the only undisclosed relationship between Denver Water and those ostensibly working for the Corps. For example, a Denver Water whistleblower alleged during the EIS process that URS—the third-party contractor the Corps hired to prepare the EIS—"ha[s] had and currently ha[s] numerous lucrative design contracts with the City of Denver/Denver Water" and "ha[s] a vested interest in seeing this project done," but the EIS "fails to address this obvious conflict." AR157732-AR157739.

concerns with Denver Water's formulation of the purpose and need, and urged that "the need to add water" and "supplying customers upstream from the [Moffat Treatment Plant. . . . be treated as two project purposes as there may be separate alternatives to meet each of these purposes." AR174044-AR174048.

In August 2004, Harvey Economics conducted a "supplemental evaluation" of the demand projection to determine whether it could credibly support Denver Water's articulated purpose and need and serve as the basis for the EIS. AR160361-AR160382.

In October 2009, the Corps released its Draft EIS. AR158879-AR161194. The Corps rubberstamped Denver Water's formulation of the purpose and need: "[t]he purpose of the Moffat Collection System Project is to develop 18,000 [AF/yr] of new, annual firm yield to the Moffat Treatment Plant and raw water customers upstream of the Moffat Treatment Plant pursuant to [Denver Water's] commitment to its customers." AR158880. Despite purporting to be a singular purpose and need, the Corps recited Denver Water's "need" to address "timeliness" (the Project must commence by 2016); "location" (the Project must route water to the Moffat Treatment Plant to address the "imbalance" in Denver Water's North and South systems); "[s]ystem-wide vulnerability issues"; and "[l]imited operational flexibility." AR158881; AR158908. Hence, rather than adopt the basic purpose of supplying Denver Water with 18,000 AF/yr of new yield, the Draft EIS severely narrowed the purpose and need based on the same considerations that EPA urged the Corps to abandon in order to comply with the CWA.

Relying on this highly circumscribed purpose and need, the Draft EIS explained the screening process the Corps used to exclude alternatives that could not meet every need identified by Denver Water. The Corps applied two "screens" to filter out

16

alternatives. AR158905-AR158907. Screen 1 evaluated 303 potential water supplies

and infrastructure components, and Screen 2 evaluated 34 specific Project alternatives

incorporating components that survived Screen 1. AR158907. However, in applying

Denver Water's discrete, separate needs to the screening process—for example,

requiring alternatives to "supply water to the Moffat [] Treatment Plant"—the Corps

excluded many alternatives that could satisfy the basic purpose of supplying Denver

Water with 18,000 AF/yr of new firm yield. *Id.* The Corps also screened out options that

could not be completed by 2016, were not capable of storing 15,000 AF in a surface

impoundment, or were deemed too costly. AR158908-AR158920.

　　　As a result of its restrictive screening process, the Corps found only five

alternatives to be "practicable"—all of which require water diversions through the Moffat

Collection System (due to Denver Water's location restriction) and a large expansion of

Gross Reservoir (ranging from 40,700 AF to 72,000 AF). AR159000. The only

difference among those alternatives was the type of storage component (if any) that

would be used in conjunction with an expanded Gross Reservoir. *Id.*

　　　With respect to Denver Water's demand projection that drove its purported need

for 18,000 AF/yr of new firm yield—which the Corps must independently validate—the

Corps supplied "technical memoranda" for "purpose and need support." AR160346-

AR163410. However, the only "independent" support for this figure consisted of the

reports from Harvey Economics. Nowhere did Corps specialists or other external

experts examine—let alone validate—Denver Water's demand projection.

　　　Although the Draft EIS mentioned climate change as a cumulative effect, it did

not discuss how the foreseeable effects of climate change will likely diminish the ability

of the action alternatives (including the Project itself) to satisfy Denver Water's stated purpose and need of obtaining 18,000 AF/yr of new firm yield. The Corps noted that climate change is expected to shift the timing of snowmelt and stream flows such that "the yield of the Moffat Collection System would decrease due to existing capacity constraints." AR159570. This would, in turn, likely "decrease Denver Water's yield" and reduce "the number of days Denver Water's water rights are in priority to divert water," which would likely "result in Denver Water building additional replacement sources to ensure an adequate supply of water for its customers." AR159570-AR159571. Yet, although climate change may render the Project unable to satisfy Denver Water's need to supply 18,000 AF/yr of new firm yield, the Corps did not evaluate this issue.

### D.    Draft EIS Comments

The Corps received comments in response to the Draft EIS from federal agencies, affected counties, Petitioners, and others, identifying serious deficiencies under the CWA and NEPA and, in particular, objecting vehemently to the Corps' unduly restrictive purpose and need, the artificially constrained alternatives analysis flowing from it, and the Corps' inaccurate water demand projection. *See, e.g.*, AR014634-AR014661; AR157598-AR157702; AR157498-AR157597; AR003652-AR003656.

Notably, EPA again expressed serious concerns regarding the Corps' legal compliance. First, as the agency that administers the 404(b)(1) Guidelines, it reiterated EPA's stance that the Corps' Draft EIS did not satisfy those safeguards. AR014662-AR014689. For instance, EPA admonished that "[a]dequately defining the project purpose and need statement is critical for developing a broad range of alternatives in the Draft EIS, including subsequent identification of the [LEDPA] for compliance with the

CWA Section 404(b)(1) Guidelines." AR014684. Thus, it "recommend[ed] the Draft EIS purpose and need statement should be more broadly defined: 'to provide a portion of additional water supply for Denver Water's Combined Service Area future needs.'" *Id.*

Second, EPA criticized the Corps' attempt "to define 'overall project purpose' and 'basic project purpose' to have separate meanings where the overall project purpose is more specific to the applicant's project thereby eliminating potential practicable alternatives." AR014684. EPA reminded the Corps that "EPA has determined that the terms 'basic' and 'overall project purpose' are to be used interchangeably and are not intended to have distinct meaning." *Id.* (citing examples).

Third, EPA highlighted "significant issues" with the Corps again combining four distinct needs because "Denver Water's desire to resolve all four problems with one federal action may have precluded identification of available, less damaging practicable alternatives." AR014684-AR014685. Thus, "EPA's recommendation has been and continues to be that a single, basic project purpose with alternatives addressing that single purpose be defined." AR014685.

Fourth, EPA found it to be "an inappropriate interpretation of the Guidelines to integrate underlying project proponent needs into the project purpose and need statement or to use them as screening criteria, as this could result in elimination of alternatives that may otherwise be 'practicable' considering the basic/overall project purpose of water supply." AR014685. As such, EPA concluded that the Draft EIS "incorrectly uses the applicant's purpose and need as one of the screening criteria (i.e., PN2; must supply water to Moffat Collection System) when the Section 404(b)(1) Guidelines direct alternatives to be evaluated, along with practicability, based on its

ability to fulfill the basic project purpose (i.e., additional water supply for the service

area), *not the applicant's purpose and need for the project*." *Id.* (emphasis added).

Thus, EPA urged the Corps to "reconsider the availability of potential practicable

alternatives prior to a determination on the permit application." AR014667.

Fifth, EPA rebuffed the Corps' "use of timeliness" in its screening criteria that

"resulted in the elimination of a multitude of alternatives from consideration." AR014685.

EPA explained that "[a] project proponent's decision to pursue a permit should not

dictate time frames in which a project is considered because it artificially eliminates

alternatives that may otherwise be available to a project proponent applying early in the

process." *Id.* Because the alternatives eliminated solely on "timeliness" grounds are

"available and capable of being done," EPA concluded that timeliness "should not

render an alternative impracticable" because "delays are generally not an appropriate

basis for screening alternatives" under the CWA. AR014685-AR014686.

Finally, EPA faulted the Corps' "limited discussion" of climate change, and

explained that "a model should be developed that analyzes a scenario where flows are

reduced substantially as a result of climate change," based on "[e]stimates of potential

incremental changes in hydrology due to climate change influences." AR014680. This

would, *inter alia*, allow the Corps to assess whether the foreseeable effects of climate

change—in conjunction with capacity constraints and the timing of Denver Water's

water rights—would render alternatives, including options that require the expansion of

Gross Reservoir to store new firm yield, impracticable due to their inability to

consistently provide 18,000 AF/yr of new firm yield during the Project's lifespan.

EPA sent *another* letter stating that "[w]e continue to have serious concerns regarding the proposed project's lack of compliance with the requirements of the CWA Section 404(b)(1) Guidelines," and urging the Corps to "reconsider the availability of potential less damaging practicable alternatives." AR145213-AR0145217.

### E.    The Corps' 2014 Final EIS

The scathing comments from stakeholders regarding the Corps' unlawful handling of important aspects of the combined CWA permitting and NEPA process fell on deaf ears. In April 2014, the Corps issued its Final EIS. AR123615-AR134705. Relevant to the issues in this case, nothing substantive changed.

For example, the Corps adopted the same purpose and need as that identified in the Draft EIS, including the incorporation of four distinct needs that must be satisfied by this single federal permit, as well as Denver Water's self-imposed limitations on location and timeliness. AR123779-AR123781. The only change to the purpose and need statement was an acknowledgement that, due to water conservation and other intervening measures, Denver Water's projection of an annual water shortfall would now begin in 2022 (instead of 2016). AR123781.

Because the Corps did not materially alter the purpose and need, the screening process and consequent alternatives analysis were essentially the same as the Draft EIS. AR123818-AR123953. The Corps imported the same restrictions decried by EPA and again used them to exclude practicable alternatives; such limitations included Denver Water's location preference (i.e., the selected action "[m]ust supply water to Moffat Collection System"), its timeliness criterion (i.e., it must be completed by 2030), and the requirement that options must be capable of storing 15,000 AF in a surface

impoundment. AR123821-AR123824. The Final EIS also carried forward the same five

action alternatives as the Draft EIS. Every action alternative that the Corps deemed

practicable in the Final EIS required the substantial enlargement of Gross Reservoir.

Despite the Corps' duty to scrutinize and validate Denver Water's demand

projection driving the firm yield need, the Final EIS did little to independently verify

Denver Water's numbers. For its "purpose and need support," the Corps pointed only to

two documents prepared by Denver Water (one of which had nothing to do with the

demand projection, and the other of which was a short memorandum to Ed Harvey),

AR126006-AR126033; two outdated Harvey Economics reports from 2004, AR125966-

AR126005; and a Harvey Economics update from 2012, AR126034-AR126041. In the

2012 report, Harvey Economics updated certain aspects of the water demand

projection—such as economics and demographics—but expressly decided *against* the

"re-estimation or new configuration of the water demand models" because "the structure

of the 2002 water demand forecasting models remained sound and appropriate for

projecting water demands in 2011." AR126037. The 2012 report ultimately concluded

that "[g]iven the updated projections of economic and demographic variables, these

water demand projections are considered reasonable." AR126041.

The Corps' cursory statements about climate change in the Final EIS mirrored

those in the Draft EIS. The agency purported to justify its failure to analyze climate

change on the ground that while "[c]limate change and global warming may be

considered reasonably foreseeable," the Corps does not believe there is "a generally-

accepted scientific method by which current climate change information [can be]

translated into predictable stream flow changes." AR124640. By sidestepping any

consideration of this issue, the Corps never examined whether the reasonably foreseeable effects of climate change, in combination with capacity constraints and water right priority, will likely render Denver Water's preferred alternative incapable of satisfying the purpose and need—and therefore impracticable under the CWA.

**F.    Final EIS Comments**

After the Corps published the Final EIS, stakeholders once again criticized the agency's refusal to address myriad legal violations, including an unduly constrained purpose and need, an artificially restrictive alternatives analysis, an inaccurate water demand projection, and a failure to examine climate change and its effect on the practicability of alternatives. *See, e.g.*, AR015444-AR015448; AR014365-AR014385; AR014267-AR014297; AR014246-AR014261; AR011395-011458; AR008389-AR008398; AR005831-AR005848.

With respect to the validity of Denver Water's demand projection, commenters objected to the Corps' (and Harvey Economics') continued use of precipitation data from 1971-2000 as neither reflective of actual precipitation patterns at the time of the Final EIS, nor representative of the hotter, drier conditions Colorado experienced in the drought years leading up to the Final EIS. *See, e.g.*, AR005856-AR005858.

Commenters also questioned the Corps' (and Harvey Economics') conclusion that the 2002 IRP models for demand projection remained sound, especially because they were built upon severely outdated water use data from 1973 to 1999, which no longer resembled actual water use trends in Denver Water's service area. *See, e.g.*, AR005831-AR005848. In fact, in 2016, Denver Water itself announced that total water demand in its service area was *less* than it had been in more than four decades, despite

a steadily increasing customer base during that time. AR008475 ("According to Denver Water records, 2015 was our lowest demand for water since 1970, despite a population increase of 400,000 people."). The following image (AR005811)—generated by Denver Water—illustrates this consistent, declining water demand trend at the time of the 2017 ROD, which *should* have formed the basis of the Corps' analysis:



Petitioners raised additional concerns when they learned that Denver Water represented to a different permitting agency that the Project would actually cost $380 million when all permitting and mitigation costs are included. AR4011-AR4013.[5] This figure is substantially higher than the Project cost the Corps used in the Final EIS ($148.7 million), AR123936, which served as the basis for Screen 1c that eliminated 20 otherwise practicable alternatives on cost grounds. AR123820; AR123832-AR123834.

_____

[5] Denver Water's license amendment application to FERC can be found online. *See* Denver Water, *Gross Reservoir Document Library*, https://bitly.ws/T3T9.

G.    **The Corps' 2017 Record of Decision and Section 404 Permit**

In July 2017, the Corps issued its Record of Decision ("ROD") authorizing Denver Water to construct and operate the Project. AR000008-AR000052. The Corps asserted that it "independently evaluated Denver Water's demand projection[] in 2004" and "reevaluated" it in 2012 through the Harvey Economics reports. AR000022. At that time, at least 15 years of data contradicted the steep, steady increases in water demand projected by Denver Water in 2002, which were baked into the models used in the 2002 IRP and subsequently affirmed as "sound" by Harvey Economics.

For purposes of NEPA, the ROD set forth a single purpose and need statement, but with strict limitations. *Id.* For purposes of the CWA, the Corps determined that the "basic project purpose . . . is to provide supplemental water supply." *Id.* The Corps identified the "overall project purpose" as a more convoluted, restrictive purpose that all but ensured the expansion of Gross Reservoir. AR000023. Even though EPA had explained that the basic purpose and the overall project purpose are interchangeable, the Corps differentiated the two purposes and asserted that the much more restrictive overall project purpose serves as the basis for the "404(b)(1) alternatives analysis" and for ultimately determining the LEDPA. *Id.* The ROD also stated that "Denver Water identified four needs . . . that required resolution" in a single Section 404 permit: "reliability, vulnerability, flexibility, and firm yield needs." *Id.*

The ROD found the Project—almost identical to Denver Water's original proposal in 2003—to be the LEDPA. AR000049-AR000050. In September 2017, the Corps issued Denver Water a Section 404 permit.

25

H.    **The Project's ESA Process**

The Corps attached to its ROD a June 2016 BiOp from FWS, culminating the

agencies' ESA Section 7(a)(2) consultation process regarding effects to green lineage

cutthroat trout that live in West Slope headwater streams of the Colorado River, which

will be negatively impacted by the Project's diversions. AR000633-AR000706.

Petitioners retained Dr. Brett Johnson—a preeminent Colorado fisheries expert—

to provide his independent analysis of the BiOp. PD001841-PD001877. His report

disputed several key aspects of the BiOp. He criticized the "simplistic" assumptions built

into the model for estimating the amount of take, and found that FWS's no-jeopardy

determination "is arbitrary and cannot be verified with reasonable scientific certainty

based on the outdated and variable population estimates set forth in the [BiOp]."

PD001843. He further determined that "currently available information [in the BiOp] is

inadequate to reach a well-informed decision on the project that protects green lineage

Cutthroat Trout in the affected streams in the manner required by the ESA." PD001844.

He urged FWS to "simply require the project proponent to screen the diversions to

prevent (or at least reduce) entrainment, or at minimum conduct a rigorous entrainment

rate study to determine whether the actual effects of these water diversions affirm the

modeling estimates of take set forth in the [BiOp]." *Id.*

Based on Dr. Johnson's critiques, Petitioners submitted a 60-day notice letter to

FWS and the Corps raising various legal violations, as required by the ESA before filing

suit. USFWS_000160-USFWS_000173. In October 2019, after Petitioners filed this

lawsuit, the Corps requested that FWS reinitiate Section 7 consultation regarding the

effects to green lineage cutthroat trout, in part to address the concerns raised by Petitioners and Dr. Johnson. FWS00075.

In April 2020, FWS notified the parties that it was withdrawing the July 2016 BiOp and terminating the ESA process. FWS00129-FWS00138. FWS's rationale was that it "lacks the legal authority to treat green lineage cutthroat trout as a protected species" because they "are not part of any species that is currently protected under the ESA." FWS00132. In reaching this conclusion, FWS relied on two older studies (from 2012 and 2013) and a more recent study (from 2019), which, in FWS's view, suggest that "only one greenback cutthroat trout population remained in existence in 2012." FWS00130. While acknowledging that "the taxonomy of green lineage cutthroat trout may not be resolved (i.e., scientific name, scientific description)," FWS asserted that "the scientific data and evidence show that they are not members of the [listed] greenback cutthroat trout subspecies." FWS00132.

When it delisted the species, FWS did not conduct formal rulemaking or adhere to other procedures that attend to delisting decisions under the ESA. Nor did FWS analyze—let alone determine—whether the green lineage cutthroat trout warrants delisting, based on the factors set forth in Section 4 of the ESA that govern all delisting decisions. Nor did FWS notify fisheries experts or other external specialists to obtain peer review comments on the species' status prior to delisting, despite the fact that this Project-specific decision would affect the species' status throughout its entire range.

Nor, as it had expressly committed in 2012 when it adopted interim protections for this species, FWS00335-FWS00337, did FWS await the conclusion of "a scientific peer review of the genetic and meristic studies together, involving genetic and cutthroat

experts from throughout the country," including a "workshop for the peer reviewers," followed by FWS "conduct[ing] a status review of the cutthroat groups, evaluating threats and population trends." FWS00336. Rather, FWS ignored its commitment that "[u]ntil the reviews and rulemaking, if necessary, have been completed, [FWS] *will not change the listing status* of the greenback," which means that "*all protection* that is currently afforded to cutthroat populations that have been identified as greenback, *including . . . [green lineage cutthroat trout]* on the western slope of Colorado, *will remain in place until rulemaking occurs, if necessary*." *Id.* (emphases added).

FWS's 2020 delisting decision acknowledged that Colorado Parks and Wildlife was actively "preparing a report on the status of the green lineage cutthroat trout that will be the foundation for our comprehensive review of this cutthroat lineage," FWS00132—i.e., the exact type of process that FWS said in 2012 must be completed prior to altering the status of this species. Yet, FWS provided no explanation as to why it needed to abruptly jettison these protections for the species during the ongoing status review process. Instead, FWS evidently found it expedient to delist the species to avoid the serious BiOp flaws raised in this lawsuit, and thus it walked away from its prior commitments without addressing them or how its one-off delisting decision in the midst of litigation comports with the ESA, its regulations, or formal FWS listing policy.

## ARGUMENT

## I.    PETITIONERS HAVE STANDING

This Court has Article III jurisdiction to review Petitioners' claims. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env'tl Serv., Inc.*, 528 U.S. 167, 180-81 (2000) (summarizing the requirements for standing). As extensively explained in declarations

accompanying this brief, Petitioners and their members have longstanding, cognizable interests in the aquatic, wildlife, and other natural resources that will be impaired or permanently eliminated by the agency decisions challenged in this case. *See* Decl. of Gary Wockner ("Wockner Decl."), Ex. A; Decl. of Beverly Kurtz ("Kurtz Decl."), Ex. B.

Given the serious, fatal flaws that tainted the decisions by the Corps and FWS—violations the Court must assume Petitioners will establish on the merits, for purposes of standing, *see, e.g.*, *Initiative & Reform Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006)—Petitioners have amply demonstrated standing to challenge Respondents' decisions, analyses, and actions that threaten their cognizable interests.

## II.     THE CORPS' ROD, FINAL EIS, AND SECTION 404 PERMIT VIOLATE LAW

Although the Corps may combine its environmental review into a single process, "[t]he [CWA] and [NEPA] require distinct analyses of alternatives to a proposed project." *Save The Colorado v. Spellmon*, 50 F.4th 954, 965 (10th Cir. 2022). Whereas "NEPA only requires that the [a]gencies '[r]igorously explore and objectively evaluate all reasonable alternatives,'" the "CWA prevents the [Corps] from issuing a § 404(b) permit if there is a less damaging practicable alternative." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1186-87 (10th Cir. 2002).

Here, the Corps utilized one streamlined analysis to satisfy its separate legal duties under NEPA and the CWA. The combined portions of that analysis, however, independently violate both statutes. Petitioners outline the ways in which each step of the Corps' analysis runs afoul of NEPA and the CWA, respectively.

**A.    The Project's Purpose and Need Statement Cannot Pass Muster Under Either NEPA or the CWA**

**1.    *The Corps' Unduly Restrictive Purpose and Need Statement Violates NEPA and Its Regulations***

An integral part of each EIS is the agency's purpose and need statement, which "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. Although agencies must "[r]igorously explore and objectively evaluate *all reasonable alternatives*," *Id.* § 1502.14(a) (emphasis added)—which is "the heart" of every EIS, *id.*—the purpose and need statement demarcates the scope of the alternatives analysis and what is "reasonable" to satisfy the purpose and need. *See, e.g.*, *Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F. 3d. 1142, 1155 (9th Cir. 1997) ("The stated goal of a project necessarily dictates the range of 'reasonable' alternatives.").

While an agency may not "completely ignor[e] a private applicant's objectives" in formulating its purpose and need, NEPA "preclude[s] agencies from defining the objectives of their actions in terms so unreasonably narrow they can be accomplished by only one alternative (i.e., the applicant's proposed project)." *Colo. Env'tl Coal. v. Dombeck,* 185 F.3d 1162, 1174-75 (10th Cir.1999); *see also Davis v. Mineta*, 302 F.3d 1104, 1119 (10th Cir. 2002) (explaining that under NEPA agencies may not "define the project so narrowly that it foreclose[s] a reasonable consideration of alternatives"), *abrogated on other grounds by Audubon Soc'y of Greater Denver v. U.S. Army Corps of Eng'rs*, 908 F.3d 593, 604 (10th Cir. 2018).

Here, the Corps crafted a textbook example of an arbitrarily narrow purpose and need, one which cannot pass muster under NEPA. The Project's basic purpose is "to

provide supplemental water supply" to Denver Water. AR000022. Nothing less, nothing

more. It is Denver Water's thirst for more water that is the impetus for the permit now

under review—not a purported system imbalance, or anything else. Stated differently,

without an ostensible need for more water, Denver Water would not have sought a

Section 404 permit solely to enhance system balance (and indeed has never done so).

Yet, in formulating the purpose and need, the Corps ignored the fundamental

purpose of the Project. The agency constrained the consideration of alternatives that

could feasibly provide Denver Water with supplemental water supply (and satisfy the

basic purpose) by summarily eliminating alternatives that did not *also* satisfy other

demands on Denver Water's wish list. But those extraneous demands have *nothing* to

do with the Project's basic purpose, such as addressing what Denver Water perceives

as an "imbalance in reservoir storage and water supplies between [its] North and South

systems." AR123705-AR123706. Hence, while conceding that "[t]he purpose of the . . .

Project is to develop 18,000 acre-feet per year of new, firm yield," the Corps' purpose

and need *also* imposes a highly circumscribed location limitation (i.e., the new water

must supply "the Moffat Treatment Plant"), and requires that *this* Section 404 permit

must simultaneously resolve "four [distinct] needs in the Moffat Collection System . . .

"reliability, vulnerability, flexibility, and firm yield." AR000022-AR000023.

The proof is in the pudding. Using Denver Water's unduly rigid purpose and

need, the Corps eliminated from analysis 19 alternatives that could provide Denver

Water with 18,000 AF/yr of new firm yield simply because those alternatives could not

*also* satisfy Denver Water's desires about where it wished to obtain and/or store its new

water. AR123826 (eliminating 19 alternatives from consideration under Alternatives

Screen PN2 ("[m]ust supply water to Moffat Collection System"), even though those options all satisfied Screen PN1 ("[m]ust provide new firm yield")); AR167629 (same).

Controlling authority expressly forecloses restricting the purpose and need in this manner. In *Davis*, the Tenth Circuit rejected the formulation of an overly narrow purpose and need that screens out alternatives based on the applicant's location preferences. 302 F.3d at 1119-20. There, the Federal Highway Administration sought to add "additional road capacity across the Jordan River"; the Court explained that insofar as the agency intended its purpose and need to "requir[e] a new crossing across the Jordan River at 11400 South," this overly rigid formulation "would violate NEPA given the more general overarching objective of improving traffic flow in the area." *Id.* at 1119; *see also id.* at 1119-20 ("[I]f the purposes and needs of the Project were so narrowly construed as to mandate the extra capacity only at 11400 South, we would conclude that such a narrow definition would be contrary to the mandates of NEPA.").

Equally instructive is a Seventh Circuit case, where "[t]he Corps rigged the [EIS] on the question of purpose" by requiring one source to supply supplemental water to two separate municipalities. *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1997). There, as here, the "general goal" of the Section 404 permit application "is to supply water to" the applicant—"*not* to build (or find) a single reservoir to supply that water," *id.*, or in this case, not to supply water to the "Moffat Treatment Plant and raw water customers upstream of the Moffat Treatment Plant." AR000022. Explaining that "[a]n agency cannot restrict its [NEPA] analysis to those 'alternative means by which a particular applicant can reach *his* goals,'" *Simmons*, 120 F.3d at 669 (quoting *Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986)), the court found that "[t]his is

precisely what the Corps did in this case." *Id.* at 669. The Seventh Circuit admonished the Corps' "wholesale acceptance of [the applicant's] definition of purpose," and held that "[t]he Corps failed to comply with the most basic terms of NEPA." *Id.* at 669-70.

The same is true here. The Corps flouted NEPA by neglecting the basic purpose of the Project—supplemental water supply—in favor of the applicant's inflexible wish list that practically guaranteed the expansion of Gross Reservoir. It is hardly surprising the end result of the Corps' NEPA process was the analysis of only five alternatives, *all of which* require the massive expansion of Gross Reservoir. AR000024-AR000029.

Accordingly, the Corps' uncritical adoption of an exceedingly rigid purpose and need—which EPA and others roundly criticized—cannot pass muster under NEPA because "it unreasonably narrows the agency's consideration of alternatives so that the outcome is preordained." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013); *see also Dombeck,* 185 F.3d at 1174-75 (same).

### 2.    *The Corps' Unduly Restrictive Purpose Violates the CWA*

In similar ways, as EPA repeatedly told the Corps, the Corps' artificially constrained purpose and need contravenes the CWA and EPA's 404(b)(1) Guidelines.

First, the Corps did not rebut the CWA's threshold presumption that non-wetland options are available to satisfy *each* Project need. The activity at issue is "not water dependent." AR000022-AR000023. In turn, "practicable alternatives that do not involve [wetlands] are presumed to be available, *unless clearly demonstrated otherwise*." 40 C.F.R. § 230.10(a)(3) (emphasis added). Whereas the Corps (and Denver Water) at least purported to demonstrate why constructing or expanding an impoundment to store 72,000 AF of new water will necessarily affect wetlands, the Corps made no serious

effort to demonstrate at all—let alone clearly—why Denver Water must disturb wetlands to address purported imbalance between its North and South systems.

Tellingly, the CWA permit application shows that the *only* wetlands to be affected relate to construction activities to expand Gross Reservoir to store 72,000 AF of new water; in contrast, nothing about merely running new water through the North System to the Moffat Treatment Plant when needed to address system vulnerability inherently requires wetland disturbance. AR000063-AR000064; AR000068. In fact, there are many nonstructural and other options that can address system imbalance by injecting water into the North System without any wetland-disturbing construction, including various conveyance methods, pipelines, and water exchanges. AR167617-AR167626.

For instance, although it would not increase Denver Water's overall firm yield (a distinct problem that *does* require a Section 404 permit to store new water), "in exchange for increased diversions through the [North] System" from an *existing* reservoir owned by another water provider, Denver Water could release a like amount of water "from a downstream reservoir [e.g., in its South System]." AR167626. This would better balance the supply ratios between Denver Water's North and South systems, and thereby enhance reliability and safeguard against vulnerability. Yet, the Corps dismissed this and other feasible alternatives that could indisputably address system imbalance without disturbing wetlands, because they could not *also* provide 18,000 AF/yr of new firm yield (a different question driven by demand). AR167619 (acknowledging that exchanges can capably "increase supplies to the Moffat [i.e., North] System," but eliminating exchanges because they "would not increase firm yield").

The Corps therefore violated the CWA by bootstrapping the system imbalance problem to the separate new firm yield problem, without rebutting the presumption that Denver Water can address system imbalance without disturbing wetlands. By merging these two disparate problems and arbitrarily excluding alternatives that cannot meet *both* needs, the Corps and Denver Water did not "clearly demonstrate" wetlands must be disturbed to address system imbalance, in violation of 40 C.F.R. § 230.10(a)(3). *See Simmons*, 120 F.3d at 667-70 (rejecting Section 404 permit that "proposed to solve both problems in one stroke" and thus limited alternatives, because the Corps never "paused to test its foundational assumption" that one permit must solve multiple problems); *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1260-63 (S.D. Fla. 2009) (vacating CWA permit where "[n]othing in the [] record indicates that the basic purpose of this project . . . requires siting within wetlands"), *aff'd*, 362 F. App'x 100 (11th Cir. 2010).[6]

The Corps' stated purpose also violates the 404(b)(1) Guidelines in another way. As with NEPA, defining a project's purpose is integral to Section 404 because it delineates the scope of the CWA alternatives analysis. *See Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1345 (8th Cir. 1994) ("Central to evaluating practicable alternatives is the determination of a project's purpose.").

Here, the Corps adopted an "overall project purpose" that is far narrower than the permit's "basic purpose" of providing Denver Water with "supplemental water supply." AR000022; *see also* AR000023 (restricting the "overall project purpose" by location and

---

[6] EPA—the agency that promulgated the 404(b)(1) Guidelines and, therefore, is entitled to deference in interpreting them—repeatedly told the Corps, to no avail, that combining distinct needs into one permitting process and requiring their simultaneous resolution violates the Guidelines by unlawfully restricting the consideration of alternatives. *See, e.g.*, AR176393-AR176394; AR174044-AR174048; AR014684-AR014685.

other needs). The Corps then used this highly circumscribed "overall project purpose . . . as the basis for the Corps' 404(b)(1) alternatives analysis," rather than the Project's basic purpose. AR000023. In doing so, the Corps screened out options that could meet the basic purpose of providing 18,000 AF/yr of new firm yield merely because they could not *also* achieve Denver Water's desire to address system imbalance. AR123826.

As EPA explained, its 404(b)(1) Guidelines prohibit applying an "overall project purpose" that is more constrained than the essential purpose of the activity, which excludes from consideration alternatives that are capable of achieving the basic purpose. AR014684. This is because EPA's Guidelines interchangeably refer to "overall project purposes" and "the basic purpose of the proposed activity" in determining which alternatives are "practicable." 40 C.F.R. § 230.10(a)(2). In fact, EPA's Guidelines make clear that the Corps may not deem alternatives impracticable merely because they cannot satisfy an applicant's location preferences (as the Corps did here); rather, the Guidelines contemplate the examination of alternative "area[s] *not presently owned by the applicant* which could reasonably be obtained, utilized, expanded or managed in order to fulfill *the basic purpose* of the proposed activity." *Id.* (emphases added).

The Corps violated these CWA precepts. Although EPA explained that it has long "determined that the terms 'basic' and 'overall project purpose' are to be used interchangeably and are not intended to have distinct meaning," AR014684 (citing examples), the Corps nonetheless "define[d] 'overall project purpose' and 'basic project purpose' to have separate meanings where the overall project purpose is more specific to the applicant's project, thereby eliminating potential practicable alternatives." *Id.*

The Corps' decision to do so is particularly suspect because EPA *and the Corps* previously agreed in the context of Denver Water's Two Forks water supply project that, despite Denver Water's "detailed 10-point statement of purpose which considerably narrowed the range of possible sites," the CWA required the agencies to broadly define the project purpose as the "provision of dependable long-term water supply to the metro Denver area." *Alameda Water & Sanitation Dist. v. Reilly*, 930 F. Supp. 486, 492 (D. Colo. 1996). When challenged, a member of this Court upheld the Corps' and EPA's determination that this broader water supply purpose—rather than a narrow, applicant-driven purpose—governs the CWA alternatives analysis. *Id.* (holding that the 404(b)(1) Guidelines required the Corps "independently to review and define the project's overall purpose," which is "not restricted to the definition contained in the [permit] application"). There, as here, the Corps cannot hide behind Denver Water's self-serving preferences to arbitrarily circumscribe what constitutes a practicable alternative for supplying water.[7]

Hence, the Corps' use of an inordinately narrow purpose to exclude alternatives not only violates EPA's 404(b)(1) Guidelines, but also arbitrarily and without explanation deviates from the Corps' established practice for comparable water supply projects, which this Court has upheld as the proper application of the Guidelines. In any event, the Court should defer to EPA's reasoned conclusion that the Corps failed to satisfy EPA's 404(b)(1) Guidelines by arbitrarily adopting Denver Water's purpose and need.

---

[7] EPA emphasized Denver Water's Two Forks project as an example of the agency's longstanding interpretation of its 404(b)(1) Guidelines as mandating the use of "a basic purpose test" for analyzing alternatives under the CWA due to the synonymous nature of the terms "basic purpose" and "overall project purposes." AR014684; *see also* EPA, *Final Determination for the Two Forks Water Impoundments* (Nov. 23, 1990) at 2-3 & n.2, https://bitly.ws/T3SI.

**B.**    **The Corps Failed to Satisfy Its Duty Under Both NEPA and the CWA to Independently Validate the Project's Purported Purpose and Need**

Under both NEPA and the CWA, the Corps has a duty to independently evaluate an applicant's asserted purpose and need for a permit in order to validate its legitimacy and accuracy, given the important role it plays in screening out alternatives.

Under NEPA, "the Corps, will in all cases, exercise independent judgment in defining the purpose and need for the project from both the applicant's and the public's perspective." 33 C.F.R. Part 325 App. B § 9(b)(4). It must also "document in the record the Corps' independent evaluation of the information [submitted by the applicant] and its accuracy, as required by 40 C.F.R. 1506.5(a)." *Id.* § 8(f).

Under the CWA, EPA's 404(b)(1) Guidelines state that no action "shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). This obligates the Corps to actually examine *all* practicable alternatives; "[o]bviously, an applicant cannot define a project in order to preclude the existence of any alternative[s] . . . and thus make what is practicable appear impracticable." *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989). This means that "the applicant's purpose must be legitimate," *id.* (internal quotation omitted), thereby requiring the Corps to validate the legitimacy and accuracy of the applicant's stated purpose and need to avoid unlawfully excluding practicable alternatives from consideration.

**1.**    ***The Corps Failed to Independently Validate Denver Water's Demand Projection***

The central purpose of the Project is to provide Denver Water with 18,000 AF/yr of new firm yield, which is driven by Denver Water's 2002 IRP and its water demand

projection that estimates a major supply shortfall to meet future demand. AR000022-AR000023. Throughout the permitting process, stakeholders called into question the Corps' analysis and validation of the IRP's demand projection, as well as the independence of the review itself. For many reasons, the Corps' uncritical adoption of Denver Water's purpose and need requiring 18,000 AF/yr of new firm yield—and screening out otherwise practicable alternatives that could not provide this precise amount of water—is arbitrary, capricious, and violates NEPA and the CWA.

As a threshold matter, the Corps did not conduct *any* independent analysis of Denver Water's 2002 IRP demand projection. The only examination of this projection inside or outside the Corps was conducted by a single consultant—Harvey Economics. But the record belies this consultant's independence from Denver Water. *Id.* In fact, Harvey Economics has *two* layers of conflict, each of which undermines its objectivity in assessing Denver Water's demand projection. *See supra* at 13-15.

First, the owner of Harvey Economics (Ed Harvey) was the Managing Director of BBC when it prepared Denver Water's 2002 IRP demand projection that sits at the heart of this case. And, while managing BBC, Mr. Harvey worked on projects directly related to the 2002 IRP and its demand projection. Moreover, Harvey Economics maintains an active consulting relationship with Denver Water (including during the Corps' permitting process) and, therefore, has a pecuniary interest in helping Denver Water achieve its objectives. *Id.* In other words, the Corps farmed out its "independent" review of Denver Water's demand projection to a person who both worked on that projection in the first instance *and* has an obvious business interest in seeing that projection affirmed.

Despite these red flags, the Corps neither conducted due diligence before hiring

Mr. Harvey nor properly responded to these conflicts during the permitting process by,

for example, obtaining additional, external reviews to validate Denver Water's demand

projection, as required by NEPA and the CWA. That, alone, compromised the integrity

of the Corps' process, and requires vacatur and remand. *See, e.g.*, *Sierra Club v.*

*Sigler*, 695 F.2d 957, 962 n.3 (5th Cir. 1983) ("[A]n agency may not delegate its public

duties to private entities . . . *particularly private entities whose objectivity may be*

*questioned on grounds of conflict of interest*." (emphasis added)); *N.Y. Pub. Interest*

*Res. Grp. v. Williams*, 511 N.Y.S.2d 864, 867 (1987) (disqualifying administrative law

judge where his company advises "private developers on energy projects" and he

therefore "might derive a benefit from his decision" in an energy-related matter).

Unsurprisingly, the self-interested review by the Corps' sole consultant produced

an outcome-oriented analysis that runs afoul of both NEPA and the CWA. Denver

Water's demand projection relies on a severely outdated precipitation data set (1971-

2000) and a very stale forecast of water use trends in the Denver Metro area (1973-

1999), which bear no relationship to *actual* precipitation data or water use trends when

the Corps issued the 2017 ROD during a hotter, drier time frame. *See, e.g.*, AR005831-

AR005848; AR005856-AR005858; AR014248-AR014250; AR014268. Indeed, as the

permit applicant concedes, "[a]ccording to Denver Water records, 2015 was our lowest

demand for water since 1970, despite a population increase of 400,000 people."

AR008475; *see also* AR006768-AR006771. Likewise, the water use trendline at the

time of the 2017 ROD clearly demonstrated a *consistent, gradual decrease* in overall

water demand in Denver Water's service area despite a growing population. AR005811.

But the Corps turned a blind eye to these inconvenient facts. It relies exclusively on reports from Harvey Economics in 2004 and 2012 to satisfy the agency's duty to independently evaluate Denver Water's demand projection. AR000022; AR123794. However, Harvey Economics explicitly *refused* in those reports to utilize newer methods and data to ensure an accurate demand projection. AR126037. This is because Harvey Economics believed "the structure of the 2002 water demand forecasting models remained sound and appropriate for projecting water demands in 2011," and thus "a re-estimation or new configuration of the water demand models was not needed." *Id.* Despite this cursory, unsupported assertion, there is no record evidence that the Corps questioned—let alone pushed back on—its consultant's troubling refusal to consider newer data, trends, and models. Had it done so, the Corps would have seen a *very* different picture of future water demand needs than those reflected in the 2002 IRP.

Compounding these errors, the Corps doubled down in its ROD on the continued use of this severely outdated data. Although it received detailed comments undercutting the validity of the 2002 IRP demand projection in response to its 2014 Final EIS, the Corps did not freshly evaluate this information. Instead, in 2017, the Corps pointed once again to the same reports by Harvey Economics from 2004 and 2012, AR000022, and brushed aside these grave concerns. AR000129 (responding to comments raising the consistent trends in precipitation and water use by stating generically that "[i]n any given year, weather and other factors will cause water use to increase or decrease"). Absent from the Corps' response and Harvey Economics' reports is any explanation of *why* their "given year[s]" are a more accurate depiction of future water demand than the more recent "given year[s]" identified by commenters based on more representative

41

data—itself a violation of administrative law. *See Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (holding that an agency acted arbitrarily in relying on data that "does not reflect actual tribal enrollment" instead of "other available data," and "refusing to adjust what the Tribe deemed errors in the agency's [chosen] data").

These facts demonstrate that the Corps failed to independently validate Denver Water's demand projection under the CWA or take a hard look at it under NEPA. It did so by ignoring more recent, more accurate data, which directly refutes the foundational purpose and need driving this permitting process, and which served as the explicit basis for screening out alternatives that could not achieve 18,000 AF/yr of new firm yield.[8]

Such a result does not comport with NEPA or the CWA. *See All. to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 606 F. Supp. 2d 121, 129-30 (D.D.C. 2009) (rejecting Section 404 permit where the Corps relied on an outdated water demand projection to exclude alternatives, even though newer data established a "reduced water need" at the time of permit issuance); *Sierra Club v. EPA*, 671 F.3d 955, 965-66 (9th Cir. 2012) (overturning decision that failed to consider newer data that "told a different story than . . . earlier data" on which the agency relied); *Cent. Or. Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1197 (D. Or. 2012) (holding that an agency "failed to take a hard look" under NEPA by relying on "older data" that was not reflective of recent data trends showing "greater temperatures and more extreme droughts").

---

[8] This is far from academic. The Corps eliminated *97 otherwise practicable alternatives* through two different screens based on the purported demand for 18,000 AF/yr of new firm yield, which also dictated the minimum size (15,000 AF) of any storage component for the Project. AR123826 (eliminating 3 alternatives under Screen PN1("[m]ust provide new firm yield"), and eliminating 94 alternatives under Screen LP1 ("[m]ust be capable of storing at least 15,000 AF in a surface impoundment")).

**2.** ***The Corps Failed to Independently Validate that the Location Restriction Would Meaningfully Address System Imbalance***

The Corps also did not independently validate the alleged system imbalance underlying the Project, which, like the water demand need, served to exclude many otherwise practicable alternatives from evaluation. AR123826 (eliminating 19 alternatives from consideration under Alternatives Screen PN2 ("[m]ust supply water to Moffat Collection System"). This glaring omission cannot pass legal muster.

For whatever reason, Denver Water structured its system such that the North System contains only 20% of available water supply and 10% of available storage. AR123781. But the obligations imposed by federal law require more of the Corps than a simple comparison of ratios to validate that an applicant has articulated a legitimate purpose that can support the issuance of a Section 404 permit to disturb wetlands.

As explained above, there are many ways (e.g., nonstructural approaches, pipelines, exchanges) in which Denver Water can address system imbalance and funnel water, when needed, through its North System and the Moffat Treatment Plant *without* disturbing wetlands. *See supra* at 34. Because Denver Water can feasibly address this issue without disturbing wetlands, system imbalance plainly is not a legitimate purpose, standing alone, upon which the Corps may grant a Section 404 permit. *See* 40 C.F.R. § 230.10(a)(3). If EPA's 404(b)(1) Guidelines prohibit the Corps from issuing a permit for system imbalance because non-wetland options are available, they most assuredly do not condone the opposite conclusion when an applicant merges this illegitimate purpose for a CWA permit with *another* distinct purpose (new firm yield) that further limits the consideration of alternatives—especially where the eliminated alternatives are capable of solving one need or the other in isolation. Put simply, the Corps did not (and cannot)

43

validate that system imbalance is a legitimate purpose for granting a CWA permit, where myriad options (that were eliminated only for failing to solve the different problem of new firm yield) could feasibly address imbalance without disturbing wetlands.

In addition, the Corps failed to validate whether *this* Project—capped at 18,000 AF/yr of new firm yield—can meaningfully address Denver Water's purported system imbalance, given that it would only provide a tiny fraction of Denver Water's overall supply. It currently has 345,000 AF of firm yield, 64,000 AF of which (18.6%) runs through the North System. AR123799. The Project would bring the total to 363,000 AF of firm yield, with 82,000 AF (22.6%) running through the North System. If, however, Denver Water obtained this 18,000 AF in its South System, then 64,000 AF of the total 363,000 AF (17.6%) would run through the North System. AR008389-AR008398.

This miniscule change in ratios means the Project will barely move the needle in addressing system imbalance. But the Corps failed to validate whether this nominal change can actually improve reliability and safeguard against vulnerability in any measurable way. Especially where the Corps is using this purpose to exclude otherwise practicable alternatives from consideration because they cannot supply the North System, it is incumbent on the Corps to validate whether issuance of the permit can legitimately achieve this highly restrictive purpose. AR005785-AR005787. Yet, the record is devoid of any quantitative analysis or explanation in support. Rather, the Corps uncritically accepted Denver Water's *ipse dixit* reasoning that adding *any* amount of water to the North System must automatically enhance reliability, and thus *must* be a sufficient basis to eliminate an entire category of otherwise practicable alternatives.

Accordingly, for this reason as well, the Corps' wholesale adoption of Denver Water's system imbalance purpose—and its exclusion of alternatives on that basis—is not the independent validation required by NEPA and the CWA. *See Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1270 (10th Cir. 2004) (citing cases for the fact that the Corps must ensure an applicant's objectives are "legitimate" and not an effort to "artificially constrain the Corps' alternatives analysis by defining the project's purpose in an overly narrow manner"; thus it may "rely on information provided by the applicant but must not do so uncritically"); *Van Antwerp*, 709 F. Supp. 2d at 1267-68 (finding that a Section 404 permit violated the CWA where "the Corps uncritically accepted the [applicant's] assertions that [the activity] required siting in these specific wetlands, in the face of possible alternatives that were presented to the agency").

### C.    The Corps' Alternatives Analysis Violates the CWA and NEPA

#### 1.    *The Corps Violated the CWA by Excluding Alternatives as Impracticable Without Proving Their Impracticability*

"[N]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). Practicable alternatives are those that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). "The burden of proof to demonstrate compliance with the § 404(b) permit Guidelines rests with the applicant; where insufficient information is provided to determine compliance, the Guidelines require that no permit be issued." *Utahns*, 305 F.3d at 1187; *see also id.* at 1186 ("[T]he burden is on the Applicant[], with independent verification by the [Corps], to provide detailed, clear and convincing information *proving*

impracticability"). Here, Denver Water and the Corps have not satisfied their burden to prove clearly that each abandoned alternative is, in fact, impracticable.

It is clear from the above discussion that the Corps eliminated an entire category of otherwise practicable alternatives that could provide Denver Water with 18,000 AF/yr of new firm yield based on a location restriction that has nothing to do with supplemental water supply, but attaches instead to the *separate* issue of Denver Water's self-created system imbalance. *See supra* at 31-37. Because those alternatives are indisputably practicable to achieve the Project's basic purpose of supplying new firm yield, and because Denver Water can address system imbalance distinct from any Section 404 permit without disturbing wetlands, the elimination of these alternatives as impracticable utterly fails to satisfy the Corps' and Denver Water's burden to *prove* they are genuinely impracticable to solve the central problem (firm yield) driving the CWA permit.

Likewise, the Corps eliminated another category of practicable alternatives on purported "timeliness" grounds. AR167620-AR167621 (eliminating 15 alternatives under Screen PN3 that could supply 18,000 AF/yr of new firm yield but could not be built by 2016); AR123826 (extending deadline to 2030, but still excluding 15 alternatives from consideration). As EPA told the Corps, imposing a timeliness requirement to exclude otherwise practicable water supply alternatives violates EPA's 404(b)(1) Guidelines. AR014685-AR014686. It allows an applicant's own timeline to unlawfully govern practicability; "[a] project proponent's decision to pursue a permit should not dictate time frames in which a project is considered because it artificially eliminates alternatives that may otherwise be available to a project proponent applying early in the process." *Id.* On this basis, EPA concluded that because the alternatives eliminated on "timeliness"

grounds are "available and capable of being done," *id.*—i.e., the test for practicability

under EPA's Guidelines, 40 C.F.R. § 230.10(a)(2)—timeliness "should not render an

alternative impracticable" because this is "not an appropriate basis for screening

alternatives" under the CWA. AR014685-AR014686.

Yet, the Corps once again ignored EPA and excluded 15 alternatives that could

provide 18,000 AF/yr of new firm yield (into the North System no less), merely because

they could not satisfy Denver Water's self-serving timeline. The Court should defer to

EPA's reasoned conclusion that the Corps failed to prove (let alone clearly) that these

alternatives are, in fact, genuinely impracticable under EPA's 404(b)(1) Guidelines.

The Corps' errors did not stop there. For the few alternatives that survived the

Corps' preliminary but arbitrary screening on location and timeliness grounds (as part of

Screen 1A), the Corps eliminated 20 additional alternatives on cost grounds as part of

Screen 1C, even though all of these options could supply 18,000 AF/yr of new firm yield

*and* do so in the North System to address imbalance. AR123820; AR123832-

AR123834. The Corps deemed Denver Water's preferred alternative (i.e., the Project

ultimately selected) "the least costly alternative" at $81,600,000 in 2007, AR167652,

adjusted to $148,700,000 by the time of the 2014 Final EIS. AR123936. The Corps

eliminated as impracticable under Screen 1C any alternative that costs more than "four

times the value of the least costly alternative." AR167652.

The Corps' approach, however, fails to account for the *overall* cost of the Project.

The Corps inexplicably deflated the cost of the Project in the Final EIS by disregarding

its exorbitant permitting and mitigation costs, which are necessary due to the substantial

size of the Project and the massive environmental damage it will cause. As the record

shows, the *actual* cost of the Project at the time of the ROD—including permitting and mitigation costs—was at least $380,000,000, *not* $148,700,000. AR004011-AR004013. This discrepancy matters: whereas the Corps excluded alternatives that cost more than $594,800,000 (i.e., four times the cost of the Project), the benchmark for exclusion should have been *$1,520,000,000*. When placed in the context of the CWA that mandates the selection of the least damaging *practicable* alternative, the Corps' arbitrary refusal to consider *overall* Project costs in deeming less damaging options impracticable fails to satisfy the Corps' burden to convincingly prove impracticability.[9]

In this same way, the Corps also violated NEPA. "Simple logic, fairness, and the premises of cost-benefit analysis, let alone NEPA, demand that a cost-benefit analysis be carried out objectively"; however, "[t]here can be no 'hard look' at costs and benefits *unless all costs are disclosed*." *Sigler*, 695 F.2d at 979 (emphasis added); *id.* (affirming lower court's finding that "the FEIS is skewed" and holding the FEIS "deficient under NEPA" because it failed to disclose all of the costs of the action).

Accordingly, the Corps has failed in several ways to prove the impracticability of dozens of unexamined alternatives through detailed, clear, and convincing information, and in the process also violated NEPA by failing to take a hard look at these options.

---

[9] EPA and the Corps agree that the CWA requires analysis of a project's *overall cost*, rather than an arbitrarily handpicked subset of costs. *See* 45 Fed. Reg. at 85,339 (EPA stating that "[o]ur intent [in the Guidelines] is to consider those alternatives that are reasonable *in terms of the overall scope/cost of the proposed project*" (emphasis added); 61 Fed. Reg. 30,990, 30,998 (June 18, 1996) (Corps adopting EPA's view that the "intent is to consider those alternatives which are reasonable *in terms of the overall scope/cost of the proposed project*" (emphasis added)).

### 2. The Corps Violated NEPA by Analyzing Five Virtually Indistinguishable Action Alternatives

As if any additional reasons are needed to demonstrate the preordained nature of the Corps' permitting process—which began and ended with the expansion of Gross Reservoir as the only serious option to address Denver Water's contrived multi-need purpose for a permit, AR177291 (identifying Gross Reservoir expansion in four of the five alternatives proposed in 2003)—the Corps' alternatives analysis cannot survive scrutiny under NEPA for yet another reason. It fails to consider any action alternative that would avoid the highly destructive expansion of Gross Reservoir in lieu of far less damaging options for providing Denver Water with supplemental water supply. This fails to "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

Here, *every* alternative the Corps examined in detail would result in the massive expansion of Gross Reservoir, ranging from 52,000 AF to 72,000 AF of new storage:

**Proposed Action (Alternative 1a):** 72,000 AF enlargement of Gross Reservoir

**Alternative 1c:** 52,000 AF enlargement of Gross Reservoir combined with a 20,000 AF reservoir at Leyden Gulch

**Alternative 8a:** 52,000 AF enlargement of Gross Reservoir combined with 20,000 AF of shallow aquifer storage at the Box Elder Creek site

**Alternative 10a:** 52,000 AF enlargement of Gross Reservoir combined with 20,000 AF of deep aquifer storage

**Alternative 13a:** 60,000 AF enlargement of Gross Reservoir combined with purchase of agricultural water rights

AR123837. Although each alternative tinkers around the margins with slightly different ways of storing a fraction of the new water supply, the touchstone of *every* alternative that survived the Corps' overly rigid screening process is the doubling (or more) of Gross Reservoir's storage volume—the exact outcome Denver Water demanded.

The Corps' failure to consider in detail *any* alternative that could provide Denver Water with supplemental water supply without expanding Gross Reservoir in an area uniquely sensitive to ecological damage defies blackletter NEPA law. *See, e.g.*, *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050-54 (9th Cir. 2013) (finding that an agency failed to "make an informed decision on a project's environmental impacts when each alternative considered would authorize the same underlying action"); *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (holding that a "range of action alternatives is unreasonably narrow [where] the alternatives are virtually indistinguishable from each other"); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (holding that an agency "failed to consider an adequate range of alternatives" where it considered "only a no action alternative along with two virtually identical alternatives").

As a result, the Corps' all-or-nothing approach to Gross Reservoir expansion flunked the Tenth Circuit's test of "provid[ing] legitimate consideration to alternatives that fall between the obvious extremes." *Dombeck*, 185 F.3d at 1175. Instead, *all* of the alternatives allow the "extreme" of expanding Gross Reservoir, rather than analyzing approaches for supplying water and/or addressing system imbalance that either avoid wetlands entirely or would cause far less damage to Colorado's environment.

## D.    The Corps' LEDPA Determination Violates the CWA and NEPA

In the same way the Corps and Denver Water must prove by detailed, clear, and convincing information that an excluded alternative is impracticable, they must also prove that the Corps' *chosen alternative* is, in fact, practicable. *See* 40 C.F.R. § 230.10(a) (prohibiting issuance of a Section 404 permit for any activity that is not the

least environmentally damaging *practicable* alternative). Hence, the record must show that the selected alternative is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). The Corps and Denver Water have not done so here.

The Corps concedes that climate change will shift the timing of snowmelt and stream flows such that "the yield of the Moffat Collection System would decrease due to existing capacity constraints." AR159570. This will likely "decrease Denver Water's yield" and reduce "the number of days Denver Water's water rights are in priority to divert water," which would "result in Denver Water building additional replacement sources to ensure an adequate supply of water." AR159570-AR159571.

Thus, stakeholders urged the Corps to analyze the best available evidence and model the impact of climate change on stream flows, to ensure that these foreseeable effects will not render the Project (selected as the LEDPA) incapable of satisfying Denver Water's purpose and need of supplying 18,000 AF/yr of new firm yield during the Project's lifespan. *See, e.g.*, AR014680 (EPA stating that the Corps must "analyze[] a scenario where flows are reduced substantially as a result of climate change," based on "[e]stimates of potential incremental changes in hydrology due to climate change influences"). Boulder County and others pointed to robust peer-reviewed literature that affirms the availability of well-established models to predict stream flow reductions due to climate change, and which reveals that "the majority of studies predict[] a diminished flow of between 15-30%"—meaning "Denver Water will not be able to fill an enlarged Gross Reservoir" because, under those conditions, it "will not provide a firm yield of

18,000 [AF/yr,] and the Proposed Action will not meet the stated Purpose and Need for the project." AR015445-AR015447; *see also* AR014571-AR014573.

Rather than evaluate the extensive evidence of climate change impacts on stream flows or hire scientific consultants to model these effects to determine whether the Project is practicable, as the CWA requires, the Corps *refused* to assess "hydrologic changes in response to [] climate change," including "climate change-induced stream flow predictions." AR124638-AR124640. Although "[c]limate change and global warming may be considered reasonably foreseeable," the Corps stated that it does not believe there is "a generally-accepted scientific method by which current climate change information [can be] translated into predictable stream flow changes." AR124640. As such, the Corps essentially accepted Denver Water's baseless assertion that "climate model projections are not predictions of future conditions" and thus "historical hydrology"—during cooler, wetter times—"is still the best planning tool." AR007445. On this backward-looking basis that dismisses the foreseeable effects of climate change and relies on an inexplicably truncated precipitation data set that ignores data and trends after 2000, Denver Water asserted (and the Corps accepted) that "[t]here is no actionable science that would justify a conclusion that the enlarged Gross Reservoir will not fill as necessary to produce the intended 18,000 [AF/yr] of yield." *Id.*

The Corps' failure to examine the best available science, established models for predicting future stream flows, and the effects of climate change to the Colorado River violates the CWA. While there may be uncertainty on the *precise* severity of climate change's effect on stream flows, it is certain that Colorado River stream flows *will* be negatively affected by climate change. *See, e.g.*, *Ctr. for Biological Diversity v. U.S.*

*Dep't of the Interior*, 72 F.4th 1166, 1179-82 (10th Cir. 2023) (discussing several available models that, based on data from *"the drought years of 2000-2015,"* the Bureau of Reclamation uses to reasonably predict "the effects of a warming climate and the likelihood of changes in hydrology," including "changes in flow," in the Colorado River basin (emphasis added)). The fact that *other* federal agencies are using models to examine identical issues undercuts the Corps' argument that doing so is impossible.

At best, the Corps' supply projection for the Project is wishful thinking; at worst, it is willful blindness. The agency assumes the Project will be capable of supplying 18,000 AF/yr of new firm yield based on hydrology data that stops in 2000. Notably, this cherrypicked dataset does not encompass the drought years of 2000-2015 that are emblematic of future climatic conditions. But the Corps spurned established science and modeling that consistently predict *reduced* stream flows in this region (and in this river). With these glaring analytical omissions, it is difficult to see how the Corps satisfied its burden of proving—through detailed, clear, and convincing evidence no less—that the Project will, or even can, capably satisfy the new firm yield need under the most likely scenarios of climate change during the Project's lifespan. Thus, the Corps acted arbitrarily by finding the Project to be the LEDPA, without proving that it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

Likewise, by ignoring available, established climate science and models that are relevant to the Project, the Corps sidestepped its duty under NEPA to analyze climate change and the consequent ability of the Project to satisfy the stated purpose and need. "Reasonable forecasting and speculation is . . . implicit in NEPA, and [courts] must

reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any

and all discussion of future environmental effects as 'crystal ball inquiry.'" *High Country*

*Conservation Advocs. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1196 (D. Colo. 2014).

But that is exactly what the Corps did. It acknowledged the foreseeable effects of

climate change. It admitted the existence of relevant (albeit what it viewed as imperfect)

climate evidence and stream flow models. But it then avoided using this information to

forecast the severity of impacts on the Project's practicability, relying instead on

historical data that is no longer predictive of future stream flow conditions that will likely

render the Project incapable of meeting the purpose and need. This is *not* the hard look

that NEPA requires. *See WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d

1222, 1236-37 (10th Cir. 2017) (rejecting analysis that "underestimates the effect on

climate change" where an agency "acknowledge[s] that climate change is a scientifically

verified reality" and "the climate modeling technology exists" and "is available for the

[agency] to use"); *Ctr. for Biological Diversity*, 72 F.4th at 1179-82 (10th Cir. 2023)

(upholding analysis of "the effects of a warming climate and the likelihood of changes in

hydrology" in the Colorado River, but only because the agency's model included data

from "the drought years of 2000-2015" and thus examined "the worst-case scenario").

For all of the reasons explained above, the Court should vacate and remand the

Corps' arbitrary and unlawful ROD, Section 404 permit, and Final EIS.

**III.    <u>FWS'S ACTIONS VIOLATE THE ESA AND THE APA</u>**

As explained above, in response to expert criticism from a preeminent fisheries

biologist, FWS revisited its 2016 BiOp; however, rather than address those critiques,

FWS withdrew the BiOp and terminated consultation, asserting that it "lacks the legal

authority to treat green lineage cutthroat trout as a protected species." FWS00132; *see also supra* at 26-28. This decision violates the ESA and the APA in several ways.[10]

First, FWS did not comply with the ESA's mandatory process for delisting species. *See* 16 U.S.C. § 1533(b)(5)(A)(i) (requiring FWS to publish all listing and delisting decisions in the Federal Register as proposed and final rules); 50 C.F.R. §§ 424.16, .18 (same). When FWS determined in 2012 that scientific evidence compelled the agency to include the green lineage cutthroat trout as part of the threatened greenback cutthroat trout species that FWS listed in 1978, FWS00335-FWS00337, it correctly stated that the species, *including green lineage cutthroat trout*, would remain listed until and unless FWS engaged in formal rulemaking to alter its status, if new science warranted such an outcome. FWS00336 ("Until the reviews and rulemaking, if necessary, have been completed, [FWS] will not change the listing status of the greenback."); *id.* (" [A]ll protection that is currently afforded to cutthroat populations that have been identified as greenback, including . . . [green lineage cutthroat trout] on the western slope of Colorado, will remain in place until rulemaking occurs, if necessary.").

Yet, when asserting for the first time in 2020 (only in response to this litigation) that new science required FWS to alter the status of the green lineage cutthroat trout, FWS failed to utilize the statutorily prescribed process for delisting a species and eliminating its concomitant protections under the ESA. While FWS can delist a species, it may do so *only* through the ESA's formal rulemaking procedures *See, e.g.*, *Humane Soc'y v. Zinke*, 865 F.3d 585, 600 (D.C. Cir. 2017) (holding that the ESA "allows the

---

[10] Although the green lineage cutthroat trout and the greenback cutthroat trout are subspecies, Petitioners use the phrase "species" because the ESA defines that term to encompass "any subspecies" or "distinct population segment." 16 U.S.C. § 1532(16).

assignment of a different conservation status to [a] segment" of a listed species, but only if FWS shows through a rulemaking that the statutory criteria are met).

In delisting the green lineage cutthroat trout, however, FWS did not engage in rulemaking, it did not solicit public comment, and it did not publish any proposed or final rule in the Federal Register. By defying these basic statutory prerequisites and the agency's own regulations, 16 U.S.C. § 1533(b)(5)(A)(i); 50 C.F.R. §§ 424.16, .18, FWS's delisting decision violates the ESA and the APA.[11]

Second, because FWS did not delist the green lineage cutthroat trout through the proper legal mechanism, FWS never analyzed whether the statutory factors that control delisting decisions actually justify delisting this species. *See Crow Indian Tribe v. United States*, 343 F. Supp. 3d 999, 1007 (D. Mont. 2018) (stating that FWS "must make listing and delisting determinations according to a five-factor analysis of potential threats"); 16 U.S.C. § 1533(a)(1) (enumerating the five factors); 50 C.F.R. § 424.11(c), (e) (same).

FWS acknowledged at the time of delisting that "the taxonomy of green lineage cutthroat trout *may not be resolved* (i.e., scientific name, scientific description)," FWS00132 (emphasis added), which suggests that its taxonomic status remains

---

[11] If FWS argues that it was excused from a formal delisting process in 2020 because it did not conduct a formal listing process in 2012, *see* FWS00140, that cannot justify FWS's neglect of its statutory duties here. Regardless of the legality of FWS's 2012 action—which is *not* before the Court—basic administrative law principles dictate that an agency may not violate the law merely because it previously may have violated the law. *See Am. Wild Horse Pres. Campaign v. Vilsack*, 873 F.3d 914, 924, 928 (D.C. Cir. 2017) (holding that "there is no 'oops' exception to the duty of federal agencies to engage in reasoned decisionmaking," and rejecting the agency's alleged lack of legal authority to take a prior action because "regardless of whether [an agency's] original decision was lawful," when it makes a new decision the agency must "grapple[] with" its prior statements and actions); *id.* at 928 (holding that "[i]n administrative law, as elsewhere, two wrongs do not make a right," and therefore the "assumption that a purported past mistake would excuse the agency's current missteps is wrong").

uncertain. But even if new science definitively showed in 2020 that the then-listed green lineage cutthroat trout was taxonomically distinct from the greenback cutthroat trout, that has *nothing* to do with the statutory factors that govern changes to the listing status of a species. *See* 50 C.F.R. § 424.11(c), (e)(2) (allowing FWS to delist a species if it "does not meet the definition of a listed species," but directing that FWS "shall consider the same factors and apply the same standards . . . [for] listing and reclassification"). Thus, not only did FWS unlawfully bypass the sole procedural mechanism available to delist this species, but it also arbitrarily failed to consider (let alone apply) the substantive criteria that Congress made dispositive for all delisting decisions.

Nor, for the same reason, did FWS conduct peer review as required by its longstanding listing policy. Although FWS must subject *every* delisting decision to a formal scientific peer review process, *see supra* at 9, FWS neither conducted that mandatory process nor complied with its substantive peer review safeguards.

In short, FWS delisted this species without demonstrating (or even attempting to show) that the green lineage cutthroat trout, while possibly distinct from other species, satisfies the sole criteria Congress made relevant to delisting. By stripping protections from this listed species without analyzing the relevant statutory factors or conducting peer review, FWS violated the ESA, the APA, and its own listing policy. *E.g.*, *State Farm*, 463 U.S. at 43 ("[A]n agency [action] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider.").

Third, FWS's decision to delist this species outside of the comprehensive, transparent process mandated by law, is made all the more arbitrary due to FWS's disregard of the specific commitments it made in 2012 when it conferred listing

protections to the green lineage cutthroat trout. Regardless of the obligations imposed by the ESA, its regulations, and the agency's listing policy, in 2012 FWS expressly committed itself to: (1) maintaining ESA protections for the green lineage cutthroat trout until FWS could complete a peer review process; and (2) maintaining those protections unless and until any rulemaking occurred, if warranted after the peer review process. FWS00336. In 2020, however, FWS did precisely the opposite; it eliminated these protections *before* the conclusion of any peer review process or rulemaking.

By binding itself in 2012 to undertaking certain, specific procedures and then washing its hands of them during this lawsuit when the agency no longer viewed them as convenient, FWS acted arbitrarily by saying one thing and doing another. This violates the fundamental duty under the APA to engage in reasoned decisionmaking. *See, e.g.*, *New England Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*, 727 F.2d 1127, 1130 (D.C. Cir. 1984) (Scalia, J.) (explaining that for an agency to say one thing and do another "'is the essence of arbitrary and capricious action'" (quoting *Squaw Transit Co. v. United States*, 574 F.2d 492, 496 (10th Cir. 1978)); *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 537-38 (D.D.C. 2016) (finding an agency's action "short on rationality" where it "state[d] one thing" but "is doing another").

Remarkably, in delisting this species through an informal letter to the Corps, FWS did not even acknowledge its 2012 commitments, let alone explain why it deviated from them. FWS00129-FWS00138. Rather, it stated that, "[s]ubject to funding and resource constraints," it "intend[s] to initiate a formal review of the status of the green lineage cutthroat trout after [Colorado Parks and Wildlife] has published their report (currently in preparation) that analyzes the current stability of the green lineage

cutthroat trout populations and their persistence into the future." FWS00137-FWS00138. Despite its prior commitments, nowhere did FWS consider maintaining protections for this species until the conclusion of this report and a rulemaking, if appropriate. This is yet another reason that FWS's decision is purely arbitrary. *See Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089-90 (D.C. Cir. 2009) ("Reasoned decision making . . . necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from" the agency's prior position); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 218 (2016) (rejecting an agency's action that "gave little explanation for its decision to abandon its [prior] practice").

Finally, FWS arbitrarily concluded that "[b]ecause green lineage cutthroat trout are not part of any species that is currently protected under the ESA, [FWS] lacks the legal authority to treat green lineage cutthroat trout as a protected species." FWS00132. In reality, FWS has broad authority to confer protections to species under the ESA, including, for example, to "treat *any species* as an endangered species or threatened species *even though it is not listed*" when it is similar in appearance to a listed species and "such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of [the ESA]." 16 U.S.C. § 1533(e) (emphases added).

Especially where FWS admits in its 2020 decision there is ongoing uncertainty regarding the taxonomy of cutthroat trout populations in Colorado, *see* FWS00132, FWS erred by incorrectly asserting that it lacked all legal authority to protect the green lineage cutthroat trout pending the outcome of an ongoing scientific review process designed specifically to answer important questions relevant to its listing status under the ESA such as "the current stability of the green lineage cutthroat trout populations

and their persistence into the future." FWS00137-FWS00138. FWS's expedient attempt to relinquish statutory authority that Congress clearly afforded the agency does not pass muster. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 528-32 (2007) (holding that "EPA has the statutory authority to regulate the emission of such gases from new motor vehicles" under the Clean Air Act, despite EPA's insistence to the contrary).

For all of these reasons, FWS's decision to delist the green lineage cutthroat trout, abandon its ESA protections, withdraw the BiOp, and terminate consultation with the Corps—rather than satisfy various substantive and procedural duties under the ESA to which FWS expressly committed in 2012—violated the ESA and the APA.

## CONCLUSION

For the reasons explained above, this Court should find that Respondents' decisions and environmental analyses violate the CWA, NEPA, and the ESA. Because these serious legal deficiencies go to the heart of the agency's decisions, the Court should order the default APA remedy and vacate these actions.

Respondents and Denver Water might request remedy briefing, as defendants often do to delay relief.[12] But "this is not a case in which the Court would deviate from the statute [i.e., the APA]" because the Project "is not an in-service system on which [water] users currently rely." *Or.-Cal. Trails Ass'n v. Walsh*, 467 F. Supp. 3d 1007, 1074 (D. Colo. 2020) (Martinez, J.). Thus, "to prevent the []Project from becoming a *fait accompli*," this Court, as in other cases involving comparable agency actions, should set aside these decisions in order to avoid any further sunk costs that could bias the

---

[12] Respondents and Denver Water already alluded to this possibility in the parties' joint case management plan. *See* ECF No. 129 ¶ 6.

agencies' reviews on remand. *Id.* at 1074-75; *see also Rocky Mountain Wild v. Dallas*, No. 19-cv-01512, 2022 WL 11733139, at *13 (D. Colo. Oct. 20, 2022) (Arguello, J.) (vacating ROD over the objections of the government and intervenor, because "no extraordinary facts exist" that would support remand without vacatur where "Respondents chose to rely upon a deficient FEIS"). Under these facts, vacatur is plainly the appropriate remedy.

Respectfully submitted

*/s/ William S. Eubanks II*
William S. Eubanks II
bill@eubankslegal.com

Matthew R. Arnold
matt@eubankslegal.com

Elizabeth L. Lewis
lizzie@eubankslegal.com

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(970) 703-6060

*Counsel for Petitioners*