.IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello

Civil Action No. 18-cv-03258-CMA

SAVE THE COLORADO,
THE ENVIRONMENTAL GROUP,
WILDEARTH GUARDIANS,
LIVING RIVERS,
WATERKEEPER ALLIANCE, and
SIERRA CLUB,

      Petitioners,

v.

TODD T. SEMONITE, in his official capacity as the Chief of the U.S. Army Corps of Engineers,
RYAN ZINKE, in his official capacity as Secretary of the Interior, and
MARGARET EVERSON, in her official capacity as Acting Director of the U.S. Fish and Wildlife Service,

      Respondents, and

CITY AND COUNTY OF DENVER, ACTING BY AND THROUGH ITS BOARD OF WATER COMMISSIONERS,

      Respondent-Intervenor.

---

## ORDER ON PETITION FOR REVIEW OF AGENCY ACTION

---

      This matter is before the Court on a "Supplemental Petition for Review of Agency Action" filed by Save the Colorado, The Environmental Group, WildEarth Guardians, Living Rivers, Waterkeeper Alliance, and the Sierra Club ("Petitioners"). (Doc. # 45-1.) The parties' positions are fully briefed. *See* (Docs. ## 134, 137–38, 143.) For the reasons explained below, this Court finds that the dredge-and-fill permit issued by the

U.S. Army Corps of Engineers to the City and County of Denver's Board of Water Commissioners ("Denver Water") is in violation of the Clean Water Act and the National Environmental Policy Act.

## I.      BACKGROUND

This case arises from Denver Water's desire to expand the Gross Dam and Reservoir ("the Proposed Action").[1] The Proposed Action would allow Denver Water to divert at least 18,000 acre-feet per year ("AFY")[2] of water from the Fraser River, Williams Fork River, and South Boulder Creek into the Gross Reservoir. *E.g.*, AR 1323781–82.[3] Impounding that much additional water would triple the size of the Gross Reservoir, which would require laying enough concrete to enlarge the Gross Dam by 125 vertical feet. *Id.* Approximately 400 acres of mostly forested land would become inundated, which would require the excavation of 1.6 million tons of rock and destroy more than 500,000 trees. (Doc. # 134 at 10–11); *cf.* AR 123782. Much of that construction has already taken place, and the Proposed Action is presently at risk of becoming a *fait accompli* despite no pronouncement from this Court yet on whether the Proposed Action is lawful. (Doc. # 145.)

---

[1] Throughout the parties' briefs and the administrative record, the Proposed Action is also referred to as the "Moffat Collection System Project."

[2] One acre-foot of water equals approximately 325,851 gallons of water—the amount of water needed to cover an acre of land with one square foot of water. AR 123690.

[3] The Gross Reservoir is approximately thirty-five miles northwest of the City of Denver and six miles south of the City of Boulder. *Id.*

To accomplish the Proposed Action required that Denver Water do two things: (1) amend its permit issued by the Federal Energy Regulatory Commission ("FERC"),[4] and (2) discharge fill material into wetlands, which requires a permit from the U.S. Army Corps of Engineers ("the Corps"). The instant case is about the latter—namely, the Corps' decision-making process in issuing that discharge permit.

Understanding this case's facts requires a degree of familiarity with the administrative procedures established by several federal environmental statutes. For that reason, before delving into the administrative procedures that Petitioners challenge, the Court begins with a primer on the first principles of the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), and the Endangered Species Act ("ESA").

Both NEPA and the CWA impose mandatory burdens on the Corps to fashion its administrative record in certain particular ways. Under NEPA, the record must show that the Corps meaningfully considered relevant issues, and the record must contain the Corps' reasoning as to why practicable alternatives to the Proposed Action are not worth pursuing. Under the CWA, however, the Corps' administrative record must support a factual finding—the Corps must *clearly demonstrate* that the Proposed Action is the "Least Environmentally Damaging Practicable Alternative" ("LEDPA"), which requires comparisons to practicable alternatives and process of elimination. In the

---

[4] The Gross Dam and its related facilities sit within land reserved for hydropower production regulated by FERC. To tamper with the Gross Dam and Reservoir requires amending the hydropower license issued by FERC to Denver Water. *E.g.*, AR 000017; *see also* (Doc. # 138 at 18).

explanation of law that follows, what must be kept in mind is that both of the Corps'
mandatory obligations under these laws turn on discussions of practicability, and
practicability derives in part from whether the alternative can satisfy the *purpose and
need* of the proposed project. Thus, the alternatives selected for further study and, by
extension, the sufficiency of the agency's administrative record, depend on the *level of
abstraction* that the agency chooses to use in framing the project's purpose. This
observation must be kept in mind while reading the explanation below because this
case, at its core, began because the Corps inappropriately framed the Proposed
Action's purpose-and-need statement, which unduly constrained the definition of
"practicability." That strategic choice wholly relieved the Corps of its burdens to explore
and discuss certain alternatives to enlarging the Gross Dam and Reservoir.

## A.    SUBSTANTIVE ENVIRONMENTAL LAW

### 1.    The Clean Water Act

The basic objective of the CWA is to "restore and maintain the chemical,
physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1311(a). To
"restore and maintain" water quality, the CWA creates a permit system whereby, under
§ 404 of the Act, the Corps can authorize, via permit, the discharge of fill material into
waters of the United States ("WOTUS"). 33 U.S.C. §§ 1251(a); 1311(a); 1344; *see also*
40 C.F.R. § 230.3 (defining WOTUS to include certain wetlands).[5] The Corps'
§ 404(b)(1) permitting process begins with a "public interest review" triggered by a

---

[5] The Court's administrative citations refer to the regulations in effect at the time the challenged
agency action occurred, which are CEQ's 1978 regulations as amended in 1986.

project proponent's application for a discharge permit. The Corps must thoroughly examine the applicant's project proposal and produce written findings that comply with regulations drafted by the EPA—the "§ 404(b)(1) guidelines." 33 C.F.R. § 323.6 ("The [Corps] will review applications for [§ 404(b)(1) permits] in accordance with guidelines promulgated by [the EPA] . . . . [A] permit will be denied if the discharge . . . would not comply with the 404(b)(1) guidelines."); *see generally* 40 C.F.R. § 230.12 (conditioning Corps permits on the satisfaction of the guidelines); *accord* 33 U.S.C. § 1344(b) (making the guidelines binding on the Corps). Critically, the CWA substantively limits the Corps' authority by mandating compliance with the guidelines.[6] The guidelines, in turn, require that the Corps' administrative record *proves* that "there is [no] practicable alternative to the proposed discharge which would have *less adverse impact* on the aquatic ecosystem." 40 C.F.R. § 230.10(a) (emphasis added) (the "LEDPA" determination). Unless the administrative record "clearly" demonstrates that the action authorized by the permit is in fact the LEDPA, the guidelines deprive the Corps of authority to issue said permit. 40 C.F.R. § 230.10(a)(3); *see also* 40 C.F.R. § 230.12.

The LEDPA finding requires comparison to "practicable" alternatives, but the definition of "practicability" depends on the context of each permit application. The guidelines generally define a practicable alternative as one that "is available and capable of being done after taking into consideration cost, existing technology, and

---

[6] Indeed, these substantive requirements make sense; plants can be propagated but—especially in the arid American West—water cannot. *See* 40 C.F.R. 230.1(d) ("[T]he degradation or destruction of . . . wetlands . . . is considered to be among the *most severe* environmental impacts . . . . The guiding principle should be that degradation or destruction of [wetlands] may represent an *irreversible loss*." (emphasis added)).

logistics in light of *overall project purposes*." 40 C.F.R. § 230.3(l) (emphasis added); *see also* 40 C.F.R. § 230.10(a)(2) (defining practicability to include areas not presently owned by the permit applicant if they could "reasonably be obtained, utilized, expanded or managed in order to fulfill the *basic* [project] *purpose*" (emphasis added)). Although the parties heavily dispute the meaning of "practicability," as detailed below, at least this much is clear: "practicability" turns in part on the purpose of the project.

What counts as a "practicable" alternative under the CWA also depends on two presumptions set forth by the guidelines. The first presumption, the "water-dependent" presumption, expands the universe of practicable alternatives. If the activity associated with the proposed discharge necessarily involves "the special aquatic site in question to fulfill [the project's] basic purpose," the Corps *must* presume that practicable alternatives exist that do not involve the special aquatic site—unless the record "clearly" demonstrates otherwise. 40 C.F.R. § 230.10(a)(3). Thus, if the activity is "water dependent," the Corps must consider and dismiss even more alternatives in order to support its LEDPA finding. The second presumption, the "no-discharge" presumption, forces the Corps to reason by process of elimination. If the proposed project involves discharge into wetlands, the Corps *must* presume that "all practicable alternatives . . . which *do not* involve a discharge . . . have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a)(3) (emphasis added). In other words, the non-discharge alternatives must be the LEDPA "unless clearly demonstrated otherwise." *Id.* Thus, if the proposed activity requires discharge into wetlands, the Corps by law cannot

find that its preferred alternative is the LEDPA unless it considers and validly dismisses every practicable alternative that avoids discharge into wetlands.

In sum, under the CWA and the EPA's § 404(b)(1) guidelines, the Corps cannot issue a permit authorizing the discharge of fill material into WOTUS unless the administrative record clearly demonstrates that said discharge is the LEDPA. To find that a proposed discharge is the LEDPA, the Corps must first frame the project's purpose and determine whether said purpose is water dependent. That preliminary framing of project purpose, along with the water-dependent presumption, determines the meaning of practicability and may expand the number of alternatives that the Corps must examine, i.e., the Corps must validly dismiss by process of elimination any of said practicable alternatives that might be the LEDPA.

### 2.    The National Environmental Policy Act

Under NEPA, "procedural mechanisms" are established that ensure agencies at least give "proper consideration [to] environmental concerns." *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1150 (9th Cir. 1997) (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)). Essentially, NEPA requires all federal agencies to prepare a written document known as an "environmental impact statement" ("EIS") that records the agency's deliberative process whenever said agency considers doing something that could constitute a "major federal action" that might "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)(C). When a proposed agency action implicates WOTUS *and* could constitute a major federal action significantly affecting the quality of the environment, the CWA

and NEPA converge. The Corps can produce an EIS and, separately, provide all the written findings required of its CWA public interest review. Or the Corps can satisfy both statutes at once by including the CWA's public interest review findings in its EIS. *See, e.g.*, 40 C.F.R. § 230.10(a)(4) (allowing the Corps to satisfy its CWA obligations by using the information contained in an EIS).[7] In the instant litigation, the Corps chose the latter.

Before setting forth what NEPA requires, it is worth explaining what it does not. Unlike the CWA, NEPA does not dictate a substantive outcome—at most, it requires that agencies make "fully informed and well-considered decision[s]." *E.g.*, *Vt. Yankee*, 435 U.S. at 558 ("its mandate to the agencies is essentially procedural"). This procedural mandate, however, is not a judicial license for the court to substitute its judgment for that of the agency. Rather, the court's review of an agency's NEPA compliance is bound by a "rule of reason." *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1233 (10th Cir. 2017) (citations omitted). Under this "rule of reason," agencies violate NEPA not by making questionable decisions, but by offering explanations in support of those decisions that are so inexplicably arbitrary or capricious that the action amounts to an abuse of discretion. *See id.* For example, an agency violates NEPA when the agency's reasoning in the EIS can be characterized as (1) a

---

[7] In addition to the statutory provisions of NEPA, NEPA has concomitant regulations that "must be read together as a whole in order to comply with [the Act]." 40 C.F.R. § 1500.3. The Council on Environmental Quality ("CEQ") has regulations about how other agencies should implement NEPA, and those regulations are "binding on all federal agencies." 40 C.F.R. § 1500.3; *see generally* §§ 1500–08. Each federal agency has its own regulations that explain how said agency incorporates the NEPA process into said agency's other processes. The Corps is no exception. *See generally* 33 C.F.R. Pt. 325 App'x B.

perfunctory, conclusory explanation devoid of sound logical reasoning or (2) a rationale that clashes with a considerable volume of credible, materially contradictory evidence without an explanation to soundly resolve the inconsistency. *See, e.g.*, *id.* at 1236–37 (rejecting agency's EIS for giving climate change no serious consideration when climate change is "a scientifically verified reality" and "climate modeling technology exists" that "is available for the [agency] to use"); *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1179–80 (10th Cir. 2023) (noting such modeling available in 2017 and 2018).

This abstract explanation of NEPA's normative thrust does not clarify what an EIS must look like to satisfy NEPA. To satisfy NEPA, an agency's EIS must prove that the agency took a "hard look" at the environmental impacts of the proposed action and practicable alternatives. *E.g.*, *id.* at 1233. A proper EIS must include a detailed report covering: (1) the "environmental impact" of the agency's proposed action, (2) unavoidable "adverse environmental effects," and (3) "alternatives to the proposed action." *Id.*; *see also City of Carmel*, 123 F.3d at 1150 (detailing the required contents of an EIS). Of these three, the significance of the alternatives analysis cannot be overstated. *See, e.g.*, *Colo. Env't Coal. v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999). To prove that the agency actually gave a "hard look" to the proposed action and its practicable alternatives, the EIS *must* "rigorously explore all reasonable alternatives to the [project proposal] in comparative form[ ] and give each alternative substantial treatment in the [EIS]." *Id.* The comparative discussion of alternatives defines issues more clearly and "provid[es] a clear basis for choice among options by the

decisionmaker and the public." This makes the alternatives analysis the "heart" of the EIS. 40 C.F.R. § 1502.14. However, an agency need not consider an infinite range of alternatives—only reasonable or feasible ones. 40 C.F.R. § 1502.14(a)–(c). The agency determines which alternatives are reasonable or feasible by including within the EIS a "Purpose and Need" section, which defines "the underlying purpose and need to which the agency is responding in proposing the alternatives." 40 C.F.R. § 1502.13. The goal of a project determines what is a "reasonable" alternative worth considering, so NEPA jurisprudence forbids an agency from defining a project's objectives in unreasonably narrow terms. *See, e.g.*, *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991).

### 3.    The Endangered Species Act

The ESA embodies "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978). 16 U.S.C. § 1532(16). Two federal agencies are charged with administering the ESA, although only one is implicated here—the United States Fish and Wildlife Service ("USFWS").[8]

Whether a "species" is "listed" as "endangered" or "threatened" requires an official determination by the USFWS. 16 U.S.C. § 1533.[9] That official determination

---

[8] Congress delegated the authority to implement the ESA with respect to terrestrial species to the Secretary of the Interior, which is the parent department in which the USFWS sits. The Secretary of the Interior delegated its ESA responsibilities to USFWS. 50 C.F.R. § 402.01(b).

[9] For context, a "species" is defined under the Act as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). The distinction between "endangered" and "threatened" status, however, is not particularly relevant to the instant case.

takes the form of an informal administrative rulemaking process that begins with a

general notice published in the Federal Register. 50 C.F.R. § 424.16(c)(1)(i); *accord* 16

U.S.C. § 1533(b)(5)(A)(i); 5 U.S.C. § 553. When USFWS contemplates listing a species

(or delisting a listed species), the ESA requires that USFWS use the "best available

scientific evidence" taken from "the biological expertise of the Department [of the

Interior] and the scientific community." To ensure that USFWS's consideration relies on

the best available scientific evidence, the USFWS has "a consistent and rigorous

practice of undertaking and managing peer review." U.S. Fish & Wildlife Serv.,

Director's Memorandum: Peer Review Process 1 (Aug. 2, 2016),

https://www.fws.gov/media/directors-memorandum-peer-review-process

[https://perma.cc/C9TD-KLNW]. Per USFWS's Peer Review Process Memorandum,

USFWS's listing and delisting decisions must solicit independent peer review as to the

following three issues: (1) whether USFWS has assembled and considered the best

available scientific and commercial information, (2) whether USFWS's analysis of said

information is correct and properly applied to the proposed action, and (3) whether

USFWS's scientific conclusions are reasonable. *Id.* at 2.

Section 7 of the ESA places an affirmative obligation on agencies to ensure they

do not jeopardize listed species. When a proposed agency action might affect a listed

species, Section 7 of the ESA obligates the USFWS to consult with the acting agency to

assess and mitigate the impact of the proposed action on said species and their critical

habitat. 16 U.S.C. § 1536(a)(2). This inter-agency consultation process requires

USFWS to produce a written report known as a "biological opinion." 50 C.F.R. §

402.14(g)–(h). The biological opinion must set forth factual findings on whether the proposed action "is likely to jeopardize the continued existence of [a] listed species or [its critical habitat]." *Id.* at (g)(4). Like listing decisions, biological opinions must rely on the "best scientific and commercial data available." *Id.* at (g)(8).

**B.      FACTS ABOUT THE CHALLENGED ADMINISTRATIVE PROCEDURES**

Denver Water is a municipal water utility that dispenses water to over 1.1 million entities around the Colorado Front Range metropolitan area. AR 173953. Denver Water's infrastructure is comprised of two delivery systems, which are referred to as the "North System," or the "Moffat Collection System," and the "South System." AR 123782. There is no infrastructure to convey water between the systems. AR 123788.



Denver Water's Collection System

In 2002, Denver Water hired the private consulting firm, BBC Research and Consulting, to update Denver Water's water management planning document, which led to the production of a "2002 IRP demand forecast." *See* AR 177569–792. A demand forecast, for context, is a planning document used to "define[ ] how much additional water a utility will need beyond its existing supply and when that water will be needed." AR 177575. The 2002 IRP demand projection postulated that, in 2016, Denver Water's customers will demand more water than Denver Water can currently supply. AR 177576, 177616. To that end, in January 2003, Denver Water contacted the Corps to request a CWA § 404(b)(1) permit. AR 177294–95.

When Denver Water contacted the Corps about beginning the permit application process, Denver Water contextualized its request by asserting that the permit would solve "a water supply reliability problem in Denver's Moffat Collection System and a vulnerability problem in Denver's entire collection system." AR 177294. From the very beginning—and twenty-one years later, at oral argument[10]—Denver Water recognized that this project sought to remedy two conceptually distinct issues. *See* AR 177294–95 (January 23, 2003 letter from Denver Water to the Corps). The first issue was that Denver Water simply needed more water. *Id.* The second problem, however, had to do with Denver Water's desire to enhance the efficiency of its water treatment and distribution infrastructure. According to Denver Water, its South System serves 90% of Denver Water's service area, whereas the North System only reaches 10% of Denver Water's customer base, which creates an imbalance in the system. This imbalance creates inefficiencies and puts the entire system at risk of failure in the event of a megadrought. *See, e.g.*, *id.*; *see also* AR 177289–90 (explaining the "Moffat Collection System Water Supply Reliability and the Entire Collection System's Vulnerability to a Disaster"); *see generally* AR 123788, 123804 (depicting and quantifying the imbalance).

According to Denver Water, the system imbalance can be meaningfully improved by targeting one component of the North System: the Moffat Water Treatment Plant. The plant "has never run out of water," but there were several instances in the last sixty years where it almost did—save for Denver Water taking emergency measures, which

---

[10] At oral argument, counsel for Respondents implicitly acknowledged as much. "[The discharge permit] was to solve *two* general problems; water supply shortages, and overreliance on the [S]outh [S]ystem." Hr'g Tr. at 32 (emphasis added).

included "constructing infrastructure and pumping treated water from the South System." AR 129541.[11] According to Denver Water, the issue is that the Moffat Water Treatment Plant shuts down from mid-October to April of every year, and bringing the plant online on short notice is either extremely inefficient or nigh impossible. *See* AR 00131 (noting that bringing the plant online requires "prim[ing] the chemical feeds and prepar[ing] the filters"); *see also* Hr'g Tr. at 46–47. To operate the plant year-round, Denver Water must pipe enough water through the plant to maintain the "minimum idle rate." (Doc. # 147 at 1) (defining "minimum idle rate" as "the lowest volume of water at which the plant can operate" to meet applicable regulatory requirements on the quality of drinking water).[12] The plant's minimum idle rate is approximately 30 million gallons per day—approximately 90 acre-feet per day. *See* AR 123871–72; *see generally* (Doc. # 147 at 1–2). However, according to Denver Water, during dry periods, there is not enough water stored in the reservoirs that feed the North System to meet the Moffat Water Treatment Plant's minimum idle rate. AR 123803; *but see* Hr'g Tr. at 47 ("I would suspect there's plenty of water in Gross Reservoir to keep an idle rate going."). The minimum idle rate is a problem referenced in the record, albeit poorly explained. *See* AR 000131; *but cf.* (Doc. # 147) (explaining that failing to maintain the minimum idle rate "effectively requires a full shutdown of the plant[ ]"). Although this information is not

---

[11] It strikes this Court as particularly ironic that Denver Water has apparently built infrastructure to move water from the South to North System before—yet claims any iteration of that solution would be impracticable as applied to the instant case.

[12] At this Court's request, Denver Water filed a supplemental letter briefly expounding on the technical minutiae of the "minimum idle rate" concept. (Doc. # 147.)

apparently in the record, Denver Water's supplemental filing explains that the plant's start-up protocols require such precise choreography that a full plant shutdown cannot be undone for days, sometimes up to a week. (Doc. # 147 at 1–2.) So, Denver Water's second goal—besides obtaining more water—was to feed the Moffat Water Treatment Plant enough water to keep it running perennially. *Id.* The Corps took note of Denver Water's objectives, as the law requires, and initiated a combined NEPA and CWA process.

    1.    <u>Pre-EIS Scoping</u>

On September 17, 2003, as required by NEPA,[13] the Corps issued a notice of intent to prepare an EIS for the Moffat Collection System Project, seeking public comment on the scope of the proposed project. *See* AR 175761; *accord* 68 Fed. Reg. 54432 (Sept. 17, 2003); 40 C.F.R. § 1501.3. In the scoping notice, the Corps characterized the project as a "water supply project" yet articulated four distinct needs to be solved by the proposed discharge permit:

**The Reliability Need:** Existing water demands served by Denver Water's Moffat Collection System exceed available supplies . . . during a drought, causing a water supply reliability problem. In a severe drought, even in a single severe dry year, the Moffat Treatment Plant—one of three treatment plants in Denver's system—is at a significant level of risk of running out of water.

**The Vulnerability Need:** Denver Water's collection system is vulnerable to manmade and natural disasters because 90 percent of available reservoir storage and 80 percent of available water supplies rely on the unimpeded operation of . . . Denver Water's South System.

---

[13] NEPA regulations require that federal agencies, as a "threshold determination" assess whether any given activity or decision they propose triggers NEPA by issuing a public scoping notice.

**The Flexibility Need:** Denver Water's treated water transmission, distribution, and water collection systems are subject to failures and outages caused by routine maintenance, pipe failures, treatment plant problems, and a host of other unpredictable occurrences that are inherent in operating and maintaining a large municipal water supply system. These stresses to Denver Water's ability to meet its customers' water supply demands require a level of flexibility within system operations that is not presently available.

**The Firm Yield Need:** Denver Water's near-term water resource strategy and water service obligations . . .  has resulted in a need for 18,000 acre-feet of new near-term water supplies.[14]

*E.g.*, AR 176962 (alteration in original); *see also* AR 176962.

The scoping notice received mixed reactions from the public. Denver Water agreed with the Corps that the project can and should address both the need for more water and the need to correct the system's geographical imbalances. AR 173948–988 (addressing both issues as separate subsections). Other stakeholders, however, disagreed. Multiple environmental organizations, for example, submitted public comments urging the Corps to frame the scope of the project in a way that would consider Denver Water's needs separately, because doing so would avoid the need to install or enlarge a major dam. *E.g.*, AR 176258, 176263. For instance, "Conduit X," one proposed alternative highlighted by the organization "Colorado Trout Unlimited," proposed bridging the South and North Systems via pipeline, which would theoretically address Denver Water's desire to fortify its system through rebalancing without the need for a massive dam construction project. AR 176261.

---

[14] "Firm yield" refers to water that can be reliably supplied during drought periods. AR 123692.

Of all the commenters, the EPA's particularly skeptical comments deserve emphasis because the EPA—the agency that wrote the § 404(b)(1) guidelines—warned the Corps that its application of said guidelines was legal error. The EPA advised the Corps that the scope of the project need not and should not seek to resolve both of Denver Water's demands simultaneously because doing so would lead the Corps to ignore alternatives that "could resolve the needs in[dependently]." AR 176393; *see also* AR 176394 (suggesting alternatives that addressed shortage concerns using means that do not necessarily require a § 404(b)(1) permit).

In December 2003, the Corps produced a "Scoping Summary" document reflecting its analysis of Denver Water's proposed project and consideration of public comments thus far. *See* AR 175578–6043. Despite the myriad comments begging the Corps not to uncritically adopt Denver Water's framing of the project purposes, the 2003 Scoping Summary concluded that the purpose of the Moffat Collection System Project should simultaneously solve all four of Denver Water's alleged needs. AR 175760–61.

Following the conclusion of the scoping inquiry, the Corps next assembled and led a coalition of federal and state agencies to begin the Herculean task of drafting an EIS. AR 000017.[15]

---

[15] This coalition was comprised of the Corps, the EPA, FERC, the Colorado Department of Public Health and Environment, and the Colorado Department of Natural Resources. Grand County, Colorado, was also permitted "Consulting Agency status" to opine on the project's potential "effects on county resources." AR 000016–17.

2.    2009 Draft Environmental Impact Statement

On October 30, 2009, the Corps released a draft EIS for public review. AR 173948–4007 ("DEIS").

a.    *The DEIS's Contents and Reasoning.*

The DEIS's purpose-and-need statement provided that the Moffat Collection System Project's purpose was "to develop 18,000 acre-feet per year of new, annual firm yield [and deliver that water] to the Moffat Treatment Plant and raw water customers upstream." AR 159083; *see also* AR 158908 (listing two distinct concerns: obtaining new firm yield between 2016 and 2030 ("timeliness") and correcting for the system's overall imbalance ("location")). The DEIS's purpose-and-need statement reflected the same four needs articulated by Denver Water in 2003. AR 159081–83**.** Many scoping comments urged the Corps to reconsider adopting this multifaceted purpose because doing so would set the threshold for practicability as only those alternatives that could simultaneously satisfy all facets of said purpose. The Corps explained its formulation of purposes by simply asserting its view that the EPA's § 404(b)(1) guidelines contemplate two types of project purposes—an "overall project purpose[ ]" and a "basic [project] purpose"—where each type of purpose was defined differently and governed different aspects of the Corps' public interest review. AR000022–23.

This multifaceted project purpose animated the DEIS's alternatives analysis, which began with a "preliminary" alternatives screening process that whittled down 303 potential alternatives to five—all of which involved some degree of tampering with the

Gross Dam. AR 159084–85; AR 159124.[16] Ultimately, after further consideration of these five "practicable" alternatives and their cumulative impacts on the environment, the DEIS recommended expanding the preexisting Gross Dam to accommodate an additional 72,000 AFY of storage—*i.e.*, the Proposed Action. AR 159085; *see generally* AR 159093–159127. The fact that all five alternatives that received a "hard look" involved tampering with the Gross Dam was not by coincidence—because an alternative's practicability derives in part from its capacity to serve the project's purpose.

As for the Corps' obligation under NEPA to discuss all relevant considerations, the alternatives analysis referenced climate change. However, rather than venture into any qualitative or quantitative analyses, the Corps explained that it would not consider climate change's potential effects on the practicability of the alternatives that survived screening. According to the Corps, no "accepted scientific method [for] transforming the general concept of increasing temperatures into incremental changes [to] stream flow or reservoir levels" existed that equipped the Corps to analyze how possible hydrologic changes might affect the Proposed Action. *See* AR 159572.

        b.    *Public Comments on the DEIS.*

The Corps' DEIS fomented a torrent of criticism. *See generally* AR 128487–134705 (documenting and responding to at least 2,500 submissions containing nearly 5,000 individual comments). The EPA, one of the many DEIS commenters, raised at

---

[16] Alternative 1(a) enlarged the Gross Reservoir by 72,000 AFY, while the other four alternatives suggested enlarging the Gross Reservoir by an amount less than 72,000 AFY alongside either implementing other storage methods or purchasing agricultural users' existing water rights.

least two issues that require specific mention because said issues bear directly on Petitioners' claims.

First, the EPA questioned the validity of the DEIS's purpose-and-need statement. The EPA explained that the regulatory phrases "basic project purpose" and "overall project purposes" are synonymous and interchangeable. By treating them as different terms, applicable to distinct parts of the CWA's public interest review, the Corps' reasoning rested on an erroneous interpretation of the guidelines—and using that framework as a rigid screening criterion would violate the guidelines. AR 014684–85. The EPA also criticized the narrowness of the purpose-and-need statement under NEPA. AR 014684–85 (citing 40 C.F.R. § 230.10(a)(2)), and warned that such an approach would violate NEPA:

> "Despite [EPA's] comments detailing the independent nature of these project purposes, the [DEIS] identifies the same four project needs" as one purpose "and has also specified the two underlying major issues of timeliness and location as additional considerations in defining and analyzing alternatives, *all of which inappropriately limit the alternatives evaluated*."

AR 014685 (emphasis added). The EPA invited the Corps to "clearly defend [its] assertion and provide additional rationale" on why Denver Water's four "needs" are not independent. *See* AR 014685 (warning that "Denver Water's desire to resolve all four problems with one federal action" might "preclude[ ] identification of *available, less damaging* practicable alternatives" (emphasis added)).

Second, the EPA criticized the DEIS for such superficial climate change considerations insofar as climate-change-driven hydrological aberrations would undercut the practicability of the Proposed Action or alternatives. AR 014680–81. The

EPA emphasized that the DEIS should at least consider the extent to which climate change might make it so there is no new water for the enlarged Gross Dam to impound. *See, e.g.*, AR 159570 (noting that climate change could significantly diminish the available raw water because increasing temperatures would hasten snowmelt and increase the volume of stream flows lost to evapotranspiration). The EPA asserted that, irrespective of the difficulty quantifying the magnitude of future hydrological changes, the Corps must better develop the administrative record to account for those changes given that at least some negative impact on stream flows is reasonably foreseeable. AR 014680. Ergo, the climate change considerations go to practicability. For example, the EPA highlighted the irony of the Corps' own observation that the project's water throughput would decrease, thereby reducing the days that Denver Water's water rights were in priority—priority being a necessary prerequisite for Denver Water to divert 18,000 AFY of water to the Moffat Collection Project in the first place. AR 158570–71.[17] As another example of inappropriate considerations, the EPA noted that the applicant's preferred timeframe is generally an inappropriate basis to exclude potential alternatives under the guidelines. AR 041685–86 ("A project proponent's decision to pursue a permit should not dictate time frames [*sic*] in which a project is considered *because it artificially eliminates* alternatives that may otherwise be available." (emphasis added)).

---

[17] Colorado, like many western states, regulates water resources using an appropriative system of rights where, under the tenet of "first in time, first in right," senior water rights holders are protected from injury by diversions caused by junior rights holders. *Aspen Wilderness Workshop v. Hines Highlands Ltd. Pshp.*, 929 P.2d 718, 725 (Colo. 1996); *see also Central Colo. Water Conservation Dist. v. Simpson*, 877 P.2d 335, 345 (Colo. 1994). Junior water rights holders are not prohibited from diverting water—they cause no "injury" if they exercise their right when it is "in priority." *Simpson*, 877 P.2d at 345.

3.    Final Environmental Impact Statement

On April 18, 2014, the Corps published its Final Environmental Impact Statement ("FEIS"). *E.g.*, AR 000030; *see generally* AR 123688–AR 134705. The summary of the FEIS requires discussing the conclusions and reasoning set forth in the FEIS and, separately, the Corps' decisions to make (or ignore) changes based on DEIS comments.

a.    *The FEIS's Contents and Reasoning.*

The FEIS's purpose-and-need statement was essentially the same as what was presented in the DEIS. AR 123781.[18] The Corps justified its adoption of Denver Water's issue framework despite the persistent objections of the EPA and others. It did not provide the "additional rationale" that the EPA suggested. AR 014685. Instead, the FEIS emphasized that the Corps independently corroborated Denver Water's purpose and need for 18,000 AFY of firm yield to the North System. AR 129309. The Corps' purportedly independent review, for context, considered five documents: two memoranda prepared by Denver Water and three reports by a consulting firm, Harvey Economics. AR 126008–33, 125968–6005, 126036–41. Harvey Economics reviewed the data on which the 2002 IRP demand projection models relied—twenty-seven years of economic demographic data that Harvey Economics "believed to be . . . sound and appropriate [variables] for projecting water demands in 2011." AR 126037.

---

[18] The only change was, for purposes of the instant motion, immaterial—an acknowledgment that Denver Water's mitigatory efforts necessitated amendment to the date of the projected annual water shortfall, from 2016 to 2022. AR 123781.

The FEIS adopted the DEIS's project purpose, and the DEIS's "preliminary" alternative screening process, so the FEIS produced the same outcome as the DEIS: five alternatives received a "hard look," all five of which involved some variation of enlarging the Gross Dam. AR 123818–42. Because the Corps declined to change the "preliminary" alternatives screening process, the Court pauses to explain it in greater detail here. The "preliminary" alternatives screening process proceeded in two phases: "Screen 1" and "Screen 2." Screen 1—which itself was broken down into three subphases—initially contemplated 303 potential options and evaluated them relative to existing technological limitations, logistics, costs, environmental consequences, and *the purpose and need statement*. AR 123820.

The Screen 1A subphase eliminated 261 potential alternatives because they were "[in]capable of meeting the basic Project Purpose and Need" or had some other "fatal flaw[ ]." *Id.*; *see also* AR 123821–24 (eliminating alternatives that would "require Congressional action," "require relocation of an interstate highway," or require "clear violation of state or federal environmental statutes"). Table 2-1 of the FEIS listed sixteen screening criteria; Table 2-3 broke down how these criteria were used to eliminate potential alternatives. *Id.*; AR 123826. Notably, the three purpose-and-need criteria— "must provide new firm yield," "must supply water to Moffat Collection System," and the 2016 deadline—preliminarily eliminated 37 possible alternatives without meaningful consideration. *Id.* 94 possibilities were rejected because they could not impound enough water, and another 58 options were excluded because they would require building a

new dam on a major waterway. *Id.* In total, Screen 1A reduced the practicable possibilities from 303 to 42.

The 42 remaining alternatives proceeded to Screen 1B, wherein the Corps sought to develop project alternatives by pairing "potential water supply source[s] with water storage and conveyance components . . . that would meet the Project Purpose and Need." AR 123827. By "matching a potential water source with water storage and conveyance components," Screen 1B paired all the remaining water supply sources, water storage options, and water conveyance infrastructure into possible combinations for the next subphase of preliminary screening. *See* AR 123827–32. Thus, Screen 1B transmuted 42 alternatives into 34.

The 34 remaining alternatives advanced to the Screen 1C subphase. During Screen 1C, the Corps first determined each alternative's "relative major capital cost" and converted each alternative into a ratio. AR 123832–33. According to the Corps, "relative major capital costs" consisted of "[r]ough order-of-magnitude (ROM) and [r]elative [d]evelopment [c]ost (RDC) estimates." *Id.* ROM costs referred to the estimated costs of a potential alternative's principal elements—*e.g.*, tunnel length, pipeline length/diameter, and impoundment capacity. *Id.* ROM costs did not, however, "represent the expected total project cost" because they did not account for the variable costs associated with permitting and mitigation. AR 123832–33.[19] Rather than attempt to estimate permitting and mitigation costs, the Corps instead concocted "RDC estimates," which purportedly reflected "a more representative cost estimate" by taking

---

[19] Dam operation and maintenance costs were also excluded.

50% of each alternative's projected ROM cost "to account for unknowns, contingencies, and total development cost escalation." *Id.* Each alternative's "relative major capital cost" was converted to a ratio, which was then ranked in a relative cost index with a cost threshold of 5.0. AR 123833. Alternatives with cost indices above the 5.0 threshold were rejected, which reduced the available alternatives to 14.

Finally, the 14 remaining alternatives reached Screen 2, which focused on "environmental consequences to the aquatic environment, other ecosystems, and other natural environmental values" in light of permanent consequences such as construction and reservoir inundation. AR 123836 (listing evaluation criteria). "Each evaluation category was treated as having equal weight, *i.e.*, wetlands [were] not considered as being more or less important than aquatic habitat." AR 123837. Screen 2 reduced the possible alternatives from 14 to the 5. Ultimately, the FEIS recommended a preferred alternative: the Proposed Action, "Alternative 1(a)"—expanding the Gross Dam to impound an additional 72,000 acre-feet of water.

As for climate change, the FEIS added a qualitative analysis but rejected the numerous comments demanding quantitative analysis. AR 124638–39; *but see, e.g.*, AR 015445–46. The FEIS acknowledged that "firm yield is controlled by drought periods," and that "[*m*]*ost* climate models" predict rising air temperatures in the West. AR 124638; AR 123798 (emphasis added). The FEIS even discerned a possible regional trend—"Colorado[ ] air temperatures have increased about 2 degrees Fahrenheit in the past 30 years[,] and future winter projections indicate fewer extreme cold months, more extreme warm months, and more strings of consecutive warm

winters." *See* AR 124638. Moreover, the FEIS noted that "[m]any scientific studies have predicted an increase in air temperatures, resulting in changes in the composition of winter precipitation and the timing of spring snowmelt." *Id.* The FEIS further observed that forward-shift in snowmelt runoff timeframes would decrease firm yield potential by minimizing "the number of days [that] Denver Water's water rights are in priority to divert water" to the North System. *Id.* However, because "hydrological modeling of the impact of rising temperatures on water resources in mountainous western regions var[ies] widely," the Corps concluded that there is no "generally-accepted [*sic*] scientific method to correlate" rising air temperature with changes in stream flow or reservoir levels. AR 124638–40 (citation omitted). Thus, the Corps declined to perform any quantitative analysis or even provide an estimate.

As for costs, the FEIS remained faithful to the RDC estimate cost metric as defined in the DEIS. AR 123832–33. Although the Corps acknowledged that RDC estimates "[did] not represent the expected total" cost of each alternative, the FEIS offered no new insight as to what made RDC estimates "a more suitable representative cost estimate . . . for use in comparing alternatives." AR 123832.

        b.     *The FEIS's Public Reception.*

The Corps received thousands of comments on the FEIS. *See generally* AR 128487–134704. Related to the § 404(b)(1) guidelines, again, multiple comments warned the Corps that the purpose-and-need statement would violate the guidelines and NEPA. AR 005832–33 (Save the Colorado's critique); AR 015444–45 (Boulder County's critique); AR 129310 (the EPA's critique). For example, the EPA, warned the

27

Corps that its insistence in separately defining "overall project purposes" would lead to CWA violations because the Corps' definition lacked any basis in the guidelines. AR 129310–11. The EPA also questioned the legitimacy of the Corps' LEDPA finding because the Corps' multifaceted purpose created a distorted practicability standard that left unexplored alternatives that had to be presumed the LEDPA until disproven. *See* AR 129312. The Corps, however, responded simply by reiterating Denver Water's framing of the issue—*without explaining why adopting that characterization made sense*—and reasserting the Corps' idiosyncratic interpretation of "overall project purposes." AR 129310, 129311–13 (concluding that Denver Water's needs are "interconnected" without explaining how).

As for NEPA, commenters denounced the Corps' failure to articulate a rationale for marrying the new firm yield need and the need to fortify the Moffat Water Treatment Plant. Given that the project purposes were so impactful on the definition of "practicability," commenters argued that the extent to which that dispositive factor led to the dismissal of multiple alternatives made the missing premise a critical link that must be articulated to justify its narrowing of the alternatives analysis. *See, e.g.*, AR 008390–91, 97; *cf.* AR 129311–13 (concluding without explanation that the Corps validly embraced Denver Water's entire wish list).

Commenters also questioned the FEIS's purpose-and-need statement by substantively challenging the legitimacy of Denver Water's underlying needs. Commenters claimed that the Corps erred in concluding Denver Water even needs new firm yield. AR 005831–48 (asserting that the 2002 IRP models utilized water-use data

so antiquated that it no longer resembles the region's hydrology or actual water use trends); *see also* AR 005856–57. Commenters expressed skepticism over whether the Proposed Action would even remedy Denver Water's purported vulnerability and flexibility problems because the Moffat Collection System Project would be a drop in the proverbial bucket given the ratio of imbalance between the North and South Systems. *E.g.*, AR 008391–92 (calculating a total imbalance reduction of 4%). Other commenters questioned whether the Proposed Action would even work. Pointing to the Corps' climate change acknowledgments, commenters argued that the region's current and projected future aridity belies the conclusion that an enlarged Gross Dam will see—let alone impound—18,000 AFY of new firm yield. *E.g.*, AR 008394 (citing FEIS App'x H-1).

Relatedly, many comments separately focused on the Corps' strategic avoidance of meaningful climate change considerations. Boulder County, for example, stressed that climate change's effect on precipitation must be quantified if not at least estimated because *dams rely on the occurrence of precipitation. See, e.g.*, AR 015445. Although some commenters—Denver Water among them—defended the Corps' decision to limit its climate change considerations to a qualitative analysis,[20] other commenters fervently

---

[20] Denver Water asserted that climate model projections "are not predictions of future conditions" such that "historical hydrology" offers "the best planning tool." AR 007445. Denver Water apparently convinced the Corps that "[t]here is no actionable science that would justify a conclusion that the enlarged Gross Reservoir will not fill as necessary to produce the intended 18,000 [AFY] of yield." *But cf. Ctr. for Biological Diversity*, 72 F.4th at 1179–80 (citing three peer-reviewed studies *published in 2017 and 2018* that establish declining flow rates in the Colorado River and American West as a whole); AR 015445–46 (quoting CEQ's 2010 interpretive guidance document on NEPA considerations of climate change) ("The level of detail in the analysis and NEPA documentation of [climate change] will vary among affected resource values. For example[,] if a proposed project *requires significant quantities of water, changes in water availability associated with climate change may need to be discussed in greater detail*." (emphasis added)). Needless to say, the CEQ's interpretive guidance document, when read

disagreed. Several offered peer-reviewed methods for predicting climate-change-induced stream flow reductions and noted that the majority of methods all but guarantee at least a 15–30% reduction in future stream flows. AR 015445–47; AR 014571–73.

The FEIS's cost representations also elicited public rebuke. Commenters cited records of conflicting cost representations and demanded that the Corps address the discrepancy. *Compare* AR 123936 (estimating the Proposed Action's cost at $148.7 million), *with* AR 004011–12 (representing to FERC that the Proposed Action will cost approximately $380 million).

Notwithstanding the public's significant concerns, rather than consider supplementing the FEIS, the Corps ratified it instead.[21]

4.    Record of Decision

In July 2017, the Corps issued its Record of Decision ("ROD"). AR 000008–90. The ROD certified the FEIS and adopted its findings, which included (1) that the Proposed Action "is compliant with NEPA Section 101" and "the Section 404(b)(1) Guidelines [of the CWA]" and (2) the Proposed Action "is the LEDPA." AR 000049–50.[22]

---

alongside observations of the American West's current aridity concerns, make the Corps' assumption dubious at best.

[21] Both the CEQ and the Corps' regulations authorize EIS supplementation to account for new information. 40 C.F.R. § 1502.9(d)(1)(ii); 33 C.F.R. § 230.13(b).

[22] The ROD also obligated Denver Water to offset the Proposed Action's harms through an approved mitigation plan, but the adequacy of mitigation is not challenged by the petition for review. That said, the mitigation plan is not a valid excuse for the CWA violations articulated below. However, in the interest of building a thorough record, the Court notes that the ROD obligates Denver Water to offset environmental impacts through an approved mitigation plan that focused on the South Boulder Creek and the headwaters of the Colorado River. However, the fact remains that construction of the Project will affect 2.24 acres of wetlands and 3.54 acres of other WOTUS. AR 000044, 47.

The ROD ossified the project's "basic" purpose as "to provide supplemental water supply," AR 000023, which is not "water dependent" in the Corps' view. AR 000023. The ROD also set forth a separate, "overall project purpose"—a much narrower goal incorporating many more restrictions—which formed the basis of the alternatives analysis. AR000023.

The ROD enabled the Corps to move the CWA process forward and issue Denver Water its § 404(b)(1) permit. With permit in-hand, Denver Water began construction in 2022; construction is expected to conclude by mid-2027. (Doc. # 138 at 19); *see also* (Doc. # 138-1 at 5). At present, the Gross Dam has been partly deconstructed in preparation for expansion, and Denver Water already dumped fill material as authorized by the Corps' discharge permit. (Doc. # 138 at 19 (describing the status of the Project's construction as of December 2023).) Denver Water has been pouring concrete on a near-continual basis. Hr'g Tr. at 50. The Gross Dam has not yet been fully expanded, however, which means the land surrounding the Gross Reservoir is not yet inundated.

     5.    ESA Process

The ESA ties into this case because of the "green lineage cutthroat trout"—a fish that lives in the Gross Reservoir as well as four streams that feed the reservoir: the Little Vasquez Creek, the Hamilton Creek, the Bobtail Creek, and the Steelman Creek. FWS 00021–22. The green *lineage* cutthroat trout is allegedly related to the ESA-listed species of fish known as the "*greenback* cutthroat trout." FWS 00010 (first citing 32 Fed. Reg. 4001 (Mar. 11, 1967), then citing 43 Fed. Reg. 16343 (Apr. 18, 1978)).

To fill the Gross Reservoir's enlarged capacity would require additional diversions of water from the four creeks listed above. Water diversion canals that lack "fish screens" can sometimes sweep fish into new areas along with the diverted water; this is called "entrainment." *See* FWS 00026.[23] On June 17, 2016, USFWS published a biological opinion and incidental take statement recognizing the possibility that the Proposed Action could harm green lineage cutthroat trout. AR 007833; *see generally* AR 00786–007858. In that biological opinion, USFWS promised to maintain "interim protection under the ESA" for the greenback lineage cutthroat trout because "[s]tudies have not been conducted specifically on the green lineage cutthroat trout" and because "several of [the green lineage cutthroat trout's] populations were previously identified as greenback cutthroat trout." FWS 007795–96; *see also* FWS 00013 (emphasis removed from original) (asserting that "threats described for the greenback cutthroat trout . . . [are considered] a surrogate for the threats to the green lineage cutthroat trout"); *see generally* FWS 00137 (explaining why USFWS provided interim protections). USFWS further promised to maintain "all protection that is currently afforded to [greenback cutthroat trout], including green lineage cutthroat trout . . . on the eastern slope and . . . on the western slope of Colorado . . . until rulemaking occurs, *if necessary*." FWS 00020 (emphasis added).

---

[23] The effects of entrainment are "difficult to assess and quantify without specific on-site entrainment studies." FWS 00027. USFWS struggles to "assess[ ] the number of fish lost from a population due to entrainment" and, as a result, USFWS "consider[s] the amount of water diverted from a given stream to be a surrogate for fish lost . . . due to entrainment." *Id.*

At the time, USFWS's 2016 promise of interim protections was supported by a white paper authored in 2012 by USFWS's in-house experts. FWS 00132. USFWS sought to revisit that promise based on a forthcoming "meristic study" reported in 2013 and published following peer review in 2019. *Id.* (first citing Metcalf et al., 2012, then citing Bestgen et al., 2019). In the 2016 biological opinion, USFWS also acknowledged that the Colorado Parks and Wildlife state agency ("CPW") was preparing a report on the status of green lineage cutthroat trout forthcoming in the spring of 2020. *Id.* This forthcoming CPW report was promised to be "the foundation of [USFWS's] comprehensive review of this cutthroat lineage" because USFWS expected CPW's report to resolve the taxonomy of the green lineage cutthroat trout. *See id.* Upon receipt of CPW's forthcoming report, USFWS promised to "initiate a comprehensive review of this fish, subject to funding and availability of agency resources." *Id.*

On October 3, 2019, the Corps requested that USFWS revisit the ESA § 7 consultation process vis-à-vis Denver Water's proposed Moffat Collection System Project. FWS 00137. As a direct result of the Corps request, on April 17, 2020, USFWS issued a biological opinion finding that green lineage cutthroat trout are genetically, morphologically, and geographically distinct from the greenback cutthroat trout. FWS 00137; *see* FWS 00133; 00135. USFWS determined that the green lineage cutthroat trout can be protected only as a separately listed species under the ESA, which requires formal rulemaking procedures. FWS 00132. Consequently, in the 2020 biological opinion, USFWS withdrew its 2016 biological opinion and incidental take statement. *Id.*

Thus, the green lineage cutthroat trout no longer posed a bar to the Moffat Collection System Project. *Id.*

That 2020 biological opinion addressed USFWS's 2016 promise to maintain interim protections. It stated USFWS's reason for departing from the expectations it set four years prior. The USFWS reviewed the meristic studies mentioned above and apparently determined that "further scientific information and data . . . casts additional certainty on the divergence of the green lineage cutthroat trout (and other lineages) from the greenback cutthroat trout subspecies." FWS 00133. This led USFWS to conclude that the green lineage cutthroat trout cannot piggyback off the greenback cutthroat trout's ESA protections absent the conclusion of a separate listing process. FWS 00133.

## C.    PROCEDURAL HISTORY

Petitioners began this lawsuit on December 19, 2018, by filing a petition for review that they supplemented on August 13, 2020. (Docs. ## 1, 45-1.) On March 31, 2021, this Court dismissed the petition for lack of jurisdiction because of confusion related to the FERC permit attached to the Gross Dam, (Doc. # 70), but on September 30, 2022, the Tenth Circuit reversed and remanded this case for further proceedings. (Doc. # 77-1.) In late January and early February of 2023, the parties jointly filed almost 200,000 pages of administrative records. *See* (Docs. ## 83–103, 105–17, 119–124.) On September 20, 2024, the Court heard oral argument on the merits of the petition for review.

## II.   <u>STANDARD OF REVIEW</u>

The Administrative Procedure Act ("APA") directs courts to "hold and set aside" agency action deemed "arbitrary, capricious, an abuse of discretion, or not in accordance with law" including actions found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

Petitions for review invoking APA § 706(2) essentially turn on the quality of the agency's reasoning. The "arbitrary or capricious" standard mandates reversal or vacatur under § 706 when an agency acts without first "examin[ing] the relevant data *and articulat[ing] a satisfactory explanation* for its action[,] including a 'rational connection between the facts found and the choices made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation omitted) (emphasis added). That explanation must be "based on a consideration of the relevant factors" and cannot exhibit "a clear error of judgment." *Id.*; *see also Colo. Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1220 (10th Cir. 2006). Quintessential examples of arbitrary and capricious agency reasoning include situations where an agency relied on an explanation that "runs counter to the evidence before the agency" or is "so implausible that [the explanation] could not be ascribed [as] a difference in view or the product of agency expertise" or if the agency "failed to consider an important aspect of the problem." *Id.*

A "presumption of validity attaches to the agency action," and, especially when the agency's challenged decision is within its area of expertise, the Court's review must be "highly deferential." *Citizens' Comm. to Save our Canyons v. Krueger*, 513 F.3d

1169, 1176 (10th Cir. 2008) (internal citations and quotations omitted); *see also San Juan Citizens All. v. Stile*, 654 F.3d 1038, 1057 (10th Cir. 2011). However, the presumption of validity does not shield an agency's conclusions simply because said agency acts within its area of expertise. The agency must "follow required procedures" in reaching substantive conclusions because, if it does not, the APA requires reversal or vacatur. *See Krueger*, 513 F.3d at 1176.

### III.  INTRODUCTION AND ANALYSIS

The debate over the Gross Dam and Reservoir expansion proposal is both public and passionate. The administrative record makes abundantly clear that a plethora of stakeholders in the Colorado River and Front Range's water resources are deeply concerned about any proposal that tampers with the region's already precarious water management system and uncertain hydrological future. And rightfully so—there is a massive and ongoing intersectional discussion about the "Law of the Colorado River." Considerable public discourse persists because the Colorado River supports seven states—Colorado, Wyoming, Arizona, Utah, New Mexico, Nevada, and California—and multiple federally recognized Indian tribes, including the massive Navajo Nation. *See generally* Charles J. Meyers, *The Colorado River*, 19 Stan. L. Rev. 1 (1966–1967).[24]

---

[24] This footnote provides information that, while not necessarily explicit in the administrative record, is a prerequisite for any legitimate discussion of western water resource management. The American West's viability rests in large part on the Colorado River, which is an undeniably overutilized water source. The Colorado River's over-allocation is due to a fatal flaw baked into the 1922 Colorado River Compact—the bedrock-level agreement that forms the basis of the various overlapping management systems dictating the River's death by a thousand cuts. The Colorado River Compact rests on a politically unpalatable truth—the Compact promised the basin states water that simply does not exist. According to water experts, the Compact's apportionment scheme draws from deliberately misleading hydrological modeling of the Colorado River's flow rates. *See generally* Eric Kuhn & John Fleck, *Science Be Dammed: How*

To summarize the analysis that follows: Petitioners have standing, and this case is not moot. The Corps' issuance of Denver Water's § 404(b)(1) permit contravened the CWA and violated NEPA, but the USFWS's decision to withdraw interim protections did not violate federal law.

## A.    JURISDICTIONAL ARGUMENTS

At the outset, the Corps and USFWS (collectively "Respondents") and Denver Water challenge Petitioners' right to even bring this lawsuit for two reasons. First, Respondents argue that Petitioners lack standing. (Doc. # 137 at 63–66.) Second, Denver Water contends that the case is mooted by the current progress of the dam construction. (Doc. # 138 at 20–27.) However, neither argument is availing.

---

*Ignoring Inconvenient Science Drained the Colorado River* 1 (Univ. Ariz. Press 2019). That fatal error now sits enshrined within the Compact, and all of the basin states' various agreements with each other (and with the Department of the Interior) are forced to overcorrect for the Compact's flawed hydrology because revisiting the agreement would require a virtually unthinkable amount of time, energy, money, and political will. However, should Colorado River diversions exceed the river's available water supply—which appears inevitable, at this rate—the 1922 Compact provides a "compact call" mechanism whereby the upper basin states are bound to curtail their water users' diversions to ensure enough water reaches the lower basin states and Mexico to satisfy the artificially inflated water delivery obligations set forth in the Compact. This Court emphasizes this context for good reason: the cracked foundation of the Colorado River's management system all but demands skepticism over any proposal that will affect the hydrology of the Colorado River basin. In the instant case, the Corps noted in its FEIS that its reasoning rests on the assumption that there will be no compact call. AR 159092; *but see* AR 0014667. However, considering the American West's last few decades of severe aridity, such an assumption warrants considerable scrutiny. *See, e.g.*, Anne Castle & John Fleck, *The Risk of Curtailment under the Colorado River Compact* 5, 34–35, 40 (2019) (emphasis added) ("Even if the risk of curtailment of Colorado River rights were assumed to be low, the consequences are not. Cities, and farmers and ranchers on the West Slope, would lose economic activity, jobs, income, and community benefits."); *Cherokee Water Dist. v. City of Colo. Springs*, 519 P.2d 339, 340–41 (1974) ("Water is essential to the existence of a community." (emphasis added)). In light of this context, it is perplexing to this Court that the Corps dismissed the possibility of a compact call in its analysis of a proposed water management project.

1.    Standing

"[U]nder Article III, a federal court may resolve only 'a real controversy with real impact on real persons.'" *W. Watersheds Project v. Interior Bd. of Land Appeals*, 62 F.4th 1293, 1297 (10th Cir. 2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* at 1296 (citations omitted). A plaintiff (or, in this case, petitioner), bears the burden of establishing these elements, and they must do so for each claim and form of relief sought—and they must maintain that interest at all stages of litigation. *Id.*; *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008).

Respondents' standing arguments revolve around the ESA. Respondents argue that: (1) Petitioners' declarations are not specific enough to prove injury-in-fact, (Doc. # 137 at 64–66); (2) Petitioners cannot show redressability because USFWS lacks jurisdiction over the green lineage cutthroat trout, *id.* at 64–65; and (3) Petitioners cannot sue under Section 4 of the ESA because they failed to submit citizen petitions for listing, *id.* at 73. In response, Petitioners append to their reply brief the declaration of Geoffrey Elliott, which asserts additional details about Petitioners' relationship to the green lineage cutthroat trout. (Doc. # 143 at 37 (citing Doc. # 143-1).)

Considering the facts of the instant case, Petitioners have adequately alleged an injury-in-fact that is concrete, particularized, and actual or imminent. "Courts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a

defendant, and to grant a [petitioner] a cause of action to sue over the [respondent's] violation of that statutory prohibition or obligation." *TransUnion*, 594 U.S. at 425. Petitioners' appended declarations allege both procedural harm—violations of the various environmental statutes that dictate how an agency goes about making decisions affecting the environment in which Petitioners' members live—and concrete injuries— harm to the environment which, as the declarations also establish, are places in the world that Petitioners' members have visited and will visit again soon. (Doc. # 134-1, 134-2.)[25] Next, Petitioners have shown that their alleged injuries were caused by Respondents. Petitioners' members allege harms that are a direct result of the actions permitted by the Corps and USFWS. *Id.*; *see also* (Doc. # 134 at 38). Finally, Petitioners have articulated injuries that would be redressable by judicial relief. Petitioners allege that USFWS has jurisdiction over the green lineage trout as evidenced by its ability to extend interim protections, and Petitioners adequately defend that assertion with citations to the administrative record showing that the USFWS indeed considered itself authorized to extend interim protections once before. *E.g.*, (Doc. # 143 at 37 (citing FWS 000335–37).) Moreover, although USFWS changed its mind after citing several peer-reviewed studies, it did promise to wait until CPW released its spring 2020 report. FWS 00020. Nonetheless, for purposes of determining standing, this Court "must assume" that Petitioners' claim has "legal validity," *i.e.*, they are able to prove that fact.

---

[25] Although part of Petitioners' proof comes from declarations appended to a reply brief, the Court accepts this submission without issue because binding precedent allows it, if not implicitly requires it. *See Davis*, 554 U.S. at 733; *U.S. Magnesium, LLC v. EPA*, 690 F.3d 1157, 1164 (10th Cir. 2012) (considering affidavit attached to reply brief for standing purposes); *accord Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988).

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006).

Respondents' arguments to the contrary "put the merits cart before the standing horse."

*Id.* at 1093 (quoting *McConnell v. FEC*, 540 U.S. 93 (2003) ("[S]tanding in no way

depends on the merits of the plaintiff's contention that particular conduct is illegal."

(emphasis added)).

2. <u>Mootness</u>

"Mootness usually results when a plaintiff has standing at the beginning of the

case but, due to intervening events, loses one of the elements of standing during

litigation[.]" *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th

Cir. 2012). If "events so overtake a lawsuit that the anticipated benefits of a remedial

decree no longer justify the trouble of deciding the case on the merits, equity may

demand not decision but dismissal." *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681

F.3d 1208, 1210 (10th Cir. 2012). At bottom, the inquiry is essentially whether

"circumstances have changed since the beginning of litigation that forestall *any*

occasion for meaningful relief." *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727–28

(10th Cir. 1997) (emphasis added) (citation omitted). The burden of showing mootness

rests with a defendant—or in this case, a respondent/intervenor—and requires showing

that intervening events make it "impossible for the court to grant any effective relief

whatever." *See, e.g.*, *Church of Sci. of Cal. v. United States*, 506 U.S. 9, 12 (1992)

(emphasis added) (quotations omitted). For that reason, a showing that partial remedies

remain available typically defeats a claim of mootness. *See, e.g.*, *Airport Neighbors All.,*

*Inc. v. United States*, 90 F.3d 426, 428 – 29 (10th Cir. 1996) ("However, courts still

consider NEPA claims after the proposed action has been completed when the court can provide some remedy if it [finds a NEPA violation]."); *cf. Caddo Nation of Okla. v. Wichita & Affiliated Tribes*, 877 F.3d 1171, 1176 (10th Cir. 2017) (internal citations and quotations omitted) (finding mootness not of a case, but of a "specific request for an injunction").

Intervenor urges this Court to declare moot Petitioners' claims for three reasons. First, Denver Water already discharged all the fill material into WOTUS that its § 404(b)(1) permit allowed. (Doc. # 138 at 26.) Second, the case is allegedly moot because Petitioners declined to move for injunctive relief. *Id.* at 25 & n.6. Third, the environmental impacts that remain—namely, the inundation of land caused by the Gross Dam's newfound storage capacity, the destruction of trees on said land, and the excavation of additional rock—do not implicate the § 404(b)(1) permit. *Id.* at 26–27.

Denver Water's arguments are unavailing. For one, the record is replete with evidence that a live "case" or "controversy" remains. 690 F.3d at 1182. Although construction is underway, and filling of WOTUS has regrettably already occurred, the Gross Reservoir has yet to impound excess water, which means the shoreline of the reservoir at its pre-enlargement levels has not yet changed, and the majority of the 500,000 trees remain alive. Hr'g Tr. at 51, 60–61 (promising to quarry additional aggregate material for the dam's concrete and remove the trees); *see generally* (Doc. # 145) (explaining the status of construction as of September 12, 2024). The trees remain alive, water diversions have yet to occur, and wildlife has not been impacted by the sudden loss of land. Ergo, this Court's decision can affect said trees, water, and

wildlife—which are partial remedies that could undeniably offer Petitioners some relief. To the extent Denver Water disagrees, it has only itself to blame—because Denver Water chose to proceed with construction despite the obvious risk posed by pending federal litigation that could lead to vacatur of the permits authorizing said construction.[26] Denver Water cannot "evade judicial review" or "defeat a judgment" through its own "questionable behavior." *Unified Sch. Dist. No. 259, Sedgwick Cnty., Kan. v. Disability Rights Ctr. of Kan.*, 491 F.3d 1143, 1149 (10th Cir. 2007 (internal quotations omitted).

## B.    SUBSTANTIVE ARGUMENTS

Petitioners' arguments reduce themselves to seven legal claims—two violations of the CWA, four violations of NEPA, and one ESA violation. Rather than summarize each argument here, the Court recites each of Petitioners' positions sequentially, below.

### 1.    The Clean Water Act

Petitioners claim that, for two reasons, the Corps violated the CWA and the Corps' own regulations—specifically, the Corps' Part 325 regulations, in which the Corps agrees to follow the EPA's § 404(b)(1) guidelines. First, Petitioners assert that, because the record does not "clearly" demonstrate that the alternatives rejected by the Corps are not actually available, the Corps failed to rebut the guidelines' presumption that "practicable alternatives" are available which do not require disturbing wetlands.. (Doc. # 134 at 42–47 (citing 40 C.F.R. § 230.10(a)(3)); Doc. # 143 at 21–27.) Second, Petitioners contend that, because the record does not contain sufficiently "detailed,

---

[26] Let the costs associated with Denver Water's litigation of this matter and the ramifications of possible permit vacatur serve as a lesson to future permit applicants that seek to hastily complete their project goals on a questionably valid permit before it gets vacated.

clear and convincing information" proving that all available alternatives are otherwise impracticable, the Corps failed to prove that the Proposed Action is in fact the LEDPA. (Doc. # 134 at 54–63 (first citing 40 C.F.R. § 230.10(a), then citing *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1186–87 (10th Cir. 2002).) Both arguments rest on the premise that the Corps improperly excluded alternatives as impracticable based on an erroneous interpretation of the guidelines. (Doc. # 137 at 55–57); *accord* AR 000022–23 (defining "basic project purpose" and "overall project purposes" as mutually exclusive).

As explained below, this Court finds that the record supports Petitioners on both points. Implicit within the Court's conclusion is a determination that the Corps' idiosyncratic interpretation of the guidelines is unlawful and, to the extent the Corps disagrees, its rationale is unconvincing.

a.   *Threshold Question: What Does "Overall Project Purposes" Mean?*

When a party challenges an agency's interpretation of the text of a regulation, the Court must first clarify what the regulation means before applying it to the instant case. *See, e.g.*, *Kisor v. Wilkie*, 588 U.S. 558, 566–74 (2019). If a regulation is truly ambiguous or vague, a court typically defers to the interpretation of the agency responsible for drafting it—absent a showing that said agency's interpretation is "plainly erroneous or inconsistent with the regulation [itself]" or "countervailing reasons outweigh" the need for deference. *See, e.g.*, *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (Scalia, J.) (internal citations and quotations omitted); *Kisor*, 588 U.S. at 573. If an

agency's interpretation receives no deference, it can still be considered persuasive. *Kisor*, 588 U.S. at 573 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

To contextualize the interpretive dispute, the guidelines' "practicability" definition section mentions "overall project purposes," but not "basic purpose[s]." *Compare* 40 C.F.R. § 230.10, *with* 40 C.F.R. § 230.1(l). Yet the § 404(b)(1) guidelines instruct the Corps to ascertain the "basic [project] purpose" to determine whether the "water-dependency" presumption applies. According to the Corps, the different wording implies that the two phrases must mean different things, so the Corps created its own definition of "overall project purposes" and used that definition to dictate what makes an alternative "practicable." *See* (Doc. # 138 at 47 n.11 (citing U.S. Army Corps of Eng'rs, Updated Standard Operating Procedures for the U.S. Army Corps of Engineers (July 1, 2009), at 15–16, [hereinafter "2009 Standard Operating Procedures"] https://www.spd.usace.army.mil/Portals/13/docs/regulatory/qmsref/eis/Regulatory%20SOP%20July%202009.pdf [https://perma.cc/Y788-Z526])); *see also* AR 000022–23. Consequently, the ROD sets forth two project purposes—a "basic project purpose" and an "overall project purpose."

Petitioners challenge the Corps' notion that the phrase "overall project purpose" should have its own definition with operative legal effect. Petitioners insist that "basic project purpose" and "overall project purpose" must mean the same thing, e.*g.*, (Doc. # 143 at 13–14),  because the EPA says they do, and the EPA wrote the guidelines. For support, Petitioners cite (1) the EPA's public comments on the DEIS and FEIS that insist the terms were meant to be used interchangeably and (2) the EPA's 1980 final

rule promulgating the § 404(b)(1) guidelines, in which the phrase "basic project purpose" was used exclusively with respect to the practicability of alternatives. (Doc. # 143 at 16–21); *accord* AR at 12930; 45 Fed. Reg. 85336, 85339 (1980).

Before this Court can consider the parties' positions, it must first determine whether the regulation's text exhibits a plain meaning. *Auer* deference is only appropriate when a regulation is "genuinely ambiguous"—*i.e.*, the regulation remains ambiguous despite exhaustive use of the traditional tools of statutory interpretation. *Wilkie*, 588 U.S. at 573. Consequently, this Court must first deploy "all the standard tools of interpretation" before considering whether *Auer* deference is warranted. *Id.*

### i.   *The Regulation is "Genuinely Ambiguous."*

The Court's analysis begins with the text of the regulation itself. Looking at the phrases in context, the guidelines have a definition section that mentions one of the two phrases—"overall project purposes"—as a component of the definition of practicability. 40 C.F.R. § 230.3(l) ("The term practicable means available and capable of being done after taking into consideration cost, existing technology, and logistics in light of *overall project purposes*." (emphasis added)). However, elsewhere, the guidelines further modify the definition of practicability: if an alternative requires use of an area not presently owned by the applicant, the definition of practicability expands to include areas that can "reasonably be obtained, utilized, expanded[,] or managed in order to fulfill the *basic* [*project*] *purpose* of the proposed activity." 40 C.F.R. § 230.10(a)(2) (emphasis added). Further, the water-dependency presumption conditions practicability on a project's "*basic purpose*." If the project "does not require access or proximity to or

siting within the special aquatic site in question to fulfill its *basic* [*project*] *purpose*," the presumption applies, which requires presuming that *practicable* alternatives exist that avoid the need for discharging fill into WOTUS. *Id.* at (a)(3) (emphasis added).

At face value, nothing about the context in which these phrases appear suggests that the EPA intended for both phrases to be mutually exclusive. The only difference between the two phrases appears to be the use of different modifier terms. *See* 40 C.F.R. §§ 230.10(a)(2)–(3). Although neither party elects to cite to dictionaries, the Court's colloquially understands the modifiers "basic" and "overall" to both mean the same thing: the general gist. If anything, the seemingly arbitrary way they are used interchangeably undercuts any conclusion that the EPA intended to imbue the two phrases with different meanings. Thus, context alone does not appear to diffuse the agencies' interpretive conflict.

Because the interpretive inquiry remains unresolved, the Court next considers canons of construction. *See generally* Antonin Scalia & Bryan A. Garner, *Reading the Law: The Interpretation of Legal Texts* (2012). Four canons that appear pertinent are mentioned below.

Naturally, the most fitting canon to begin with is the "presumption of consistent usage" canon, which would direct the Court to conclude that the phrases "basic project purpose" and "overall project purposes" must mean different things because the phrases use different words. The logic goes that if the EPA wanted "basic purpose" and "overall project purposes" to mean the same thing, the EPA could have simply picked one phrase and used it consistently. *See id.* at 170 ("[W]here the document has used

one term in one place, and a materially different term in another, the presumption is that

the different term denotes a different idea."). However, the underlying premise is that

the textual inquiry is a search for *plain meaning*, and it is anything but "plainly" clear that

the words mean different things simply because different words were used. "[T]he mere

fact that the words are used in each instance" does not, by itself, necessarily justify

concluding that the EPA's use of two different phrasings necessarily implies that the

EPA meant to create two terms with distinct definitions and concomitant operative legal

effects. *Id.* at 172 (citation and internal quotations omitted). Although a material variation

can sometimes suggest a drafter's intent to create different meaning, nothing in the

guidelines emphasizes the distinction in a way to suggest the difference in word choice

is material. Without more, that omission belies the inference that the modifier terms

"basic" and "overall" are properly considered mutually exclusive. Moreover, as a

practical matter, this Court remains mindful of the time at which the regulation was

drafted. The guidelines were finalized in 1980—well before legislators and agencies

truly began heeding the late Justice Antonin Scalia's call to draft laws with less

ambiguity.[27] Given the relatively lax drafting standards at the time the regulations were

promulgated, it becomes particularly apparent that the consistent usage canon is not

dispositive in the instant case because:

> more than most other canons, this one assumes a perfection of drafting
> that, as an empirical matter, is not often achieved. Though one might wish

---

[27] *See, e.g.*, *Lamie v. U.S. Trustee*, 540 U.S. 526 (2004) (Scalia, J.) (citation omitted) ("It is beyond our province to rescue Congress from its drafting errors[.]"); *see also Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of Fed. Rsrv. Sys.*, 745 F.2d 677, 685–86 (D.C. Cir. 1984) (Scalia, J.) (expressing frustration with Congress's "unpropitious use" of a special term of art in a case involving competing standards of review under the APA).

> it were otherwise, drafters more than rarely use the same word to denote different concepts, and often (out of a misplaced pursuit of stylistic elegance) use different words to denote the same concept.

*Id.* Hence, the unfortunate reality of imprecise regulatory drafting—especially when the drafter is a collective, such as a federal agency—discourages this Court from considering the parties' interpretive dispute resolved by the consistent usage canon.

The Court next turns to the surplusage canon, which counsels against "revis[ing a regulation] by subtraction." *Id.* at 174. Applied to § 230.10, the surplusage canon would guide this Court away from reading "overall project purposes" out of the statute. *See* Hr'g Tr. at 15. However, as with most canons of construction, the proposition underlying the surplusage canon is not invariably true—sometimes, agencies "*do* include words that add nothing of substance," and agencies "are not likely to waste time or energy arguing to remove redundancy [or sloppiness] when there are more important issues to address." *Id.* at 179 (internal quotations and citation omitted). This observation is particularly pertinent considering that the EPA was created to extinguish one (sometimes literal) ecological dumpster fire after another since its inception. The Sisyphean nature of the EPA's role supports an inference that the EPA would rather retroactively clarify the guidelines to avoid dedicating resources to revisiting the guidelines. "[T]he presumptions [underlying this canon] simply do not match political reality," especially in the context of an agency in the 1980s, which leads this Court to continue its exhaustive search for meaning. *Id.* (alteration in original) (internal quotations and citation omitted).

The Court next considers the "harmonious meaning" canon, which suggests that the "provisions of a text should be interpreted in a way that renders them compatible, not contradictory." *Id.* at 180. Here, the phrases "basic purpose" and "overall project purposes" are not necessarily in conflict, because "basic" and "overall" are both modifiers that refer to the core or fundamental requirements of a thing. The harmonious meaning canon would lead this Court to interpret the two phrases in a manner that allows them to peacefully coexist, which is exactly what the drafter of the regulation at issue, the EPA, suggests. AR 129310–11.

Relatedly, the "associated words" canon encourages the assignment of similar meaning to when words are associated in a context "in such a way as to indicate that they have some quality in common." *Id.* at 195–96. Here, both "basic project purpose" and "overall project purpose" are used in the same context—dictating an alternative's practicability. *See* 40 C.F.R. § 230.10(a)(2) (using both phrases in the same provision when explaining an alternative's practicability). So, at the very least, this canon suggests that "basic project purpose" should have some effect on the definition of practicability—in spite of the Corps' efforts to keep the phrase quarantined to the water-dependency determination.

Thus, this Court holds that there is no plain meaning discernible from the regulation on its face and, unsurprisingly, the canons are inconclusive. Yet, because the Corps interprets the phrases differently and offers a *prima facie* valid construction for each phrase, this Court concludes that the regulation remains "genuinely ambiguous"

notwithstanding the exhaustive application of the panoply of traditional tools of legal interpretation. *Wilkie*, 588 U.S. at 573.

ii.      Auer *Deference Is Warranted.*

If Petitioners want this Court to defer to the EPA's interpretation of "basic project purpose" and "overall project purpose" over the Corps' competing view, Petitioners must satisfy all the prerequisites necessary to justify *Auer* deference. As explained below, Petitioners satisfy the prerequisites to trigger *Auer* deference but, even were that not the case, the EPA's interpretation is nonetheless persuasive enough to justify rejecting the Corps' contradictory construction.

*Auer* deference requires not only that the regulation remains "genuinely ambiguous" after exhausting the traditional tools of legal interpretation, but also that the proffered interpretation is reasonable. *Id.* at 576. Moreover, the drafting agency's proffered interpretation of its own regulation must be: (1) the agency's "actual" position—not an *ad hoc* statement; (2) within the agency's substantive expertise; *and*—not "or"—(3) reflective of the agency's "fair and considered" judgment as opposed to a "convenient litigation position", a "*post hoc* rationalization advanced" in preparation for trial, or an interpretation that postdates the litigation in which the regulation's meaning is challenged. *Id.* at 577–80.

First, Petitioners insist that the EPA's interpretation in this case is the agency's "actual position," and the EPA's interpretation has been consistent for over forty years. (Doc. # 143 at 20); Hr'g Tr. at 64; (Doc. # 148 at 2–13 & nn.1, 6). In support, Petitioners point to four types of evidence: (1) public comments filed by the EPA in the instant

administrative proceeding that assert the two phrases are synonymous, (2) the EPA's final rule promulgating the guidelines in the Federal Register, (3) a proverbial sea of written representations from EPA officials to others—including the Corps—demonstrating forty years of the EPA consistently asserting that practicability turns on a project's "basic purpose," and (4) a separate EPA regulation where the EPA explicitly made the phrases interchangeable by defining "practicability" as "the basic *or* overall purpose of the project." (Doc. # 143 at 16–21) (emphasis added) (citing 45 Fed. Reg. 85336, 85339 (Dec. 24 (1980)); (Doc. # 148 at 2–13 & nn.1, 6) (citing 67 Fed. Reg. 31129, 31133 (May 9, 2002)) (collecting sources); *see also* AR 014684–85, 129310–11. The evidence thus consists of a promulgated regulation that predates the FEIS and ROD, interpretive guidance documents, and longstanding and consistent official representations of the same interpretation—clearly not an *ad hoc* statement, but an "actual" position.

Next, the EPA's interpretation of the § 404(b)(1) guidelines are within the agency's "substantive expertise." The meaning of the guidelines is the EPA's domain. The EPA wrote the guidelines at Congress's instruction, and Congress tasked the EPA with ultimate authority in administering the CWA. *See, e.g.*, Memo. of Benjamin R. Civiletti, 43 Op. Att'y Gen. 197, 201–02 (Sept. 5, 1979), https://www.epa.gov/sites/default/files/2015-08/documents/civiletti_memo.pdf [https://perma.cc/33GZ-9YSK] (noting that neither the CWA's own terms nor the act's legislative history suggests that the Corps is the CWA's final administrative authority); *accord* 33 U.S.C. § 1251(d).

Last, as Petitioners' supplemental letter has made abundantly clear, the EPA's interpretation is far from a "convenient litigation position." 588 U.S. at 578. The EPA is not a party to this litigation, so it has not crafted this interpretation in an attempt to affect this litigation. Moreover, its interpretive position predates the Moffat Collection System Project's administrative procedures by decades. Further, the EPA's interpretation accords with the operative and normative thrusts of the CWA. Such an interpretation is properly considered the product of the agency's "fair and considered" judgment. 519 U.S. at 462.

In sum, the EPA has made its view known for over forty years in contexts ranging from (1) simple correspondence on EPA letterhead to (1) public comments *directed at the Corps* to (3) official regulations evidencing the exact interchangeability asserted in the instant case. (Doc. # 148 at 2–13 & nn.1, 6). Although it is true that the EPA could have formalized its interpretation of these conflicting phrases, Petitioners have established that the EPA's reasoning is "reasonably discernible" enough to warrant deference. *Licon v. Ledezma*, 638 F.3d 1303, 1308 (10th Cir. 2011).

iii.   <u>*The EPA's Interpretation Is Persuasive.*</u>

Even assuming *arguendo* that this Court erred in its *Auer* analysis, the EPA's interpretation of its own regulation is nevertheless sufficiently persuasive to overcome the Corps' contrary view. First, the Corps' interpretation of another agency's regulations deserves no deference given that the agency that wrote said regulations condemned the Corps' interpretation. Mindful that "the authority to construe [practicability] amounts to the authority to determine the scope of the § 404 permit program," this Court sees

considerable reason to deny the Corps' competing view *any* deference. *See, e.g.*,

Memo. of Benjamin R. Civiletti, 43 Op. Att'y Gen. 197, 200 (Sept. 5, 1979),

https://www.epa.gov/sites/default/files/2015-08/documents/civiletti_memo.pdf

[https://perma.cc/33GZ-9YSK]. Second, structurally, the CWA bestowed the

responsibility of promulgating the CWA § 404's standards to the EPA—not the Corps.

*Id.* at 199–200 (citation omitted). Obviously, the EPA should be the agency whose

intent—or, more precisely, the lack thereof—governs the interpretation of said

regulations. Third, textually, the Corps' definition is based solely off of non-dispositive

semantic canons of construction. The mere fact that the phrases about project purpose

use functionally equivalent modifier terms does not entitle the Corps to conjure mutually

exclusive definitions that carry separate, operative legal meaning without *at least*

*something* in the administrative record, the Federal Register, or the Code of Federal

Regulations suggesting that the EPA intended for the guidelines to do so. Hr'g Tr. at

12–13 (acknowledging that there is no definition of "overall project purposes" in the

Corps' Part 325 regulations).[28]

---

28 Although there is some weight behind Respondents' emphasis that the Corps can create two
project purposes because the phrase "overall project purposes" is plural, *the Federal Register
offers no reason to infer that the pluralization evinces intent to imbue separate meaning*.
Moreover, the Corps' interpretation would create a material inconsistency in the CWA whereby
the Corps would have to create two possibly inconsistent definitions of practicability. For
example, the Corps could conclude that an alternative is impracticable for failing to meet the
"overall project purposes" of supplying 18,000 AFY of firm yield to the Moffat Water Treatment
Plant because it would impound water at Leyden Gulch, but then have the Corps assess the
practicability of impounding water at Leyden Gulch based on whether acquiring, utilizing,
expanding, or managing the Leyden Gulch furthers the "basic [project] purpose." See (Doc. #
148 at 2 n.1.)
The obvious drawback of condoning such inconsistency is exemplified by the instant case,
whereby the Corps used one project definition to completely avoid serious consideration of all
alternatives that avoided tampering with the Gross Dam.

Although Respondents disagree, the context of their legal authorities reveals the futility of their position. Respondents point not to the Code of Federal Regulations or the Federal Register but, rather, their own 2009 Standard Operating Procedures. The 2009 Standard Operating Procedures are merely the Corps' own interpretive guidance document, which (1) was never subjected to notice-and-comment rulemaking and (2) contradicts the Corps' prior interpretive position. *E.g.*, (Doc. # 137 at 38–39; Doc. # 138 at 45–50); *cf.* Memo. on Plantation Landing Resort Permit from Lance D. Wood, Asst. Chief Counsel, U.S. Dep't of Army Corps 8 (May 9, 1989), https://www.epa.gov/sites/default/files/2015-05/documents/2006_04_19_wetlands_plantationlandingelevation request.pdf [https://perma.cc/T7W4-3V8R] ("the Guidelines' mandate [is] to use every project's <u>basic</u> purpose for the Guidelines' practicability review" (emphasis in original)).[29]

---

[29] Respondents and Intervenor also point to several federal courts that have recognized a legal distinction between "overall project purposes" and "basic [project] purpose," but the reliance on those cases is sorely misplaced. None of those courts had this interpretive issue squarely presented to them, and without adequate briefing on that issue, those courts took the 2009 Standard Operating Procedures at face value. (Doc. # 137 at 15 (citing *Fla. Clean Water Network, Inc. v. Grosskruger*, 587 F. Supp. 2d 1236, 1243 (M.D. Fla. 2008) (citing *All for Legal Action v. U.S. Army Corps of Eng'rs*, 314 F. Supp. 2d 534, 548–49 (M.D.N.C. 2004)).) However, as explained above, the Standard Operating Procedures deserve no deference. For that reason, to the extent that other federal district and circuit courts cite *Grosskruger* and *All for Legal Action*, those cases are equally invalid. *See generally Gouger v. U.S. Army Corps of Eng'rs*, 779 F. Supp. 2d 588, 606 (S.D. Tex. 2011); *Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*, 869 F.3d 148, 157–58 (3rd Cir. 2017); *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 912 (9th Cir. 2018). Beyond that, Respondents and Intervenor cite cases whose technical holdings did not squarely address and approve of the Corps' dual-purpose strategy. *See generally Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989); *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1270 (10th Cir. 2004); *Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1170 (10th Cir. 2012). None of the aforementioned cases forced a court to examine the validity of the Corps' interpretation of the guidelines, and, for that reason, they are simply inapposite.

Because the Corps' newfound definition is noticeably devoid of persuasive authority (textually, structurally, logically, or otherwise), the Corps' interpretation cannot stand. Concluding otherwise would not only contradict the agency that wrote the guidelines but also, given the context of the instant case, undercut the CWA's substantive protections. *Cf.* AR 129310–11.

Respondents and Intervenor disagree, but their counterarguments rely on a distinction without difference. They fail to adequately support their argument's implicit premise that the distinction between "overall" and "basic" is material. Ockham's Razor counsels that the simplest explanation is most likely true and, here, the simplest explanation is that the word variation appears to be no more than sloppy drafting. Critically, neither Respondents nor Intervenor offers any evidence suggesting otherwise. *Cf.* 45 Fed. Reg. 85336, 85339 (Dec. 24, 1980). The Corps' definition comes from a paper-thin source of authority that escaped notice-and-comment rulemaking—the Corps' 2009 Standard Operating Procedures. Given the choice between the two interpretations, this Court opts for the view of the regulation's drafter, which accords with the thrust of the CWA, over the informal memorandum of the Corps, which is "not a state water agency." Hr'g Tr. at 33.

Thus, the Court finds that the EPA's interpretation is persuasive—at the very least, far more persuasive than the Corps' definition. The EPA never intended to imbue

the phrases "basic [project] purpose" and "overall project purposes" with mutually exclusive definitions.[30]

> b. *The Corps Failed to Prove that Wetlands Must Be Destroyed.*

With the guidelines' meaning clarified, the Court now turns to the merits of Petitioners' arguments. Petitioners contend that the Corps failed to produce an administrative record that rebuts the water-dependent presumption because the Corps prematurely rejected alternatives based on its unlawful interpretation of practicability. (Doc. # 134 at 42–43.) As detailed below, this Court agrees.

According to the Corps, the Proposed Action's goal of "providing supplemental water supply" by enlarging the Gross Dam is not water dependent. AR 000022–23. Because the Proposed Action is not water dependent, the Corps must (per the guidelines) presume that practicable alternatives exist that do not involve disturbing wetlands. 40 C.F.R. § 230.10(a)(3). Ergo, the Corps cannot lawfully issue Denver Water's discharge permit without "clearly" disproving that there are practicable alternatives available that avoid the use of wetlands. *See id.*

Turning to the administrative record, the Corps' erroneous practicability definition led it to reject "sixteen storage sites [with] corresponding water supplies, two water supply management strategies, and one conveyance component" that avoided the

---

[30] It makes sense that the Corps can *consider* a permit applicant's stated purpose. However, nothing in the CWA's statutory scheme supports *exalting* the applicant's project goals above the purpose of the statute—minimizing the degradation of WOTUS. Congress expressly conditioned discharge permits on the EPA's guidelines and directed the EPA to harmonize its forthcoming guidelines with seven enumerated factors. 33 U.S.C. § 1343(c). Notably, the permit applicant's goals are listed nowhere among them.

disturbance of wetlands *See, e.g.*, AR 123826; AR 167619. Those nineteen alternatives were rejected entirely because they could not provide supplemental water supply to the Moffat Water Treatment Plant. AR 167619. However, as explained above, the definition of practicability in the instant case is "providing supplemental water supply" because the Corps' "overall project purposes" definition, which injected the geographic preference into the practicability standard, is legally indefensible. Because the water-dependency presumption applies, the Corps was required to presume that at least some of those alternatives could have produced 18,000 AFY of firm yield without disturbing precious wetlands. *See, e.g.*, *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1260 (S.D. Fla. 2009). Yet the record does not provide much meaningful detail about the practicability of these 19 alternatives insofar as they can provide supplemental water supply—*due to the Corps preliminarily excluding them.* AR 123826. Although this Court would prefer citing to the administrative record in support of its conclusion that the Corps gave short shrift to said alternatives, there is nothing to cite, which is precisely the issue raised by Petitioners' claims. Mindful that the Corps, by law, *must disprove every potentially practicable alternative* that does not disturb special aquatic sites, the dearth of information on these nineteen alternatives leads this Court to presume that all of them were practicable and available. *See* 40 C.F.R. § 230.10(a)(3).

Consequently, the administrative record cannot "clearly" disprove that any of those nineteen alternatives were both practicable and available based on such a scant record. This Court thus finds that the Corps failed to disprove that the Proposed Action required disturbing wetlands in violation of 33 C.F.R. § 323.6.

c.  *The Corps Failed to Prove that the Proposed Action is the LEDPA.*

Next, Petitioners assert that the Corps' LEDPA finding violated the guidelines because the Corps (1) unlawfully excluded alternatives based on its unsupported definition of "practicability", (2) failed to "clearly" support its LEDPA finding insofar as practicability depends on project costs, and (3) failed to "clearly" support its LEDPA finding by ignoring the foreseeable effects of climate change on precipitation. *E.g.*, (Doc. # 134 at 54–57.) The Court agrees on all three points.

i.  <u>Rejected Alternatives Could Be the LEDPA.</u>

As mentioned above, the § 404(b)(1) guidelines prohibit the Corps from issuing a permit unless the administrative record clearly demonstrates that "there is [no] *practicable* alternative to the proposed discharge which would have *less adverse impact* on the aquatic ecosystem." 40 C.F.R. § 230.10(a) (emphasis added) (the "LEDPA" determination). The "no-discharge" presumption adds to that burden—the Corps must further disprove the possibility that *any* practicable alternative not involving filling WOTUS could be the LEDPA. 40 C.F.R. § 230.10(a)(3).

Those legal standards in mind, this Court finds that the administrative record has not satisfied the burdens imposed by the guidelines. In the instant case, the Corps' alternatives analysis formed the basis of the Corps' LEDPA finding. By law, the alternatives analysis was obligated to disprove that any practicable alternative not involving discharge into WOTUS could be the LEDPA. However, because the Corps' definition of practicability is inherently unlawful, the Corps' preliminary screening of alternatives was invalid. Those alternatives, under the guidelines, are presumed the

LEDPA until proven otherwise. *Id.* On these facts, the administrative record simply cannot "provide detailed, clear and convincing information *proving* impracticability." *Utahns*, 305 F.3d at 1186 (emphasis in original). Thus, the Corps' flawed alternatives analysis left many stones unturned, which invalidates its LEDPA finding in violation of 33 C.F.R. § 323.6.

ii.     <u>*RDC Estimates Cannot Support a LEDPA Determination.*</u>

Irrespective of whether the limited range of alternatives considered necessarily invalidates the LEDPA finding, Petitioners next argue that the uncertainty created by the Corps' inexplicably formulated cost metric also undermines its LEDPA finding. *E.g.*, (Doc. # 134 at 57.)

Cost must be considered when assessing the practicability of an alternative. 40 C.F.R. § 230.3(I). Although the guidelines do not expressly mandate a particular cost metric or list of cost-related factors, the Corps' discretion to choose a cost methodology depends on the agency first explaining "why it is reliable." *Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1177–78 (10th Cir. 2012). Provided the Corps' cost assessment is reasonable, a court generally upholds the cost assessment. *See, e.g.*, *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 912 (9th Cir. 2018). Typically, the default cost metric is "overall scope and cost," which is notably *not* defined as a random subset of costs. 45 Fed. Reg. 85339 (1980), 61 Fed. Reg. 39999 (1996).

In the instant case, the Corps chose to represent the costs of the mitigation and permitting necessary to implement each alternative with a dollar amount that accounted

for permitting and mitigation by merely multiplying each alternative's expected

construction costs by 1.5. AR 123832–33. However, as Intervenor's cited case law

acknowledges, the reasonableness of an agency's chosen cost metric rests on the

predicate condition that the agency explained "why [the metric] is reliable." (Doc. # 138

at 41–42, 51–52 (citing *Hillsdale Env't Loss Prevention, Inc.*, 702 F.3d at 1177–78).

Neither Respondents nor Intervenor—nor the record itself, for that matter—offers an

adequate explanation as to why it is reasonable to assume that 50% of each

alternative's cost realistically represents the costs of permitting and mitigation.[31] Nor

has Intervenor identified a single instance where the Corps—or any federal agency, for

that matter—has used RDC estimates to account for the permitting and mitigation costs

associated with a construction project.[32] Petitioners, by contrast, have identified Tenth

Circuit case law rejecting the use of such sweeping cost assumptions to account for

permitting and mitigation. *Utahns*, 305 F.3d at 1187. Instead, Intervenor relies on the

unremarkable observation that the guidelines do not obligate the Corps to conduct a

"formal 'cost-benefit analysis'" and conclude (without explanation) that the Corps'

comment defending its cost metric is a "rational" response. (Doc. # 138 at 41.) [33]

However, Intervenor's argument misses the point. Petitioners' claim does not demand a

---

[31] In fact, Respondents do not even bother addressing this problem in their brief—and they represent the Corps.

[32] Not that it matters—neither Intervenor nor the Corps can defend its cost metric with reasoning formulated *post hoc*. *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 395 (D.C. Cir. 1973).

[33] Intervenor also attempts to shift the burden to Petitioners by accusing them of failing to specify alternatives that were excluded based on cost. (Doc. # 138 at 42.) Yet, according to Petitioners, twenty alternatives were excluded by cost. *E.g.*, Hr'g Tr. at 73.

formal cost-benefit analysis. The problem is the inexplicable nature of choosing to ignore massive costs that vary considerably by circumstance. If costs go to practicability, and the cost analysis ignores such a significant category of costs (or neglects to explain why doing so is reasonable), then the record cannot "clearly" demonstrate that any given alternative is the LEDPA because the record cannot conclusively determine that said alternative is even financially viable after accounting for permitting and mitigation.

Thus, the Corps' failure to prove the financial feasibility of the Proposed Action means the Corps has not met its burden of "clearly" demonstrating that the Proposed Action is the LEDPA in violation of 33 C.F.R. § 323.6.

iii.   *Ignoring Climate Change Undermines the LEDPA Finding.*

As for Petitioners' final CWA argument, they assert that the Corps' burden of "clearly" demonstrating the LEDPA cannot possibly be met without considering some quantification of climate change's effects on precipitation. (Doc. # 134 at 60–63.)

Needless to say, a dam's storage function depends on precipitation. It follows that the practicability of a dam as a water storage solution depends on precipitation and losses due to evapotranspiration as the water sits in storage. The Corps certainly recognizes as much, as does Denver Water. *See* AR 124638–40; AR 173975–77 (recognizing that climate dictates evapotranspiration rates for water sitting in a reservoir, which is why one acre-foot of water does not equal an acre-foot of "firm yield"). Ergo, "clearly" demonstrating that a dam is the LEDPA *in the context of a water supply project*

requires confirming that there will even be additional water to impound. *See* 40 C.F.R. s

230.3(l) ("[P]racticable means . . . taking into consideration . . . logistics").

Both the DEIS and the FEIS acknowledged that climate change could decrease

or eliminate firm yield. The Corps observed that "firm yield is controlled by drought

periods" and that climate change will undeniably shift the timing of snowmelt, which can

decrease stream flows which, in turn, reduces the North System's ability to collect and

deliver raw water at a time when Denver Water can actually exercise its right to divert

said water. AR 123798, 124638–40, 159570–71. Incredibly, the Corps even recognized

that climate change's impact on hydrology might render the Proposed Action ineffective

enough to warrant the need for "additional replacement sources [of water] to ensure an

adequate supply." AR 124638–40, 159570–71. Yet, despite acknowledging that future

climate conditions might neuter the Gross Dam's value as a water storage solution, the

Corps expressly declined to attempt to quantify the impacts of climate change—or even

provide an educated guess, for purposes of discussion. AR 000130. This proves fatal to

the Corps' LEDPA finding because, if the Gross Reservoir has no extra water to

impound, or that water is lost to the sun or flora, the Proposed Action cannot possibly be

practicable in a logistical sense. As the Corps provided no quantitative assessment—or,

at the very least, only an educated guess—to disprove those possibilities, the LEDPA

determination rests partly on guesswork. It is therefore inconceivable that the Corps

could "clearly demonstrate" that the Proposed Action is the LEDPA without at least

examining a single hypothetical scenario where future climate conditions prevent the

Gross Reservoir from reaching or maintaining its newfound capacity.

Respondents fervently disagree in two respects, but neither counterargument withstands scrutiny. First, Respondents argue that the Corps' assessment of "potential cumulative impacts . . . included an analysis of climate change." *See* (Doc. # 137 at 23, 58–62.) Respondents' assertion, however, is half-true at best. The Corps' analysis was entirely qualitative—the mere recognition of relevant variables. However, acknowledging that variables exist does not justify ignoring any scenario where said variables render the Proposed Action impotent. Second, Respondents insist that the Corps was entitled to avoid quantitative climate-change analysis based on the uncertainty of the Corps' in-house expertise. *Id.* at 61–62. Respondents' contention ignores the strict burden of proof set by the guidelines to support a LEDPA determination. The Corps in this case was required to examine the extent to which climate change would undercut the practicability of the Proposed Action. Such is the nature of a substantive requirement that hinges on proving a fact. Further, this Court cannot help but highlight the irony that the Corps claims it cannot find a way through the uncertainty of future hydrological modeling. For one, the "firm yield" concept inherently requires accounting for losses due to evapotranspiration which, per the Corps, will vary as the climate changes. AR 173975–77. Also, as explained above, the Corps was more than willing to account for uncertainty when it came to permitting and mitigation costs.

To conclude, this Court finds that the record's utter failure to consider climate change's impact on hydrology belies the Corps' determination that the Proposed Action is the LEDPA in violation of 33 C.F.R. § 323.6.

2.   The National Environmental Policy Act

Petitioners advance four NEPA claims. The first two claims concern the Corps' purpose-and-need statement, and the second two claims involve relevant considerations that never received a "hard look" in the administrative record. As detailed below, the Court agrees with three of Petitioners' four theories.

a.  *The Record Supports Both Needs, Albeit Separately.*

Petitioners first claim the Corps violated its own NEPA implementing regulations by failing to substantiate Denver Water's purported need for (1) 18,000 AFY of new firm yield and (2) that water being routed through the North System. (Doc. # 134 at 47–54); *accord* 33 C.F.R. Pt. 325 App'x B. Although Petitioners acknowledge that the Corps reviewed the materials underlying Denver Water's purported needs, Petitioners contend that the Corps' review failed to satisfy NEPA because it papered over significant factual inconsistencies and ignored a potential conflict of interest between Denver Water and the Corps' consultant agency, Harvey Economics. *Id.*; (Doc. # 143 at 27–29). However, as explained below, this Court finds that the record supports the Corps' determination that Denver Water needs at least some amount of new firm yield.

i.  <u>*Denver Water's Need for New Firm Yield.*</u>

An agency has discretion to define a project's purposes, and a court should uphold said agency's definition where reasonable. *E.g.*, *Wyo. v. U.S. Dep't of Ag.*, 661 F.3d 1209, 1244 (10th Cir. 2011); *accord Citizens Against Burlington*, 938 F.2d at 196. When formulating an EIS's purpose-and-need statement, an agency must at least consider a project proponent's objectives, but said agency must exercise independent judgment in doing so. *E.g.*, *Colo. Env't Coal.*, 185 F.3d at 1174–75. The agency's

independent judgment must strike a balance between wholly adopting the project proponent's proffered purpose and ignoring them entirely. *Id.* At bottom, the agency must produce a purpose-and-need statement "from both the applicant's and the public's perspective." However, an agency's discretion is not without limit. NEPA prohibits agencies from framing a project's purpose "so narrowly that it foreclose[s] a reasonable consideration of alternatives." *Davis v. Mineta*, 302 F.3d 1104, 1119–20 (10th Cir. 2002) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 19 (2008)), *abrogated in part by Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016) (focusing on preliminary injunctions). Moreover, NEPA forbids agencies from ignoring significant data discrepancies. *See, e.g.*, *All. to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 606 F. Supp. 121, 129–30 (D.C. Cir. 2009); *see also Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (vacating based on an agency's decision to ignore data outdated by six years); *Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1197 (D. Or. 2012) (finding NEPA violations due to an agency having more recent data yet choosing to rely on outdated data without explaining why the older data was adequate).

Petitioners dispute that 18,000 AFY is the volume of water needed.[34] Denver Water reached this figure based on the 2002 IRP demand projection produced by BBC

---

[34] Denver Water's representations at oral argument strongly suggest that the Moffat Water Treatment Plant could obtain enough water to maintain its minimum idle rate without first securing new water supply. Hr'g Tr. at 47 ("I would suspect there's plenty of water in Gross Reservoir to keep an idle rate going."). This observation is especially ironic considering (1) the Corps took pains to avoid consideration of Conduit X or similar system-bridging solutions, and (2) Denver Water itself acknowledged that it has built infrastructure in the past to re-route water where necessary. AR 129541 (noting that Denver Water previously built infrastructure to avoid an unplanned North System shutdown).

Research and Consulting. *See generally* AR 177569–792. The Corps had an obligation to corroborate that need and, to that end, the Corps delegated that responsibility to a consulting firm, "Harvey Economics." AR 125970–71; AR 158890. The Corps' independent assessment is therefore that of Harvey Economics, which documented its analysis in a 2012 report that Petitioners challenge. *See id.* Petitioners' argument challenges the 2012 Harvey Economics report, which uncritically endorsed the 2002 IRP demand projection's precipitation and water-use data despite the availability of newer, relevant data. (Doc. # 134 at 50–51); *accord* AR 005811, 006768–71, 008475. Petitioners question the legitimacy of the 2012 report's conclusion that the Corps can rely on data sets spanning the years 1971 to 2000 and 1973 to 1999 when there was in fact more recent data available, and said newer data contradicted the older data. (Doc. # 134 at 50); AR 125972.

The administrative record reveals that Harvey Economics reaffirmed the legitimacy of antiquated data without much reasoning—only the conclusion that the allegedly antiquated data remained sufficient. AR 126037. However, the newer data contradicts the older data. The older data predicted greater water use demands, whereas the newer data suggested that water conservation initiatives were proving even more successful than anticipated. *E.g.*, Hr'g Tr. at 80–81 (explaining that in 2011, six years before the ROD issued, the Corps' primary data source, the National Oceanic Atmospheric Administration released an updated data set based on much hotter, drier climate conditions). Yet, Harvey Economics failed to explain this contradiction, which renders what could otherwise have been a valid assertion of expertise little more than a

bald conclusion. NEPA does not require that an agency always use the newest data, provided it offers an explanation as to why older data remains viable, but an agency cannot satisfy NEPA without addressing such discrepancies. *See, e.g.*, *All. to Save the Mattaponi*, 606 F. Supp. 2d at 129–30. Without that explanation, the administrative record would not support Harvey Economics' conclusion that Denver Water's need for new firm yield must be exactly 18,000 AFY.

However, Denver Water's need for more firm yield is not necessarily driven by its consumer base alone. The record explains that the 18,000 AFY of firm yield is necessary to convert the Moffat Water Treatment Plant from part-time operation to year-round operation. Doing so would improve the efficiency of the Moffat Water Treatment Plant. Irrespective of Petitioners' substantive critiques of the 2002 IRP demand projection, the fact that the Moffat Water Treatment Plant must process a certain volume of water per day to maintain its "minimum idle rate" creates a need for however much water is necessary to meet that threshold. AR 000132 (discussing minimum idle rate); AR 125970–71 (corroborating the 2002 IRP demand projection); *see also* Hr'g Tr. at 45–46 (positing that the Gross Reservoir's pre-enlargement capacity could not sustain the Moffat Water Treatment Plant's minimum idle rate through a drought). At the outset, it must be recognized that the record does a poor job of clarifying how much water that "minimum idle rate" actually requires—for two reasons. First, again, the Corps neglected to even estimate let alone quantify climate-change-induced aridity's effect on precipitation. Second, as Intervenor acknowledged at oral argument, the Moffat Water Treatment Plant's minimum idle rate is only impossible to maintain during

a drought. Hr'g Tr. at 28, 47. Regardless, NEPA does not require absolute mathematical certainty, and the record contains information that supports the Corps' belief that Denver Water needs to fortify its North System in the near-certain event of future drought. Per the record, if enough water flowed through the Moffat Water Treatment Plant to perennially maintain its "minimum idle rate," the plant could stop wasting the considerable resources consumed whenever the plant is brought online after a shutdown. *See, e.g.*, AR 000131; *see also* (Doc. # 147). Regardless of Petitioners' complaints regarding how inaccurately Denver Water might have predicted future water customer needs, at an infrastructural level, the administrative record shows that the plant itself needs more water to reap the benefits of maintaining the minimum idle rate.[35] The record thus contains adequate support for the notion that Denver Water actually needs some volume of firm yield.

ii.   *Ed Harvey's Alleged Conflict of Interest.*

Although Harvey Economics provided no real explanation as to what made the 2002 IRP demand projection's antiquated data sufficient, Petitioners supply a theory. They accuse Harvey Economics of bias—blindly supporting the 2002 IRP demand projection—because the founder of Harvey Economics, Mr. Ed Harvey, worked at BBC

---

[35] Petitioners insist that the Proposed Action would not meaningfully address the imbalance issue because the Moffat Collection System Project would only decrease the imbalance ratio by approximately 1%. (Doc. # 134 at 53.) However, Petitioners' argument is too narrow. The issue is not changing the number of water users that draw from the North System relative to the South System—it is bringing the Moffat Water Treatment Plant online perennially to avoid the waste associated with its annual winter shutdown. AR 000131.

Research and Consulting when it produced the 2002 IRP demand projection. *E.g.*, (Doc. # 143 at 27–28.)

If an EIS is prepared by a contractor, the agency must "independently evaluate" that the contractor has "no financial or other interest in the outcome of the project." 40 C.F.R. § 1506.5(c). The "responsible Federal official shall . . . take responsibility for [the] scope and contents [of the contractor's denouncement of bias.]" *Id.* A contractor with "'an agreement, enforceable promise[,] or guarantee of future work' has a conflict of interest under [40 C.F.R.] § 1506(c)." *Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1128 (10th Cir. 1998).[36] When an EIS is challenged on the basis of an alleged conflict of interest known to the agency, "the Court can evaluate the oversight that the agency provided to the [EIS] process as a factual matter and make a determination [on the [EIS]." *Id.* at 1129 (quotations and citations omitted). When reviewing an EIS prepared by an agency that substituted its judgment for that of a contractor, "the ultimate question for the court is thus whether the alleged breach compromised the 'objectivity and integrity of the NEPA process.'" *Id.* (quotations and citations omitted).

The record shows that Harvey Economics executed a written "no conflict of interest statement that disclosed historic work products as well as the promise of future work from Denver Water." AR 000125. The "Harvey Economics staff member who led the model evaluation [of BBC's 2002 IRP demand projection] never previously worked

---

[36] On its face, 40 C.F.R. § 1506.5 does not specify whether the prohibition it creates reaches seminal documents prepared by a contractor that form the basis of a critical aspect of the FEIS.

on th[at report]." AR 176801. Ed Harvey himself personally asserted that he did not

prepare or supervise the creation of the 2002 IRP demand projection while he worked at

BBC and that the Harvey Economics employee who reviewed the IRP never worked at

BBC. AR 178853. Moreover, the Corps successfully dissuaded Harvey Economics from

bidding on other Denver Water work opportunities pending finalization of the ROD. AR

008060. Although certainly not dispositive, these facts cut against a conclusion that

Harvey Economics is intractably biased in favor of the Proposed Action.[37]

Petitioners urge this Court to discern a conspiracy behind a façade of perfunctory

paperwork denying the existence of a conflict. To their point, it is perhaps fair to

acknowledge that the promise of no future work does not fully address bias given that

Mr. Harvey might have a personal interest in preserving the reputation of his work

product from his time at BBC Research and Consulting. Yet, the mere theoretical

possibility of Ed Harvey's professional pride is not the smoking gun that Petitioners

need to prove this NEPA claim. None of the parties cite case law suggesting that such a

scenario is a conflict of interest *per se* and, although this Court can see why this

circumstance begat Petitioners' suspicion, without more inculpatory evidence, this Court

is unwilling to go so far as to conclude Mr. Harvey lied to the federal government in

writing.

b.   *Nothing Justifies Merging Two Distinct Purposes.*

---

[37] Petitioners also paint this NEPA process as corrupt by pointing to vague accusations of whistleblowers fired from Denver Water, but, without more information, Petitioners' allegations of other general corruption appear too attenuated to help their Ed Harvey bias theory across the finish line. *Cf.* (Doc. # 134 at 15 n.4.)

Petitioners next assert that the Corps violated NEPA by aggregating conceptually distinct project purposes without articulating a rationale for doing so. In Petitioners' view, the conceptually distinct objectives inappropriately raised the standard of practicability and enabled the Corps to avoid truly considering alternatives that could have accomplished the basic project purpose—Denver Water's desire for more water. (Doc. # 134 at 39–42.) At its core, Petitioners' argument challenges the reasonableness of the extent to which the Corps embraced a near-identical version of Denver Water's proposed project purpose statement.

It is unavoidably apparent that, at a conceptual level, supplying more water to Denver Water's customer base and buttressing the North System are two distinct, albeit somewhat overlapping, purposes. As Intervenor implicitly conceded at oral argument, the 18,000 AFY of new firm yield is not technically necessary to bring the Moffat Water Treatment Plant perennially online at present—the 18,000 AFY of new firm yield is only to safeguard the plant from dropping below the minimum idle rate during a drought or South System emergency. Hr'g Tr. at 45–46; *see also* (Doc. # 148). The fact that Denver Water could benefit from more firm yield specifically in the North System says *nothing* about why the Corps must limit its "hard look" review to alternatives that meet both objectives simultaneously. Although the record arguably supports the Corps' conclusions that Denver Water needs 18,000 AFY of new firm yield in the North System, the record lacks any cogent explanation as to why the Corps can and should address both needs simultaneously. Tellingly, neither Respondents nor Intervenor points to anywhere in the record where the Corps actually articulates an explanation as

to why the two purposes are inextricably interconnected to the point that they must be resolved simultaneously, and, for that reason alone, the Corps' purpose-and-need statement is unduly narrow in violation of NEPA.[38]

Respondents and Intervenor attempt to defend the Corps' purpose-and-need statement, but their arguments are neither availing nor supported by law. At the outset, both Respondents and Intervenor repeatedly assert that NEPA affords the Corps wide discretion to frame a project's purpose. (Docs. ## 137 at 34, 138 at 29); *see also* Hr'g Tr. at 15. However, the mere observation that binding precedent affords the Corps discretion does not, without more, convince this Court that the Corps' discretion *in these circumstances* deserves deference.

Although Intervenor attempts to buttress the Corps' choice with citations to case law involving NEPA, drawing analogies to inapposite legal authority is hardly persuasive. Intervenor claims their case law establishes that the Corps' discretion under NEPA includes the right to consolidate multiple distinct objectives into one, but the legal authorities on which they rely are materially distinguishable for several reasons.[39]

---

[38] The lack of explanation is especially troubling in light of the myriad factual inconsistencies highlighted by Petitioners regarding the validity of Denver Water's claimed needs. However, because Petitioners characterize those discrepancies as indicia of a separate NEPA violation, the Court will not recount those points here.

[39] For example, Intervenor cites a case where an agency's purpose-and-need statement that heavily deferred to the project proponent's geographical preferences because federal law directed the permitting agency to do so with respect to highway projects. *See HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1230–31 (9th Cir. 2014) (citing 23 U.S.C. § 139(f)(3)). Similarly, Intervenor cites a case where an agency's purpose-and-need statement deferring to a project proponent's geographic preference, but said project was within federally managed public lands governed by a NEPA-proofed Forest Plan. The Forest Plan designated the land for recreational development, which artificially tipped the scales towards the applicant. *See Colo. Env't Coal.*, 185 F.3d at 1175 & n.15. Intervenor also cites a case where

Simply put, NEPA cases that do not involve the CWA are materially distinguishable. What must be kept in mind is that an agency trips NEPA by avoiding *relevant* considerations, and relevance is a relative term. *See, e.g.*, *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1109 (9th Cir. 2010). When a "major federal impact" intersects with a specific statute, the statute's objectives define the agency's "analytic obligations." *Id.*; *see also* Nancy H. Sutley, *Draft NEPA Guidance on Consideration of the Effects of Climate Change and Greenhouse Gas Emissions* 6–7 (Feb. 18, 2010), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/20100218-nepa-considerations-effects-ghg-draft-guidance.pdf [https://perma.cc/4B3R-DE5X]. Mindful that the Corps' FEIS was prepared for a project that might jeopardize WOTUS, the FEIS's consideration of relevant factors should correspond to the CWA's substantive focus—*minimizing the degradation of WOTUS*. Instead, the record shows a purpose-and-need statement that limited its "hard look" to alternatives that all tampered with the Gross Dam and, by extension, the WOTUS at the dam's base.

Respondents, for their part, defend the purpose-and-need statement with a flurry of counterarguments, none of which find the mark. Respondents insist that the Corps in fact considered options that did not involve tampering with the Gross Dam, which is brazenly misleading in light of the record. "Considered" is only correct in a colloquial sense; in the context of a NEPA claim, consideration requires a "hard look," which is

---

the issue of a multifaceted project purpose arose in the context of scoping and the plaintiffs conceded that both projects constitute "major federal action" whereas, in the instant case, Petitioners strenuously object to the notion that Denver Water's geographic preference could invoke federal jurisdiction by itself. *Compare Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 959 F. Supp. 2d 982, 1000 (W.D. Ky. 2013), *with* Hr'g Tr. at 60–61.

something the Corps did not give to proposals unless they involved expanding the Gross Dam, so none of the alternatives from the Corps' "preliminary screening" process count towards its NEPA obligations. Respondents also emphasize the Corps' discretion to define the project's purpose and need, but again, merely observing the fact that NEPA affords the Corps discretion to define the purpose and need of a project has no persuasive force when the relevant inquiry is not whether discretionary authority exists but *the scope of that discretion*. *See* (Doc. # 137 at 32 (citing *Wyo. v. U.S. Dep't of Ag.*, 661 F.3d 1209, 1244 (10th Cir. 2011).) Respondents contend that the Corps adequately justified its purpose-and-need statement as exhibited in the Corps' responses to public comments. Although it is true that the Corps responded to public comments, responding itself does not support a conclusion that the comment response is necessarily sound. The Court's review of the comment responses reveals that the Corps' responses exhibited reasoning that was perfunctory at best and, as explained above with respect to the CWA, in direct contradiction of the § 404(b)(1) guidelines. AR 129310 (concluding that "it is appropriate to integrate several underlying needs into one defined purpose, since the multiple needs of the applicant are not 'independent' but rather are 'interconnected'" without any further explanation). Finally, Intervenor highlights the Corps' responses to the EPA's public comments challenging the purpose-and-need statement and insists that the Corps need not agree with the EPA simply because the EPA suggested changes to the FEIS. (Doc. # 138 at 32.) However, while true that the Corps need not agree with the EPA, the ultimate issue is whether the Corps' disagreement is reasonable and supported by the record and, here, the Corps'

response could hardly be called a paragon of sound reasoning. *E.g.*, *Fuel Safe Wash. v. FERC*, 389 F.3d 1313, 1326 (10th Cir. 2004). At most, the Corps asserted in conclusory fashion that it has the discretion to define the project purpose however narrowly or broadly it wants without meaningfully addressing the link between the two purposes. *See* AR 129311–13.

In sum, nothing in the record explained what justified "federalizing" Denver Water's system imbalance concerns by lumping them into their desire for more water. The Corps' amalgamation of these conceptually distinct criteria led to the premature rejection of at least nineteen alternatives that apparently satisfied the new firm yield need, which meant the public and the Corps lost the benefit of a "hard look" and concomitant informed choice. NEPA "prohibits uninformed—rather than unwise— agency action," and the record shows that the Corps' downright refusal to even consider alternatives incapable of threading the needle between Denver Water's wish list items is not just "unwise" agency action—it is objectively "uninformed." *Roberts v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).[40] Given the record contains relatively little if any analysis of those nineteen alternatives, it is *precisely* this type of analytical gap that NEPA is meant to obviate. The Corps violated NEPA based on its inability to

---

[40] Although Intervenor at oral argument emphasized the efficiency of utilizing pre-existing dam structures to minimize environmental impact, Intervenor's brief cited no portion of the administrative record making this point. (Doc. # 138 at 40 (citing AR 000030)); *but see* AR 000030 (not making this point explicitly); 463 U.S. at 50 "([C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action.") Thus, the soundness of this rationale, by law, cannot be used in defense of the Corps' deficient NEPA record.

identify where in the record the Corps ever articulated a sound explanation for marrying

two conceptually distinct project purposes. 463 U.S. at 50.

c.  *The Corps Failed to Give Relevant Issues a "Hard Look."*

Petitioners' final three NEPA claims go hand-in-hand because they highlight relevant considerations that the Corps declined to give a "hard look." (Doc. # 134 at 54–59.) The first argument challenges the scope of the alternatives analysis and, as with the CWA, is a direct consequence of the Corps' unlawful purpose-and-need statement. The second and third contentions highlight two salient considerations—climate change and projected costs.

i.  <u>*The Alternatives Analysis Is Unreasonably Narrow.*</u>

Petitioners aver that the Corps' alternatives analysis violated NEPA because the FEIS considered effectively indistinguishable alternatives. (Doc. # 134 at 57–63.)

Under NEPA, an agency must at least consider alternatives to a proposal, and those alternatives must span a wide enough range to show the public that the agency made a "real, informed choice." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) ("the range of action alternatives is unreasonable narrow because the alternatives are virtually indistinguishable from each other"). NEPA does not require agencies to consider all alternatives—but those that are ignored must be "impractical or ineffective," which requires that the agency "appropriately define[ ] the objectives of [the] action." *Wyo. v. U.S. Dep't of Ag.*, 661 F.3d 1209, 1244 (10th Cir. 2011).

The downstream effects of the Corps' unduly narrow purpose-and-need statement are, unfortunately, unsalvageable. Because the Corps chose to exclude from further consideration multiple alternatives that, on their face, at least could have

possibly been practicable, the Court concludes that the FEIS's alternatives analysis fails to satisfy NEPA's requirement that the agency demonstrate it made a "real, informed choice"—that choice being based on the dubious assumption that the Corps *had* to accommodate Denver Water's location and timeliness preferences. *Friends of Yosemite Valley*, 520 F.3d at 1038. The Corps in the instant case failed to "appropriately define the objectives of [the] action." 661 F.3d at 1244. For that reason, the Court finds that the Corps' narrow alternatives analysis violates NEPA.

Respondents' counterarguments change nothing about this conclusion. Respondents argue that the Corps considered other actions, including constructing new reservoirs, expanding other reservoirs, agricultural water transfer, municipal water recycling, storage options, and "other strategies." (Doc. # 137 at 50–55.) However, that is only partly true—the Corps "considered" these alternatives in a merely colloquial sense, but NEPA requires "hard look" consideration of seemingly practicable alternatives and, here, the Corps excluded all of the aforementioned possibilities simply because they could not meet all of Denver Water's demands. Separately, Respondents also highlight that the Corps considered denying the permit—the "No Action" alternative. *Id.* However, NEPA's regulations require every agency always consider "No Action," so Respondents' argument merely recharacterizes the bare minimum into a "hard look," which it is not. Considering "No Action" does not change the fact that the Corps only considered options that relied entirely on expanding the Gross Dam and praying for rain to fill it. Even though Respondents emphasize that each alternative involved different environmental effects stemming from variations in how much water the Gross Dam's

enlargement would accommodate, that distinction is immaterial when each alternative's commonality depends on precipitation. NEPA cannot possibly allow such willful blindness.

ii.   *The Corps' Cost Metric Is Inexplicably Arbitrary.*

"There can be no 'hard look' at costs and benefits unless all costs are disclosed." *Scis. Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1097 (D.C. Cir. 1973). Indeed, without a clear understanding of costs, neither the Corps nor the public can possibly obtain what NEPA exists to facilitate—an informed decision. The Tenth Circuit agrees—having previously rejected liberal Corps' assumptions downplaying mitigation and permitting costs in the NEPA context. *Utahns*, 305 F.3d at 1165–66.

In the instant case, the Court's assessment of the Corps' RDC estimates above with respect to the LEDPA determination applies with equal force to the Corps' NEPA obligations. To reiterate, the Corps inexplicably chose to represent the widely variable costs of permitting and mitigation by adding 50% of the cost of building each alternative to that construction cost. No one has bothered to explain to this Court why or how the Corps chose 50% as a percentage that validly approximated the costs associated with permitting and mitigation. The record does not even provide a universe of possible comparators for this Court (and, by extension, the public) to consider what permitting and mitigation would cost, i.e., whether this metric has been used by the Corps before, and to what extent that challenges to the seemingly arbitrary nature of that metric have failed before other Article III courts. Such an artificially myopic cost assessment cannot possibly satisfy NEPA's "hard look" requirement.

Intervenor disagrees but fails to articulate a persuasive defense for the Corps' puzzlingly unorthodox cost estimates. Intervenor cites no authority for the proposition that the Corps can arbitrarily choose a percentage to account for undeniably variable mitigation and permitting fees without explaining what makes 50% a reasonable placeholder. The approximation becomes even more suspect when compared to the fact that, as Petitioners point out, the record contains contradictions as to what these alternatives actually cost—Denver Water gave the Corps one cost, yet reported to FERC a much, much higher number. AR 123936; *cf.* AR 004011–12. This inconsistency further underscores the need for skepticism as to the Corps' chosen cost metric.

In short, the Court finds that the Corps violated NEPA by failing to adequately explain its "RDC estimate" cost metric.

### iii.   *Climate Change Deserved a "Hard Look."*

Finally, Petitioners fault the Corps for failing to quantify climate change's impact on precipitation. (Doc. # 134 at 50–54.) According to Petitioners, despite the Corps' apparent willingness to shoot from the hip with considerably *laissez-faire* permitting and mitigation cost estimates, the Corps' ironic unwillingness to consider the same approach for climate change's effects on precipitation underscores the insufficiency of the Corps' qualitative analysis. (Doc. # 134 at 50–54.)

Looking to the administrative record, the Corps acknowledged the scientific community's prediction that climate change would raise air temperatures, which will, in turn, worsen aridity conditions and increase the magnitude of evapotranspiration— which means less water. AR 000231, 124638–40. The Corps even understood these

issues back in 2008. AR 159570–71 (acknowledging in the DEIS that climate change was "reasonably foreseeable" and would reduce new firm yield). However, the Corps provided no figure to quantify, much less estimate, whether proposals *reliant on a dam's inherent ability to impound rain and snowmelt* would remain viable solutions *in the likely event that aridity worsens for extended periods of time after acknowledging that scenario would affect precipitation and snowmelt*. There can be no better example of arbitrary reasoning than this. The Corps' refusal to provide even an estimate on future hydrology is indefensible, an abject violation of NEPA.

Respondents insist that uncertainty justifies avoidance. At the outset, it is worth noting that the Corps' conspicuous inability to find a sufficient climate precipitation estimation model is questionable in light of the Bureau of Reclamation's ability to produce climate precipitation estimates. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 74 F.4th 1166, 1179–82 (10th Cir. 2023). Because climate change modeling remains a nascent art form, the Corps claims that it satisfied NEPA by simply acknowledging relevant and foreseeable effects of climate change. (Doc. # 137 at 50–53; Doc. # 149 at 2–3.) Although binding precedent permits the Corps to justify indecision given a lack of accepted methodology, the particular facts of the instant case discourage deference to the Corps on this point. The Corps in this case considered the practicability of a dam—*a construction project entirely dependent on storing water*. The salience of the consideration makes it absolutely critical to at least explore whether increased aridity due to climate change will undermine the construction project's capacity to store water.

Respondents and Intervenor disagree, but to no avail. Intervenor, for its part, emphasizes that climate change projections show both increases and decreases in precipitation. (Doc. # 138 at 42–44 (citing AR 000117, 130126.) How that justifies the Corps' failure to simply pick at least one means of projecting precipitation changes, however, remains to be seen—a quintessential *non sequitur*. Intervenor also contends that the Proposed Action will produce the water that Denver Water wants regardless of climate change. *See id.* (citing AR 000125–27, 130–32). However, the Court fails to see how the record supports Intervenor's idealistic assertion when the Corps specifically declined to consider, much less establish, the very outcome that Intervenor insists will come to pass. Given that the Corps declined to adopt any methodology to analyze climate change, Intervenor cannot credibly claim that the Proposed Action will withstand the increasing aridity looming on the horizon. *Cf.* AR 124640, 130306 (presenting peer-reviewed studies predicting future precipitation variability in either direction).

In sum, this Court "cannot defer to a void." *Or. Nat. Desert Ass'n*, 625 F.3d at 1121. The Corps might not have been required to quantify the effects of climate change on hydrology with precision, but at the very least, NEPA obligated the Corps to at least consider whether the practicability of a given alternative would change if the negative consequences identified in its qualitative analysis came to pass.

### 3.   The USFWS Did Not Violate the ESA

Finally, Petitioners accuse the USFWS of violating the ESA by extending but later withdrawing "interim" protections for the green lineage cutthroat trout despite promising to maintain protections until USFWS completed its established peer-review

process. (Doc. # 134 at 63–69; Doc. # 143 at 38 & n.15.) Petitioners' argument targets the validity of the USFWS's reasoning. They argue that USFWS acted capriciously by withdrawing the green lineage cutthroat trout's interim protections based on several peer-reviewed studies despite promising to wait until CPW released its 2020 report before making any changes to the fish's interim protections. (Doc. # 143 at 37–38); Hr'g Tr. at 87–89; *see also* FWS 00129–38.[41]

An agency does not violate the APA by reconsidering its stance on an issue and, in the face of new information or changing circumstances, choosing to change course— provided that the agency adequately explains the basis of reconsideration. *E.g.*, *Nat'l Ass'n of Homebuilders v. Defs. of Wildlife*, 551 U.S. 644 (2007); *but see Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 395 (D.C. Cir. 1973) (forbidding an agency from defending its actions with the reasons that it did not contemporaneously assert when the action occurred).

The peer-review process is and has been an official position of the agency for decades. *See, e.g.*, Notice of Interagency Cooperative Policy for Peer Review in Endangered Species Act Activities, 59 Fed. Reg. 34270, 34270 (July 1, 1994). Per the

---

[41] Respondents accuse Petitioners of shoehorning Section 4 delisting procedural requirements into a claim of Section 7 violations. *See, e.g.*, (Doc. # 137 at 66.) To the extent that Respondents are correct—*i.e.*, insofar as Petitioners intend to argue that USFWS's withdrawal of interim protections amounts to a delisting violation, such a position is indefensible. The green lineage cutthroat trout has never been listed under the ESA. Petitioners neglected to formally request USFWS initiate a listing consultation on the green lineage cutthroat trout. *See, e.g.*, (Doc. # 137 at 73.) They offer no authority for the notion that interim protections are legally equivalent to a listing such that withdrawing interim protections counts as a delisting. Without such authority, Petitioners fail to explain how the ESA's delisting procedural requirements apply. *See, e.g.*, *WildEarth Guardians v. U.S. Env't Prot. Agency*, 759 F.3d 1196, 1208–09 (10th Cir. 2014).

peer-review policy, USFWS pointed to specific peer-reviewed studies that, in USFWS's view, at the time, clarified that the green lineage cutthroat trout is taxonomically, genetically, and geographically distinct from the listed greenback cutthroat trout. FWS 00133, 258.

The USFWS in this case, however, provided an explanation for why it withdrew interim protections notwithstanding its promise to maintain protections until CPW released its forthcoming 2020 report: the currently available science sufficiently convinced the USFWS that the green lineage cutthroat trout was not a greenback subspecies. The USFWS's "further refinement of [its] knowledge" of the two fish led it to conclude it "appropriate [to] confine the protections of the ESA to . . . the greenback." FWS 00140; *accord* FWS 00132 (concluding that the green lineage cutthroat trout has a distinct genetic identity and native range). For that reason, the USFWS determined that rulemaking was "not necessary"—a caveat made in the agency's 2012 promise—so the USFWS withdrew interim protections. This decision, although less than ideal considering it appears to have been hastened by the Moffat Collection System Project, "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Colo. River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170, 174 (D.D.C. Sept. 7, 2006); FWS 00129 (noting reconsideration began with the Corps' request regarding the Moffat Collection System Project). Although Petitioners substantively disagree with the USFWS's factual conclusion—that the two fish are unrelated—that does not make the underlying rationale arbitrary or capricious. *See generally Ass'n of Data Processing Serv. Orgs.*, 745 F.2d at 683–84 (distinguishing the

"substantial evidence test" used to challenge factual findings and the "arbitrary or capricious standard" applicable to agency decision-making challenges despite recognizing that both rest on the same premise).

Thus, this Court finds that the USFWS adequately justified its decision to withdraw interim protections.

### 4. Remedy Briefing Is Required

Respondents and Intervenor request remedy briefing. (Doc. # 137 at 75–76); (Doc. # 138 at 55); Hr'g Tr. at 58–59. Petitioners do not oppose. Hr'g Tr. at 89–90. The parties' stipulation aside, the Court also notes several equity concerns. First, Denver Water is about to halt construction due to weather conditions, which undercuts the urgency of ordering a remedy without the benefit of briefing. (Doc. # 147 at 2 (stating that construction will halt from November 2024 to approximately April 2025).) Second, the dam's integrity could become compromised by fully halting construction. Hr'g Tr. at 58 (noting that interrupting the pouring of concrete could compromise the dam's structural integrity, which would risk an unplanned discharge of a catastrophically powerful amount of water).[42] Therefore, this Court finds it prudent to limit its holding to finding that the Corps violated the CWA and NEPA and will defer the matter of a specific remedy until the parties have adequately briefed the Court on the scope of its authority in this context.

---

[42] Intervenor also emphasizes the wasted taxpayer dollars if construction were to halt. Hr'g Tr. at 59. It strikes this Court as ironic, however, that Denver Water complains of fiscal inefficiency when it was the one which chose to immediately begin construction despite repeated warnings from Petitioners that they intended to challenge the Corps' discharge permit.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Court concludes that:

1.      The U.S. Army Corps of Engineers violated the CWA, the § 404(b)(1) guidelines, 33 C.F.R. § 323.6, and § 706(2) of the APA.

2.      The U.S. Army Corps of Engineers violated NEPA, its concomitant regulations, and § 706(2) of the APA; and

3.      Petitioners shall have fourteen (14) days from the date of entry of this Order their to file their Bill of Costs with the Clerk of this Court in accordance with the procedures set forth in Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

The Court DEFERS a final ruling on the remedies until further briefing is submitted.

It is ORDERED that counsel for all parties shall confer and attempt in good faith to reach an agreement as to remedies concerning the issues on which The Corps was not in compliance. If an agreement is not reached, the parties may submit briefs. This briefing will consist of one brief from each party, including Intervenor-Respondent, not exceeding ten pages. Simultaneous briefing shall be filed with the Court on or before November 15, 2024.

DATED: October 16, 2024

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge