**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 18-cv-03258-CMA

SAVE THE COLORADO,
THE ENVIRONMENTAL GROUP,
WILDEARTH GUARDIANS,
LIVING RIVERS,
WATERKEEPER ALLIANCE, and
SIERRA CLUB,

      Petitioners,

v.

TODD T. SEMONITE, in his official capacity as the Chief of the U.S. Army Corps of
Engineers,
RYAN ZINKE, in his official capacity as Secretary of the Interior, and
MARGARET EVERSON, in her official capacity as Acting Director of the U.S. Fish and
Wildlife Service,

      Respondents, and

CITY AND COUNTY OF DENVER, ACTING BY AND THROUGH ITS BOARD OF
WATER COMMISSIONERS,

      Respondent-Intervenor.

---

## ORDER ON REMEDIES

---

## I.      BACKGROUND

On October 16, 2024, this Court entered its Order on Petition for Review of

Agency Action finding that the U.S. Army Corps of Engineers (the "Corps") had failed to

comply with the Clean Water Act ("CWA"), Administrative Procedure Act ("APA"), and

National Environmental Policy Act ("NEPA") when it issued the dredge-and-fill permit

allowing the City and County of Denver's Board of Water Commissioners ("Denver Water") to expand the Gross Dam and Reservoir. Specifically, the Court found that the Corps violated the CWA, the § 404(b)(1) guidelines, 33 C.F.R. § 323.6, and § 706(2) of the APA. (Doc. # 151.) The Court also found that the Corps violated NEPA, its concomitant regulations, and § 706(2) of the APA. (*Id.*)

At the request of the parties, the Court deferred the matter of a specific remedy to allow the parties to brief the Court on the appropriate remedy. (*Id.* at 86.) The parties have submitted multiple remedies briefs, taking differing positions on whether vacatur is appropriate and what amount of additional construction is reasonable and necessary to make the dam safe.[1] Petitioners argue for remand with vacatur, asserting that the new arch dam, which is currently 60 percent complete, can be built to the 340-foot height of the old gravity dam with a new temporary spillway. *See* (Docs. ## 157, 165). Respondents and Respondent-Intervenor ("Intervenor" or "Denver Water") argue for remand without vacatur, asserting that construction of the new arch dam must be fully completed. *See* (Docs. ## 155–56, 170, 172).

For the reasons explained below, this Court orders remand with vacatur of the Corps' Record of Decision ("ROD"), Final Environmental Impact Statement ("FEIS"), and Section 404 Permit ("Permit") for the Moffat Collection System Project.

---

[1] In compliance with the Court's Order (*see* Doc. # 151 at 86), the parties represent that counsel for all parties conferred and attempted in good faith to reach an agreement upon a remedy but were unable to reach such an agreement.

The Court also preliminarily enjoins any further construction on the Gross Dam pending a hearing on what is reasonable and necessary to ensure that the dam, as it is currently constructed, will be structurally safe.

Finally, the Court orders a permanent injunction prohibiting enlargement of the Gross Reservoir, including tree removal, water diversion, and impacts to wildlife.

## II.    <u>LEGAL STANDARD</u>

### A.    REMAND WITH OR WITHOUT VACATUR

The APA states that a "reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Accordingly, "[v]acatur of agency action is a common, and often appropriate form of injunctive relief granted by district courts." *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1048 (10th Cir. 2023) (quoting *Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 859 (10th Cir. 2019)). "But many courts have held that while remand with vacatur is the preferred remedy under the APA, it is not the only permissible remedy." *Id.* (citing *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, et al.*, 988 F.2d 146, 150–51 (D.D.C. 1993); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, et al.*, 781 F.3d 1271, 1290 (11th Cir. 2015) (collecting cases that have adopted the *Allied-Signal* test)).

Under the *Allied-Signal* test, courts must consider two factors—(1) "the seriousness of the [agency action's] deficiencies (and thus the extent of doubt whether the agency chose correct)," and (2) "the disruptive consequences of an interim change

that may itself be changed." *Id.* at 1049 (alteration in original) (citing *Allied-Signal*, 988 F.2d at 150–51). Importantly, with respect to the first factor, "[w]hen an agency bypasses a fundamental procedural step, the vacatur inquiry asks not whether the ultimate action could be justified, but whether the agency could, without further explanation, justify its decision to skip that procedural step." *Id.* (quoting *Standing Rock Sioux Tribe, et al. v. U.S. Army Corps of Eng'rs, et al.*, 985 F.3d 1032, 1052 (D.D.C. 2021), *cert. denied sub nom. Dakota Access, LLC v. Standing Rock Sioux Tribe, et al.*, 142 S. Ct. 1187 (2022)).

Further, regarding the second factor, the court looks to "the disruptive consequences to the [relevant] industry, as well as the potential environmental damage that might continue unabated while [the Corps] revisits its determinations." *Id.* (citing *Black Warrior Riverkeeper*, 781 F.3d at 1290). Application of the *Allied-Signal* factors requires a fact-intensive inquiry that is typically left to the discretion of the district court. *Id.* (citing *Black Warrior Riverkeeper*, 781 F.3d at 1291).

## B.    INJUNCTIVE RELIEF

To show that permanent injunctive relief is warranted, the proponent must demonstrate

> (1) that [they] ha[ve] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the [petitioner] and [respondents], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.* at 1049–50 (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010)).

4

When assessing the first two factors in the context of environmental harm, courts recognize that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Id.* at 1050 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)). "Additionally, when assessing the balance of hardships, financial harms should be considered but 'financial concerns alone generally do not outweigh environmental harm,' especially if the financial harm is 'self-inflicted.'" *Id.* (quoting *Valley Comty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1086 (10th Cir. 2004)). Some courts have found that "where a project has already begun, the public interest in continuing a project is much stronger" than the "public interest favor[ing] compliance with NEPA." *See Hayes, Tr. for Paul B. Hayes Fam. Tr., Dated Apr. 30, 2010 v. Haaland*, No. 4:16-cv-00615-JAR-FHM, 2024 WL 1906435, at *6 (N.D. Okla. May 1, 2024 ) (slip copy) (citing *Valley Comty. Pres. Comm'n*, 373 F.3d at 1087). As with vacatur, whether to issue an injunction is within the discretion of the district court. *Diné*, 59 F.4th at 1050 (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

### III.    <u>ANALYSIS</u>

### A.    REMAND WITH VACATUR IS APPROPRIATE

Vacatur is the preferred/presumptive remedy under the APA and the Court finds it to be the appropriate remedy in this case. Both factors of the *Allied-Signal* test weigh in favor of remand with vacatur of the Corps' ROD, FEIS, and Permit for the Moffat Collection System Project. In its October 16, 2024 Order, the Court found that the Corps had failed to comply with the CWA, APA, and NEPA. The Corps' violations were serious

and will necessitate that, among other things, the Corps re-define the project purpose, consider a multitude of alternatives that were eliminated without analysis, reassess its "Least Environmentally Damaging Practicable Alternative" ("LEDPA") finding, use a supported cost metric, and seriously consider the implications of climate data. *See* (Doc. # 151).

      1.    <u>The seriousness of the agency action's deficiencies</u>

Respondents and Intervenor argue that remand without vacatur is appropriate because "there is at least a serious possibility that the Corps can justify the issuance of the permit after more NEPA and CWA work is completed." (Doc. # 156 at 6–7.) However, the standard focused on by Respondents and Intervenor has been uniformly rejected by the courts as a proper formulation of the *Allied-Signal* test. *See Standing Rock Sioux Tribe*, 985 F.3d at 1052 ("[T]he vacatur inquiry asks not whether the ultimate action could be justified, but whether the agency could, with further explanation, justify its decision to skip that procedural step."); *Diné*, 59 F.4th at 1049 (same).

Moreover, Respondents and Intervenor have had ample opportunity to explain how the Corps could provide such justification but have failed to do so. The deficiencies found by the Court are extensive and serious. They are not of the type that can simply be supported by better reasoning. As such, the deficiencies are not "curable upon remand" without vacatur. *See W. Watersheds Project v. Haaland*, 69 F.4th 689, 723 (10th Cir. 2023).

The Court therefore finds that vacatur is appropriate under factor one of the *Allied-Signal* test.

a.    *The Corps' inappropriately framed purpose-and-need statement supports vacatur*

The EPA advised the Corps that its framing of the Proposed Action's[2] purpose-and-need statement unduly constrained the definition of "practicability." Nonetheless, the Corps ignored that advice and proceeded to combine the basic project purpose and overall project purpose contending that they were inextricably interconnected to the point that they had to be resolved simultaneously. *See* (Doc. # 151 at 4–6, 19–21, 23–25, 27–28, 64–65, 70–76). As the Court noted, "Tellingly, neither Respondents nor Intervenor points to anywhere in the record where the Corps actually articulates an explanation as to why the two purposes[, the basic project purpose and overall project purpose,] are inextricably interconnected to the point that they must be resolved simultaneously, and, for that reason alone, the Corps' purpose-and-need statement is unduly narrow in violation of NEPA." (*Id.* at 71–72.)

In their remedies briefing, the only statement made by Respondents or Intervenor specifically addressing this deficiency is, "The Corps can reexamine the purpose and need statement and modify it or provide more explanation on remand." *See* (Doc. # 156 at 7 (citing to Doc # 156-1, Decl. of Eric Laux, ¶ 17)). This is hardly convincing.

The Corps' erroneous practicability definition led it to reject "sixteen storage sites [with] corresponding water supplies, two water supply management strategies, and one conveyance component" that avoided the disturbance of wetlands. (Doc. # 151 at 56–57.) Mindful that the Corps, by law, *must disprove every potentially practicable*

---

[2] The Proposed Action refers to Denver Water's desire to expand the Gross Dam and Reservoir. Throughout the parties' briefs and the administrative record, the Proposed Action is also referred to as the "Moffat Collection System Project."

*alternative* that does not disturb special aquatic sites, the dearth of information on these nineteen alternatives led this Court to presume that all of them were practicable and available. (*Id.* at 57.) The fact that the Corps began its analysis with such a serious error weighs heavily in favor of vacatur.

          b.      *The Corps' need to analyze a multitude of proper alternatives based on a reframed purpose supports vacatur*

The Corps' erroneous multifaceted project purpose also animated its alternatives analysis in the Draft Environmental Impact Statement ("DEIS"), which began with a "preliminary" alternatives screening process that whittled down 303 potential alternatives to five—all of which involved some degree of tampering with the Gross Dam. *See* (Doc. # 151 at 19–20). As this Court stated, "The fact that all five alternatives that received a 'hard look' involved tampering with the Gross Dam was not by coincidence—because an alternative's practicability derives in part from its capacity to serve the project's purpose." (*Id.* at 20.)

Respondents argue that "NEPA does not require agencies to reach any substantive outcome after taking the requisite hard look at significant environmental impacts and considering a reasonable range of alternatives." (Doc. # 156 at 7 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).) The Court does not agree that the mere five alternatives given a hard look, all involving tampering with the Gross Dam, was a reasonable range in this case.[3]

---

[3] By way of example, Denver Water concedes that it has built infrastructure to move water from the South to North System before yet claims that any iteration of that solution would be impracticable as applied to the instant case. *See* (Doc. # 151 at 65 n.34 (citing AR 129541)). In fact, one alternative considered just that. "Conduit X," one proposed alternative highlighted by the organization "Colorado Trout Unlimited," proposed bridging the South and North Systems via pipeline, which would theoretically address Denver

This serious deficiency includes the Corps' failure to *clearly demonstrate* that the Proposed Action by Denver Water "is the LEDPA." (Doc. # 151 at 30 (citing AR 000049–50).) A clear demonstration of the LEDPA requires comparisons to practicable alternatives and the process of elimination. The Corps' mandatory obligations under both NEPA and the CWA turn on discussions of practicability, and practicability derives in part from whether the alternative can satisfy the purpose and need of the proposed project. As addressed immediately above, reframing the purpose-and-need statement and considering a multitude of practicable alternatives that avoid the disturbance of wetlands weighs heavily in favor of vacatur.

        c.     *The Corps' unsupported cost analysis supports vacatur*

The Corps inexplicably chose to ignore massive costs that vary considerably by circumstance. The Corps' failure to prove the financial feasibility of the Proposed Action means it failed to meet its burden of *clearly* demonstrating that the Proposed Action is the LEDPA in violation of 33 C.F.R. § 323.6. *See* (Doc. # 151 at 60–61). Respondents and Intervenor have had multiple opportunities to explain the cost metric used but have utterly failed to do so.

Intervenor relied on the unremarkable observation that the guidelines do not obligate the Corps to conduct a "formal 'cost-benefit' analysis" and concluded (without explanation) that the Corps' comment defending its cost metric is a "rational" response. *See* (Doc. # 151 at 60 (citing Doc. # 138 at 41)). In fact, Respondents did not bother to

---

Water's desire to fortify its system through rebalancing without the need for a massive dam construction project. (Doc. # 151 at 17 (citing AR 176261).)

address this problem in their prior briefing and have failed to provide even a modicum of

evidence in their remedies briefing that the Corps would be able to appropriately

address this problem on remand without vacatur. The Court therefore finds that starting

over and developing a reasonable cost analysis when the Corps considers all

practicable alternatives is the appropriate remedy.

> d.     *The Corps' complete failure to quantify climate change's effects on precipitation supports vacatur*

Yet another serious defect is that the Corps failed to quantify climate change's

effects on precipitation.[4] The Corps acknowledged that climate change could decrease

or eliminate firm yield and recognized that climate change's impact on hydrology might

render the Proposed Action ineffective enough to warrant the need for "additional

replacement sources [of water] to ensure adequate supply." *See* (Doc. #151 at 62).

Despite this, the Corps declined to quantify the impacts of climate change or even

provide an educated guess for purposes of discussion. *See* (*id.*). Neither Respondents

nor Intervenor provide any argument on this point in remedies briefing. Instead, they

only mention it as a concern for further construction delays. *See* (Doc. # 172 at 5). The

Court finds that this is also a serious defect supporting vacatur.

In sum, the amalgamation of these serious defects supports the Court's finding

that vacatur is appropriate under factor one of the *Allied-Signal* test. To allow an attempt

---

[4] The Court is aware that an imminent ruling from the United States Supreme Court may hold that agencies do not have to consider indirect effects that are out of their direct regulatory control, which could allow agencies to ignore indirect climate change impacts. *See Seven Cty. Infrastructure Coalition v. Eagle Cty., Colo.*, 144 S. Ct. 2680 (2024). The Supreme Court heard oral argument on December 10, 2024, but has not yet issued a decision, so this potential ruling is not the law at the time of this Order. Further, climate change in this case arguably has a direct, not indirect, impact on the firm yield of water at issue.

by the Corps to retroactively explain away these serious errors on remand without vacatur would render the required analysis under the CWA, APA, and NEPA meaningless.

2.    The disruptive consequences of an interim change that may itself be changed

The second factor of the *Allied-Signal* test has the Court consider the potential disruptive consequences to the Proposed Action and any potential environmental damage that may continue unabated while the Corps redoes its analysis. *See Diné*, 59 F.4th at 1049. On this issue, the parties have much to say about the disruption, or lack thereof, that will result if the Court vacates the Corps' Section 404 Permit. The Court concludes that this factor also weighs in favor of remand with vacatur.

Petitioners argue that "the paramount consideration under the second vacatur factor is whether the Court can restore the status quo ante" and that the Court's remand with vacatur would accomplish this. *See* (Doc. # 157 at 14–15). Respondents and Intervenor, on the other hand, argue that vacatur would not actually disrupt construction of the new arch dam, since it would not require construction to stop under the Federal Energy Regulatory Commission ("FERC") license issued to Denver Water. *See* (Docs. ## 155 at 15, 156 at 10–11, 172 at 2–3). Respondents and Intervenor conflate this vacatur factor with Petitioners' requested injunction. *See, e.g.,* (Docs. ## 155 at 15, 172 at 2–3). Respondents further argue that vacating the Section 404 Permit would remove the Corps' power to enforce "special conditions" Denver Water must follow that are not included in the FERC license, "which survive the initial discharge of dredged and fill

material into waters of the United States," thereby allowing potential environmental

harms. (Doc. # 156 at 4, 10 (listing several of the conditions).)

The Court finds Respondents' and Intervenor's arguments on this factor

unavailing. First, the Court disagrees that vacatur has no impact on further construction

as discussed in more detail in the injunction section immediately below. Second, the

Court disagrees that remand with vacatur would cause environmental harm, primarily

because this Court has the power to order mitigation of adverse environmental effects

resulting from prior construction or that would result from any necessary further

construction. *See*, *e.g.*, *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 404 F. Supp.

2d 1352, 1366 (enjoining construction under invalid CWA permit, but not enjoining

"mitigation measures designed to compensate for the environmental harm caused by"

project construction to date); *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 80

(D.D.C. 2010) (vacating CWA permit but not affecting "several current permit conditions

pertain[ing] to the continued operation and maintenance of the storm water

management system and ongoing stabilization of the site" to promote the purposes of

NEPA and the CWA); *Colo. Envtl. Coal. v. Off. of Legacy Mgmt.*, 819 F. Supp. 2d 1193,

1223–25 (D. Colo. 2011), *as amended on reconsideration*, *Colo. Envtl. Coal. v. Off. of

Legacy Mgmt.*, No. 08-cv-01624-WJM-MJW, 2012 WL 628547, at *3 (D. Colo. Feb. 27,

2012) (vacating and enjoining action that violated NEPA, but allowing activities, subject

to notification to the Court and parties, "that are absolutely necessary to remediate

dangers to the public health, safety, and environment").

The Court therefore finds that vacatur is also appropriate under factor two of the *Allied-Signal* test.

**B.    THE COURT PRELIMINARILY ENJOINS FURTHER CONSTRUCTION ON THE DAM PENDING A HEARING**

1.    <u>A preliminary injunction is appropriate pending a hearing</u>

The four factors of a preliminary injunction are slightly different than for a permanent injunction. To receive a preliminary injunction, the proponent must establish: (1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest. *Valley Comty. Pres. Comm'n*, 373 F.3d at 1083. The Court finds that all four factors warranting a preliminary injunction are present pending a hearing described below, which will guide the Court in its final decision on a tailored permanent construction injunction.

a.    *Substantial likelihood of success on the merits*

Petitioners have already successfully prevailed on this factor pursuant to the Court's October 16, 2024 Order and this Order's vacatur of the Corps' ROD, FEIS, and Permit for the Moffat Collection System Project.

Respondents and Intervenor spend much of their remedies briefing arguing that the FERC license is distinct from the Corps' permitting and that Petitioners do not actually challenge this license (nor can they in this Court). They argue that this thereby renders the Court's decision to remand with vacatur meaningless when it comes to construction of the new arch dam. *See* (Docs. ## 155 at 6–8, 10 n.1, 156 at 5 & 9–10,

13

170 at 4–5, 172 at 2). Respondents further argue that "[t]here is no basis for injunctive relief against FERC, a non-party . . . ." (Doc. # 156 at 10.) However, the injunction entered pursuant to this Order prohibits *Denver Water*, not FERC, from taking further action. Respondents and Intervenor also argue that an injunction would be inappropriate, because all the permitted discharges of dredged and fill material into the jurisdictional wetlands which was allowed by the Corps' Section 404(b)(1) permit has been completed. *See* (Docs. ## 155 at 12, 156 at 11).

These are disingenuous arguments that oversimplify and misrepresent the larger scale of the Proposed Action and the Corps' authority.[5] As pointed out by Petitioners, Respondents have already twice lost on the argument of the Corps' limited authority over the scope of the Project. *See* (Doc. # 165 at 5–7). The Tenth Circuit panel explained that the Project contains a hydroelectric dam component, over which FERC and the Corps have dual authority, which is subsumed within the broader Project requiring *only the Corps' approval* due to the foreseeable "effect of discharges on a massive water supply crossing several counties," in contrast to FERC's "consider[ation] [of] only the effect of the dam and reservoir on a single reservoir in Boulder County." (*Id.* (quoting *Save the Colo. v. Spellmon*, 50 F.4th 954, 963 (10th Cir. 2022).)

     b.    *Irreparable injury*

Environmental injury is often the very definition of irreparable harm—often permanent or at least of long duration. *See Diné*, 59 F.4th at 1050; *Amoco*, 480 U.S. at

---

[5] Further, Respondents' and Intervenor's completed discharge and fill material argument ignores the fact that the Corps' ROD and FEIS have been vacated.

545. All parties agree that there will be environmental harm resulting from completion of the Moffat Collection System Project, including the destruction of 500,000 trees, water diversion from several creeks, and impacts to wildlife by the sudden loss of land. Further, as explained above, the fact that the discharges of dredged and fill material for construction of the new Gross Dam have already happened does not make the environmental impact of this Project any less. The Tenth Circuit acknowledged, and this Court will not ignore, the foreseeable effect of this Project's discharges on a massive water supply crossing several counties. The Court therefore rejects Respondents' and Intervenor's attempts to distinguish environmental impacts resulting from completion of the dam itself from those resulting from the entire Proposed Action. The Court finds that, without an injunction, irreparable injury would occur.

> c. *Threatened injury to the movant outweighs the injury to the other party*

While this Court can consider financial harms to Intervenor, "financial concerns alone generally do not outweigh environmental harm, especially if the financial harm is self-inflicted." *Diné*, 59 F.4th at 1050 (citing *Valley Comty. Pres. Comm'n*, 373 F.3d at 1086) (internal quotation marks omitted). As stated above, the environmental harm that will occur as a result to the Moffat Collection System Project is indisputable.

The Court does not find Respondents' and Intervenor's arguments about alleged cost, delay, and the alleged urgent need to address droughts persuasive because these alleged hardships are largely self-inflicted. Not only did Denver Water wait three years between the Corps' 2017 ROD and submitting its FERC application, but it also filed an

unsuccessful motion to dismiss, delaying this case for two more years.[6] Further, Denver

Water concedes that it has built infrastructure to move water from the South to North

System before, so could presumably do so again in the event of a drought. *See* (Doc. #

151 at 65 n.34 (citing AR 129541)).

      The Court therefore finds that this factor also weighs in favor of a preliminary

injunction pending a hearing.

          *d.*     *Public interest*

      "The public has an undeniable interest in the [Corps'] compliance with NEPA's

environmental review requirements and in the informed decision-making that NEPA is

designed to promote." *Colo. Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1223

(D. Colo. 2007). In December 2003, in response to the Corps' "Scoping Summary,"

there were a myriad of comments begging the Corps not to uncritically adopt Denver

Water's framing of the project purposes. *See* (Doc. # 151 at 18 (citing to AR 175578–

6043)). Multiple environmental organizations also submitted public comments urging the

Corps to frame the scope of the project in a way that would consider Denver Water's

needs separately, because doing so would avoid the need to install or enlarge a major

dam. (*Id.* at 17 (citing AR 176258, 176263).) Years later, the Corps' DEIS also fomented

a torrent of criticism. *See* (*id.* (citing AR 128487–134705 (documenting and responding

---

[6] Along these same lines, the Court does not find Intervenor's laches argument persuasive. *See* (Doc. #
155 at 10–12). Respondents and Intervenor had warnings of potential environmental law violations from
Petitioners and the EPA for years but decided to commence the Project in the face of this uncertainty
anyway.

to at least 2,500 submissions containing nearly 5,000 individual comments)).[7] The Court found that these public concerns were valid, finding multiple serious environmental law violations by the Corps. *See* (Doc # 151).

Further, the Court finds Respondents' and Intervenor's argument that halting the Project is against the public interest unavailing. Although some courts have found that the public interest in continuing a project that has already begun is stronger than the public interest in complying with NEPA,[8] this Court will not reward Denver Water for starting construction on the Project despite being aware of the seriousness of the environmental law challenges by Petitioners.

    2.    The Court defers ruling on a permanent injunction pending a hearing

Petitioners do not ask this Court for a permanent injunction that would require Denver Water to tear down the partially built dam or restore the unlawfully filled wetlands. (Doc. # 165 at 14.) Instead, acknowledging that Denver Water needs to address safety concerns to stabilize the new dam, Petitioners argue that the new arch dam, which is currently 60 percent complete, can be built to the 340-foot height of the

---

[7] As previously explained by this Court, "Although it is true that the Corps responded to public comments, responding itself does not support a conclusion that the comment response is necessarily sound. The Court's review of the comment responses reveals that the Corps' responses exhibited reasoning that was perfunctory at best and, as explained above with respect to the CWA, in direct contradiction of the § 404(b)(1) guidelines." (Doc. # 151 at 74 (citing AR 129310 (concluding that "it is appropriate to integrate several underlying needs into one defined purpose, since the multiple needs of the applicant are not 'independent' but rather are 'interconnected'" without any further explanation).)

[8] The cases relied on by Intervenor are distinguishable from this case. In both *Valley Comty. Pres. Comm'n v. Mineta*, 373 F.3d 1078 (10th Cir. 2004) and *Hayes, Tr. for Paul B. Hayes Fam. Tr., Dated Apr. 30, 2010 v. Haaland*, No. 4:16-cv-00615-JAR-FHM, 2024 WL 1906435 (N.D. Okla. May 1, 2024 ) (slip copy), the court found that all appropriate alternatives were considered. In this case, the Court has already found that the Corps' did not consider several practicable alternatives.

old gravity dam with a new temporary spillway, thereby reinstating the status *quo ante*.

*See* (Doc. # 157 at 9). Respondents and Intervenor, on the other hand, argue that

construction of the new arch dam must be fully completed for the following reasons:

> • As described in the Supplemental Declaration of Project Manager Jeff Martin, the Dam has been reengineered from the original gravity dam to an arch dam. Denver Water cannot just stop work now, when the new Dam is 60% of the way to its final height. Now that the prior foundation and abutments have been excavated, completion of the new "arch" structure to the FERC-ordered height is the only way to ensure the Dam is safe and structurally sound.

> • The original gravity dam has been deconstructed and its foundation excavated, exposing steep rock slopes that depend on bolts to temporarily shore them up. Timely completion of the dam raise is necessary to permanently stabilize and support those surfaces.

> • The Dam currently has no spillway or auxiliary outlet works, compromising the ability to respond to flooding events. While FERC anticipated that would be true for a relatively brief period during construction, the need to expeditiously re-install those key elements for Dam safety and functionality is part of why FERC ordered Denver Water to complete construction on the established schedule.

> • Until the spillway and outlet works are re-installed, Gross Reservoir must remain drawn down below the amount of water that could previously be stored.

*See* (Doc. # 155 at 7–8) (citations to Supplemental Decl. of Jeff Martin omitted).

Allowing the construction of the new arch damn to proceed without limitation

undermines and renders meaningless the Court's October 16, 2024 Order which found

serious violations of environmental laws.

Although, the Court is concerned about the safety issues referenced in

Respondent's and Intervenor's briefing, it is not clear to the Court that the only means of

addressing those safety issues is by completing construction of the dam to the

specifications originally contemplated in the Proposed Action. The Court needs to hear

the testimony of engineering experts regarding what amount, if any, of additional

construction is reasonable and necessary to make the existing dam safe, including what is necessary for continued site stabilization, monitoring, and maintenance activities. It is for this reason that the Court does not enter a permanent injunction, but rather, enters only a preliminary injunction enjoining any further construction on the Gross Dam pending a hearing which will guide the Court in its final decision on a tailored permanent construction injunction.

## C.    THE COURT GRANTS A PERMANENT INJUNCTION PROHIBITING ENLARGEMENT OF THE GROSS RESERVOIR

The Court permanently enjoins enlargement of the Gross Reservoir, finding that Petitioners have met all four factors to show that permanent injunctive relief is warranted.

### 1.    Irreparable injury and available remedies at law

The first two factors Petitioners must show to prove that permanent injunctive relief is warranted are (1) irreparable injury and (2) inadequate remedies at law. As noted above, the Court recognizes that environmental injury is often the very definition of irreparable harm and can seldom be remedied by money damages. *See Diné*, 59 F.4th at 1050; *Amoco*, 480 U.S. at 545. Again, all parties agree that there will be environmental harm resulting from enlargement of the Gross Reservoir, including the destruction of 500,000 trees, water diversion from several creeks, and impacts to wildlife by the sudden loss of land.

Respondents and Intervenor argue that enlargement of the Gross Reservoir can only happen after the Gross Dam is complete and is thus not imminent. *See* (Docs. ## 155 at 9, 172 at 3–4). However, this argument rings hollow given Denver Water's

impatience with the Project thus far, choosing to immediately begin construction despite repeated warnings from Petitioners that they intended to challenge the Corps' discharge permit. It also rings hollow given Denver Water's alleged current plans to recommence construction despite this Court's Order finding serious environmental law violations. Given this impatience, the Court will not wait for a motion for an emergency injunction some time down the road in the event Denver Water decides to go ahead and cut down trees while the dam construction is being completed. Further, as stated above, the Court will not ignore the foreseeable effect of this Project's discharges on a massive water supply crossing several counties.[9]

Moreover, neither Respondents nor Intervenor have argued that remedies available at law, such as monetary damages, are adequate to compensate for the environmental injury. The Court therefore finds that the first two elements of a permanent injunction of Gross Reservoir enlargement have been met.

2.    Balance of hardships and public interest

The third and fourth factors Petitioners must show for permanent injunctive relief are (3) that, considering the balance of hardships between Petitioners and Respondents, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. The balance of hardships and public interest factors merge when the government is the opposing party. *See Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5, 14 (D.D.C. 2019) (citations omitted).

---

[9] Therefore, *Valley Comty. Pres. Comm'n v. Mineta*, 373 F.3d 1078 (10th Cir. 2004) and *Hayes, Tr. for Paul B. Hayes Fam. Tr., Dated Apr. 30, 2010 v. Haaland*, No. 4:16-cv-00615-JAR-FHM, 2024 WL 1906435 (N.D. Okla. May 1, 2024 ) (slip copy) are also distinguishable from this case because, unlike in those cases, the Court does find imminent environmental harm.

As articulated in Section III.B.1.b. above, there is strong public interest in government agencies' compliance with environmental laws and, as it specifically relates to enlargement of the Gross Reservoir, the public has raised concerns for years with respect to the Corps' failure to consider alternatives that avoid the disturbance of wetlands. These grave concerns have been affirmed in the Court's findings. Again, this Court will not reward Denver Water for starting construction on the Project despite being repeatedly warned by Petitioners, the public, and the EPA that it could be put in jeopardy by serious environmental law violations.

Additionally, as articulated in Section III.B.1.c. above, the environmental harm that will occur as a result of the Moffat Collection System Project outweighs any financial concerns articulated by Denver Water when assessing the balance of hardships in this case. The environmental harm that will occur as a result of the Gross Reservoir enlargement is indisputable and irreparable.

The Court therefore finds that the second two elements of a permanent injunction have also been met and a permanent injunction of Gross Reservoir enlargement is appropriate.

## IV.    CONCLUSION

For the foregoing reasons, the Court ORDERS remand with vacatur of the U.S. Army Corps of Engineers' Record of Decision ("ROD"), Final Environmental Impact Statement ("FEIS"), and Section 404 Permit ("Permit") for the Moffat Collection System Project. It is

FURTHER ORDERED that any further construction on the Gross Dam is ENJOINED pending a hearing on what is reasonable and necessary to make the currently existing structure safe, including what is necessary for continued site stabilization, monitoring, and maintenance activities, to guide the Court's decision on a tailored permanent injunction regarding construction of the dam. At this hearing, the Court expects the parties to present testimony from one or more experts on both sides of this case. Because the Court is aware that time is of the essence, although the Court has three weeks of trial scheduled in April, it will make available the following dates for a full day hearing: April 22–25 and May 5–9, 12–14. The parties are to confer, agree on an acceptable date for the hearing, and email the Court at arguello_chambers@cod.uscourts.gov with that date. It is

FURTHER ORDERED that the Court GRANTS a permanent injunction prohibiting enlargement of the Gross Reservoir, including tree removal, water diversion, and impacts to wildlife.

DATED:  April 3, 2025

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge

22