**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 18-cv-03258-CMA

SAVE THE COLORADO,
THE ENVIRONMENTAL GROUP,
WILDEARTH GUARDIANS,
LIVING RIVERS,
WATERKEEPER ALLIANCE, and
SIERRA CLUB,

      Petitioners,

v.

TODD T. SEMONITE, in his official capacity as the Chief of the U.S. Army Corps of
Engineers,
RYAN ZINKE, in his official capacity as Secretary of the Interior, and
MARGARET EVERSON, in her official capacity as Acting Director of the U.S. Fish and
Wildlife Service,

      Respondents, and

CITY AND COUNTY OF DENVER, ACTING BY AND THROUGH ITS BOARD OF
WATER COMMISSIONERS,

      Respondent-Intervenor.

---

**ORDER ON PERMANENT INJUNCTION REGARDING DAM CONSTRUCTION**

---

## I.      BACKGROUND

### A.      PROCEDURAL HISTORY

On April 3, this Court entered its Order on Remedies remanding with vacatur the

U.S. Army Corps of Engineers' Record of Decision ("ROD"), Final Environmental Impact

Statement ("FEIS"), and Section 404 Permit ("Permit") for the Moffat Collection System

Project, permanently enjoining enlargement of the Gross Reservoir, and temporarily

enjoining further construction on the Gross Dam pending a hearing for testimony from

experts on what is reasonable and necessary to make the currently existing structure

safe. (Doc. # 176.) Three days later, on Sunday, April 6, the Court denied the City and

County of Denver's Board of Water Commissioners' ("Denver Water") motion seeking a

stay pending appeal of the Court's October 16, 2024, and April 3 Orders, but granted a

temporary 14-day stay applicable only to its preliminary injunction prohibiting further

construction of the dam to allow Denver Water to seek an emergency stay from the Tenth

Circuit. (Doc. # 179.)

The next day, on April 7, Denver Water appealed the Court's April 3 Order (Doc. #

180) and the Tenth Circuit entered a temporary stay of the Court's preliminary injunction

prohibiting further construction of the dam to take effect at the expiration of this Court's

14-day temporary stay (Doc. # 184). After receiving submissions from the parties, the

Tenth Circuit extended its temporary stay of this Court's preliminary injunction pending

the Court's hearing and further order concerning injunctive relief regarding construction of

the dam (and thereafter until the Tenth Circuit further orders). (Doc. # 194.)

On May 6, this Court held a hearing on what is reasonable and necessary to make

the currently existing dam structure safe. At this hearing, four experts testified—three on

behalf of Denver Water and one on behalf of Petitioners. At the conclusion of this

hearing, in order to guide this Court's decision on a tailored permanent injunction

regarding construction of the dam, the Court ordered the parties to submit proposed

findings of fact and conclusions of law based on the nearly eight hours of expert

testimony. The Court requested that such findings and conclusions specifically address the safety risk or lack thereof to the public and what was necessary for continued site stabilization, monitoring, and maintenance activities, including the estimated amount of time it would take for any re-design and construction of the project.

For the foregoing reasons, the Court vacates its preliminary injunction and finds that a permanent injunction prohibiting further construction of the Gross Dam is not merited due to safety concerns. Nothing in this order, however, impacts the Court's prior rulings (1) remanding with vacatur the U.S. Army Corps of Engineers' ROD, FEIS, and Section 404 Permit for the Moffat Collection System Project and (2) permanently enjoining enlargement of the Gross Reservoir. These rulings remain in full force and effect for the reasons stated in the Court's April 3 Order. *See* (Doc. # 176).

## B.    FINDINGS OF FACT

Denver Water began construction work on the Gross Dam in April 2022 and has since deconstructed key elements of the prior gravity dam structure as necessary to prepare for construction of the expanded, arch form dam. *See* Intervenor-Resp.'s ("Resp.") Ex. 12, Martin Decl. ¶¶ 20−25; May 6 Hearing Tr. (hereinafter "Tr.") 143. The abutments surrounding the dam have been excavated down to the foundation; the dam's surface has been roughened so that new concrete can properly adhere; and the spillway and stilling basin have been removed. Resp. Ex. 12 ¶¶ 21−37.

In 2023, Denver Water removed the original foundation at the base of the dam and the stilling basin; placed new concrete foundation blocks at the base of the dam to support the new arch structure; and began raising the new dam by pouring roller-

compacted concrete ("RCC") continuously "to form the new arch structure that will restore the Dam to permanent stability." Resp. Ex. 12 ¶¶ 30−33; Tr. 143. Apart from seasonal breaks during the winter when it is too cold to lay concrete, that dam-raising work has progressed continuously. Resp. Ex. 12 ¶ 33. Dam maintenance, security, and other ancillary work continued during the winter months. Tr. 143−44. Denver Water Project Manager Jeff Martin[1] testified that, although Denver Water has not yet constructed the new spillway or stilling basin for the dam, the spillway is slated to be built early next year and the stilling basin is expected to be complete by the end of this construction season. Tr. 153−54, 165. As of May 6, 2025, the dam had been constructed to a height of 280 feet, which is roughly 60% of its final, anticipated height of 471 feet. Tr. 148, 273.

Mr. Martin asserts that enjoining dam construction would harm Denver Water by requiring Denver Water to lay off much of its specialized workforce (which harms those workers as well), interfering with Denver Water's contracts with contractors supplying materials and labor for the Project, and significantly increasing the costs of finishing the Project. Resp. Ex. 12 ¶ 53(d), (e), (h); Tr. 168, 182.

Denver Water's expert and Engineer of Record for the Gross Dam, Michael Rogers[2], explained that the Gross Dam is classified as "a high hazard dam, which means that its failure could potentially result in loss of life and extreme property damage downstream." Tr. 26. He testified that his design of the new arch-form dam was based on

---

[1] Mr. Martin was admitted without objection as an expert in water infrastructure, project management, and dam safety. Tr. 138−39.

[2] Mr. Rogers was admitted without objection as an expert in dam engineering and safety. Tr. 15.

a "continuous construction period" and does not contemplate delays of more than four

weeks. Tr. 90. He explained that the interim "risks that we accepted for construction that

we discussed throughout our design period and this workshop were based on the

construction schedule that we had that had the project being done within five years." Tr.

99. Mr. Martin supported this position when he testified that "at one point this project was

about seven years long" but they were ultimately "able to develop and shorten [their]

schedule to five years, and the exposure of these rock abutments we estimated would be

somewhere between 18 months and two years." Tr. 155−56. Mr. Martin testified that it

was "extremely" important to limit the exposure period for these abutments. Tr. 156. Mr.

Rogers also testified that "[t]he abutment excavations are meant to be temporary for just

a year or so as [Denver Water and its contractor] get them cleaned and get the RCC." Tr.

82−83.

Mr. Rogers opined that it would take at least 18 months, but more likely two or

more years, to prepare a new design and engineering package for submission to the

Federal Energy Regulatory Commission ("FERC"). Tr. 126. Further, Mr. Martin explained

that the 18+ month period needed for a new design does not include the additional time it

would take him, as Project Manager, to procure new engineering and design personnel at

the front end of the re-design process, and contract for labor and materials after the new

design is approved before beginning construction. Tr. 150.

Mr. Rogers also played a significant role in designing the spillway of the new arch

dam, which he testified will be the tallest and steepest of its kind in the world. Tr. 22. Mr.

Rogers explained that changing the spillway in any way would require a new, and likely

lengthy, design and modeling process. Tr. 46−48, 125−27. Mr. Rogers also described the

"stilling basin [as] the most crucial part of the spillway system." Tr. 44. "It's the Achilles'

heel of a concrete dam, because . . . it has the highest velocity of water, the most energy

coming down." Tr. 44. As FERC Regional Engineer Frank Blackett[3] explained, FERC was

involved at every step of the original Project design process, commenting on more than a

dozen rounds of design plans, requiring changes, and ultimately approving the design of

the new arch dam and issuing the schedule for Project work and completion. Tr. 270-72.

Mr. Blackett confirmed that any change to the dam structure would have to go through a

similar FERC review and approval process. Tr. 281.

After the outset of his testimony, Petitioners' expert, Stephen Rigbey[4], testified as

Mr. Rogers testified that every day the dam sits in its current unfinished,

"damaged" state, the risk of catastrophic failure increases. Tr. 44, 99. According to Mr.

Rogers, the best way to ensure that the dam meets the proper safety and stability criteria

is to finish the construction according to the design plan approved by FERC. Tr. 129.

At the outset of his testimony, Petitioners' expert, Stephen Rigbey[4], testified as

follows:

---

[3] Mr. Blackett was admitted without objection as an expert on dam safety and FERC's role and process for approving and supervising dam projects. Tr. 269.

[4] Mr. Rigbey was admitted without objection as an expert in dam engineering, dam safety, and risk evaluation. Tr. 207. Mr. Rigbey's opinions were based on his 46 years of experience in dam engineering and dam safety. Tr. 259. *See also* Petitioners' Ex. 10, Mr. Rigbey's Curriculum Vitae. On May 21, Denver Water filed a Motion to Exclude Expert Opinions Offered by Stephen Rigbey, arguing that he did not support any of the opinions he gave at the hearing with any underlying methodology, analysis, calculations, or evidence in the record. (Doc. # 203.) Instead, Denver Water argues that his opinions were "based on his personal belief and speculation—including late night 'musings' on the eve of the hearing—rather than engineering analysis." (Doc. # 203 at 5, 8−9.) Even if Mr. Rigbey came to some of his opinions the night before the May 6 hearing, such as the temporary use of flashboards, that does not mean that those opinions and the methodology he described are not valid considerations and admissible expert testimony. As

> But in essence, I think I can start by saying everything I have reviewed and everything that I heard Mr. Rogers say this morning, I can agree with. Quite bluntly, as far as I can see, this entire project has been approached in a very careful, controlled, professional manner, and from what I've been exposed to so far, it looks like it's the highest level of engineering.

Tr. 207. That said, Mr. Rigbey testified that he did not have any "concern whatsoever about catastrophic [dam] failure" during a short-term injunction. Tr. 219. Mr. Rigbey opined: "I would have no concern of catastrophic failure over the next couple of years regarding the abutments or the dam itself, or the toe of the dam." Tr. at 219−20.

Mr. Rigbey explained that there had not been any reason given "why this dam must be completed in 2025 for those areas below that 280-foot [RCC] level to be stable and in place." Tr. at 221. Mr. Rigbey also testified that there is no engineering reason why Denver Water must finish the RCC structure in 2025 to stabilize the slopes above the current level of RCC placement. Tr. 226. He further testified that' if Denver Water "felt for some reason those slopes had to be supported more than they are now, that's what they built rock bolts and rock anchors for." Tr. 226. When asked about the lack of a spillway in the Gross Dam's current state, Mr. Rigbey testified that, in his expert opinion, a dam lacking a spillway is definitely not safe for the long-term, but for the short-term, "it's

---

argued by Petitioners in their brief in opposition to the Motion, flashboards are well-established risk reduction measures in the engineering community and have even been used by Denver Water in the past. (Doc. # 206 at 13.) Further, this was a hearing to the Court, not a jury, so "the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial." *AG of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009). "Ultimately, the test requires that the expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Basanti v. Metcalf*, 35 F. Supp. 3d 1337, 1341 (D. Colo. 2014) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). That said, given the Court's rejection of a permanent injunction in this Order, the Court denies as moot Denver Water's Motion to Exclude (Doc. # 203) and need not get into the details as to why it finds that Mr. Rigbey is a qualified expert and that his opinions are admissible in this case.

something you have to live with." Tr. 251. Mr. Rigbey further testified, "I can't minimize
how important a spillway is. I mean, I'm just going to reiterate words that Mr. Rogers
says, but it's key to the safety of that dam." Tr. 218. However, he then highlighted that
this risk had been accepted by Respondents for the past three years and opined that "the
only way it could have been accepted is the fact that there actually is no consideration of
catastrophic failure." Tr. 218.

Mr. Rigbey also testified that further interim safety measures could be taken by
further reducing the reservoir level and/or installing flashboards in order to prevent an
overtopping or catastrophic failure of the dam while the Army Corps of Engineers redoes
its analysis. Tr. 216−17. Mr. Martin testified, however, that flashboards are "[g]enerally []
not a common practice anymore, because when they fail, they release an instant wall of
water downstream." Tr. 195. Mr. Rigbey countered that, although Mr. Martin was correct
that a brand new dam would not be built with flashboards, for temporary purposes,
flashboards could provide a "little bit of additional storage" to minimize risk of a
catastrophic failure in the interim. Tr. 216.

In sum, Mr. Rigbey testified that he does not believe the dam would have to be
finished in order to alleviate the potential for catastrophic failure[5] and the dam in its
current state (including if it remained in this state for the next two years) is a negligible
safety risk to the downstream public and environment. Tr. 226−27, 240−41. He explained
that it is "no more than the risk that it was before," referring to the fact that Denver Water

---

[5] Mr. Rigbey emphasized that when he testifies as to catastrophic failure, he is considering the
potential effect on downstream loss of life or loss of environment, not about construction risk to
the Project itself. Tr. 214.

and others already accepted the risk during the five years the Project was to be under construction. Tr. 240−41.

Finally, Mr. Blackett testified that the Gross Dam is under his jurisdiction as regional engineer, head of the Division of Dam Safety for the San Francisco regional office of FERC. Tr. 264−65. He said that "part of [his] responsibility is to ensure the safety of the downstream consequences, downstream population at risk, and to protect the public from dam failure, mis[-]operations, problems with dams." Tr. 265. Mr. Blackett explained that a high hazard dam, such as the Gross Dam, is "a dam that if it was to fail could result in the loss of life." Tr. 266. When asked by the Court, he testified that for the Gross Dam, the downstream communities include part of Boulder and part of Greeley, and a catastrophic failure of the dam would very likely result in flooding potentially reaching those communities, which could kill people and damage property. Tr. 277−78, 292−93, 300.

Mr. Blackett also testified that, while overtopping itself is not a catastrophic event, "it could do damage to the foundation that would – the dam would then lose support, and the dam would fail, and then the whole reservoir would be released downstream." Tr. 294−95. He further explained that, if the dam failed and reservoir water was released downstream, the effect on the public "would be extreme" and there "could be a lot of loss of life." Tr. 295.

Mr. Blackett explained that weather events are unpredictable—a seismic event could happen or a hundred-year flood could instead be a larger five-hundred year flood— and this Project still "isn't in a complete design[] so, we don't know exactly how it's going

to react to" these potentially catastrophic weather events. Tr. 296−97. Mr. Blackett

explained that, although FERC was "comfortable with the temporary shutdowns during

the winter and the construction season it took" and that although a 100-year flood may

have been accounted for in making Denver Water lower the reservoir level during

construction, "the longer the delay goes, the more likely you could get that storm or [a]

bigger storm." Tr. 296, 298. He stated, "You can't predict Mother Nature . . . the seismic

information changed just before they started this project . . . and . . . the hydrologic

forecasting is changing all the time." Tr. 297. Mr. Rigbey agreed that "extreme

precipitation events are happening more regularly, and what was considered a one in

100[-year] storm is actually now maybe a one in 50[-year] storm," which increases the

risk of a dam failure. Tr. 215.

## II.    LEGAL STANDARD

To show that permanent injunctive relief is warranted, the proponent must

demonstrate

> (1) that it has suffered an irreparable injury; (2) that remedies available at
> law, such as monetary damages, are inadequate to compensate for that
> injury; (3) that, considering the balance of hardships between the plaintiff
> and defendant, a remedy in equity is warranted; and (4) that the public
> interest would not be disserved by a permanent injunction.

*Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1049–50 (10th Cir.

2023) (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010)). A

permanent injunction cannot be granted unless all four requirements are satisfied. *Utah*

*Env't Cong. v. U.S. Bureau of Land Mgmt.*, 119 F. App'x 218, 220 (10th Cir. 2004).

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto*, 561 U.S. 165 (citation omitted). Whether to issue an injunction is within the discretion of the district court. *Diné*, 59 F.4th at 1050 (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

When assessing the first two factors in the context of environmental harm, courts recognize that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Id.* (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)). "Additionally, when assessing the balance of hardships, financial harms should be considered but 'financial concerns alone generally do not outweigh environmental harm,' especially if the financial harm is 'self-inflicted.'" *Id.* (quoting *Valley Comty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1086 (10th Cir. 2004)). Some courts have found that "where a project has already begun, the public interest in continuing a project is much stronger" than the "public interest favor[ing] compliance with NEPA." *See Hayes, Tr. for Paul B. Hayes Fam. Tr., Dated Apr. 30, 2010 v. Haaland*, No. 4:16-cv-00615-JAR-FHM, 2024 WL 1906435, at *6 (N.D. Okla. May 1, 2024 ) (slip copy) (citing *Valley Comty.*, 373 F.3d at 1087).

The loss of human life is also a prime example of irreparable harm. *See, e.g.*, *Colonial Ford, Inc. v. Ford Motor Co.*, No. Civ-90-1157E, 1991 WL 30020, at *2 (W.D.N.Y. Mar. 1, 1991) ("Moreover, the fact that a loss can be quantified in monetary terms cannot in and of itself control the question of irreparable harm. In today's world, it is possible and sometimes deemed necessary to assign a monetary value even to human life, but no one would contend this renders loss of life "reparable."); *Glenside West Corp.*

11

*v. Exxon Co., U.S.A.*, 761 F. Supp. 1118, 1133 (D.N.J. 1991) ("Any activity that may threaten human life may be enjoined on the ground that a court of equity will not gamble with human life, at whatever odds, and on the ground that for loss of life there is no remedy that is, in an equitable sense, adequate.") (citations omitted).

### III.    ANALYSIS

The Court finds that Petitioners have failed to show the four necessary elements for permanent injunctive relief. The Court thus will not enter a permanent injunction prohibiting further construction of the Gross Dam.

**A.    NO IRREPARABLE INJURY TO PETITIONERS IF DAM CONSTRUCTION IS COMPLETED**

The Court finds that Petitioners have not shown that they would be irreparably harmed if the Gross Dam construction were to be completed. Petitioner's focus at the May 6 hearing was the negligible risk of catastrophic dam failure if construction was halted and, that Denver Water has accepted that risk during the last three years of construction, so waiting another one-and-a-half to two years is acceptable. However, nothing at the hearing or in any of the prior filings convinces the Court of an irreparable injury to Petitioners if the Court does not enter a permanent injunction prohibiting completion of construction of the dam. There has been no evidence presented of any environmental harm from further dam construction. Without irreparable harm, it follows that Petitioners also fail to show the second element for permanent injunctive relief— that remedies available at law, such as monetary damages, are inadequate to compensate for an irreparable injury.

12

Regrettably, environmental injury undoubtedly occurred when Denver Water

moved forward with tearing down the gravity dam to build the new arch dam, including

but not limited to the discharges of dredged and fill material into navigable waters

pursuant to the then-existent Section 404 Permit. However, there is no evidence that

there would be additional environmental injury resulting from completion of the dam

construction.[6] In fact, the opposite is true. There is a risk of environmental injury and loss

of human life if dam construction is halted for another two years while Denver Water re-

designs the structure of the dam and gets that re-design approved by FERC. As

explained by Mr. Rogers and Mr. Blackett, the Gross Dam is a high hazard dam, which

means that its failure could potentially result in loss of life and extreme property damage

downstream. Tr. 26, 266. It follows that a catastrophic failure of the dam leading to a

flood downstream could also result in destruction of wildlife habitat and other

environmental damage.

---

[6] The Court acknowledges the importance of rectifying legal violations prior to project completion, especially in light of the "difficulty of stopping a bureaucratic steam roller, once started," as argued by Petitioners in its proposed conclusions of law. *See* (Doc. # 204 at 52) (citing *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989) (Breyer, J.)). *See also id.* at 503 (explaining that without an injunction, the agency and project proponent "may become ever more reluctant to spend the ever greater amounts of time, energy and money that would be needed to undo the earlier action and to embark upon a new and different course of action"); *id.* ("Given the realities, the farther along the initially chosen path the agency has trod, the more likely it becomes that any later effort to bring about a new choice, simply by asking the agency administrator to read some new document, will prove an exercise in futility."); *id.* at 504 ("The way that harm arises may well have to do with the psychology of decisionmakers, and perhaps a more deeply rooted human psychological instinct not to tear down projects once they are built."). This is why the Court stresses that nothing about this decision impacts the Court's prior rulings (1) remanding with vacatur the U.S. Army Corps of Engineers' ROD, FEIS, and Section 404 Permit for the Moffat Collection System Project and (2) permanently enjoining enlargement of the Gross Reservoir. These rulings remain in full force and effect for the reasons stated in the Court's April 3 Order. *See* (Doc. # 176).

**B.    BALANCE OF HARDSHIPS AND PUBLIC INTEREST WEIGH IN FAVOR OF DAM COMPLETION**

The third and fourth factors Petitioners must show for permanent injunctive relief are (3) that, considering the balance of hardships between Petitioners and Respondents, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. The balance of hardships and public interest factors merge when the government is the opposing party. *See Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5, 14 (D.D.C. 2019) (citations omitted).

As revealed through expert testimony, leaving the dam in its present "damaged" condition—*i.e.*, with the vertical dam face sitting unfinished and exposed, no spillway, and no stilling basin—for additional months or years beyond the time anticipated by Denver Water and FERC increases the risk that the dam will overtop during a serious storm event; that overtopping could cause flooding that could result in loss of life or property downstream; and that scouring of the exposed abutments and of the dam's foundation may weaken the dam and cause dam failure either immediately or at some later time. Leaving the dam in its present damaged state also increases the risk of the structure of the dam weakening or failing due to seismic events such as earthquakes. *See* Tr. 296−97 (Mr. Blackett explaining that weather events are unpredictable—a seismic event could happen or a hundred-year flood could instead be a larger five-hundred year flood— and this Project still "isn't in a complete design[] so, we don't know exactly how it's going to react to" these potentially catastrophic weather events.). *See also* Tr. 215 (Mr. Rigbey agreeing that "extreme precipitation events are happening more regularly, and what was

14

considered a one in 100[-year] storm is actually now maybe a one in 50[-year] storm," which increases the risk of a dam failure.).

Expert testimony established that, if dam construction were to be halted and a re-design process was required, such re-design would take at least 18 months. Tr. 126. However, adding in the FERC approval process makes it more likely that the delay to start reconstruction would be two or more years. Tr. 126. Furthermore, Mr. Martin testified that, in his opinion, it would likely take even longer for construction to commence due to delays resulting from the need to coordinate labor, equipment, and materials. Tr. 150. Although toleration of the potential of the risk of a catastrophic dam failure and flooding incident may have been necessary due to construction of a new dam, this Court will not gamble with human life, no matter the odds. *See Glenside*, 761 F. Supp. at 1133. The Court finds that the public interest weighs against a permanent injunction prohibiting completion of the dam, including construction of the spillway atop the new dam crest and installation of the stilling basin at the toe of the dam.

Given the Court's finding that completion of the dam structure, at this point, poses no imminent threat of environmental injury, the Court finds that the public interest in the continued construction of the dam is strong and outweighs halting the Project.[7] *See Valley Comty. Pres. Comm'n v. Mineta*, 373 F.3d 1078 (10th Cir. 2004).

Furthermore, the evidence shows that enjoining dam construction would harm Denver Water and the general public by requiring Denver Water to lay off much of its

---

[7] It is in this regard that completion of the construction of the dam structure is separate and distinct from expansion of the Gross Reservoir which remains enjoined in accordance with this Court's April 3 Order.

specialized workforce (which also harms those workers), as well as interfere with Denver Water's contracts with contractors supplying materials and labor for the Project, which in turn, would significantly increase the costs of finishing the Project. Resp. Ex. 12 ¶ 53(d), (e), (h); Tr. 168, 182.

The Court therefore finds that Petitioners also fail to show the third and fourth elements necessary for permanent injunctive relief.

## IV.     CONCLUSION

For the foregoing reasons, the Court finds that a permanent injunction that would prohibit any further construction of the Gross Dam structure is not merited. It is

FURTHER ORDERED that the Court's preliminary injunction prohibiting further construction of the Gross Dam (Doc. # 176) is VACATED. It is

FURTHER ORDERED that the Court's rulings (1) remanding with vacatur the U.S. Army Corps of Engineers' ROD, FEIS, and Section 404 Permit for the Moffat Collection System Project and (2) permanently enjoining enlargement of the Gross Reservoir remain in full force and effect for the reasons stated in the Court's April 3 Order (Doc. # 176). It is

FURTHER ORDERED that Denver Water's Motion to Exclude Expert Opinions Offered by Stephen Rigbey (Doc. # 203) is denied as moot.

DATED:  May 29, 2025

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge